FILED by _____ D.C.
ELECTRONIC

**Sep. 26, 2011**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

YOUNES KABBAJ, )
    individually and as "Next Friend" of )
OMAR ABDEL RAHMAN, )
    Plaintiffs )
V. )
BARAK H. OBAMA, GEORGE W. BUSH, )
    Presidents, United States of America; and, )
DEPARTMENT OF JUSTICE, )
DEPARTMENT OF STATE, )
CENTRAL INTELLIGENCE AGENCY, )
DEPARTMENT OF HOMELAND SECURITY, )
NEW YORK CITY POLICE DEPARTMENT, )
METROPOLITAN POLICE DEPARTMENT, )
SUNRISE POLICE DEPARTMENT, )
    all United States government entities; and, )
DONALD E. GONNEVILLE, VITO SPANO, )
ALBERTO R. GONZALES, KEN BRADLEY, )
GEORGE G. FREDERICK, NANCY FLOYD, )
WILFREDO MANLAPAZ, GLENN A. FINE, )
MICHAEL B. MUKASEY, JOHN ANTICEV, )
MARK J. KAPPELHOFF, LESLIE BROWN, )
JOSEPH I. LIEBERMAN, DONALD BAILY, )
CLAIRE S. KEDESHIAN, JANET W. RENO, )
EDWARD M. GABRIEL, PERRY CUOCCI, )
HILLARY R. CLINTON, JIMMY ARROYO, )
MATT LEATHERMAN, ERIC H. HOLDER, )
E. SCOTT MORVILLO, DAVID FORTEZA, )
ROBERT P. JACKSON, AMANDA CURET, )
WALTER M. NORKIN, RICHARD JAMES, )
MATTHEW KROGER, SHAMUS SKELLY, )
KELLY O'MAHONEY, JOHN HANNAH III, )
SAMUEL L. KAPLAN, MICHAEL FARISH, )
WILLIAM R. CLARK, MICHAEL REIGLE, )
JOHN D. ASHCROFT, THOMAS T. RILEY, )
LICHA M. NYIENDO, FRANK G. WISNER, )
MATTHEW FOSTER, ANTHONY SCALIA, )
DANIEL S. DORSKY, MELISSA MARRUS, )
DONALD B. EASUM, LANNY A. BREUER, )
PHILL WISE, JOHN DOES 1 to 100, inclusive, )
    in their individual and official capacities, )
    Defendants. )

**11-23492-CIV-SEITZ/SIMONTON**

1

## COMPLAINT AND JURY DEMAND

Plaintiffs Younes Kabbaj ("Plaintiff") and Omar Abdel Rahman ("Sheikh Rahman") hereby bring this Complaint against the above-named Defendants for their participation in a prolonged, expansive and unlawful conspiracy to violate basic civil rights by aiding, assisting and/or otherwise causing criminal conspiracies to be formed as a consequence of discriminatory law enforcement policies and the improper use of intelligence operatives as co-conspirators in criminal activity.  With the artificial increase in the terrorism threat resulting from these unlawful activities, the named Defendants have successfully provisioned a steady stream of terrorist attacks to continue unabated against innocent civilians in order to maintain political support for discriminatory domestic and foreign policies.

After first helping to establish the terrorism threat, named Defendants then engaged selective prosecution of terrorism cases based upon unlawful and discriminatory principles, and further obstructed the investigation of other specific cases whereby wrongdoing and complicity by named Defendants would be exposed.  Named Defendants additionally engaged a conspiracy to obstruct multiple homicide investigations in an effort to conceal their unlawful activities from the public.

The last known set of overt actions taken by named Defendants in furtherance of this unlawful conspiracy were committed by individuals located at FBI headquarters in Miami and elsewhere starting approximately March 8th, 2011 after Plaintiff travelled to that location to alert law enforcement officials regarding, among other things, the existence of an imminent terrorist threat affecting tourists and citizens located in Morocco, to wit, a plot by individuals located in

2

Morocco and elsewhere to bomb a specific tourist location in Marrakesh, Morocco in the following month of April, 2011.

After Plaintiff met with unidentified individuals at FBI headquarters on March 8th, 2011 to inform them about the imminent terrorist threat affecting Morocco, the location of Osama Bin Laden in Pakistan, and the identities of Islamic militants that have acquired anti-aircraft missiles and other relevant information, named Defendants then continued to further the unlawful conspiracy described herein by refusing to investigate this information, and then, upon information and belief, additionally obstructing Plaintiff's attempts to provide this information directly to foreign law enforcement in the days and weeks following the FBI's refusal to investigate.  This deliberate obstruction by the named Defendants resulted in the imminent terrorist threat affecting Morocco being allowed to come to fruition on April 28th, 2011, when an explosion ripped through a tourist café in Marrakesh, Morocco, resulting in 17 of the approximately 61 preventable deaths directly attributable to the unlawful conspiracy described herein.

When Plaintiff was rendered unable to prevent the Marrakesh bombing due to obstruction by the named Defendants, Plaintiff additionally began to take steps to provide the remainder of his information to alternate governments, including contacting the Embassy of Pakistan in an attempt to alert them that certain rogue elements of their intelligence and military services were holding Osama Bin Laden under "house arrest" in Abbottabad, Pakistan.

Named Defendants, through illegal surveillance of the Plaintiff, subsequently learned that Plaintiff was going to publish the location of Osama Bin Laden to the media and various foreign Embassies in response to their deliberate failure to prevent the Marrakesh bombing.  Named Defendants then rushed to immediately assassinate Bin Laden before the Plaintiff could

3

publically disclose Bin Laden's location approximately eight days later during a planned trip to Washington, D.C. on May 12th, 2011.

The unlawful conspiracy described in this complaint, covers a time period of approximately 15 years starting approximately 1996, with overt actions in furtherance of the conspiracy being committed by named Defendants at least every year since that date. Prior to the Marrakesh bombing, there were several preventable deaths that had occurred over an eleven year time period starting with the murder of Pedro A. Morales in Washington D.C. on December 24th, 1996, up until the murder of William Lewis in New York on March 29th, 2007. In addition to named Defendants failing to engage law enforcement responsibilities that would have prevented these deaths, named Defendants additionally obstructed numerous other unsolved homicide investigations in a continued attempt to conceal their unlawful activities.

In 2011, the number of preventable deaths attributable to this unlawful conspiracy increased by approximately 61 in the span of just three months between April 28th, 2011 and July 12, 2011, resulting in a final confirmation that it was impossible for Plaintiff to prevent named Defendants from deliberately allowing imminent terrorist attacks to proceed absent judicial intervention on this matter. As a result of the confirmed deaths in Marrakesh that are directly attributable to this prolonged conspiracy to obstruct the course of justice, Plaintiff was therefore left with no other choice but to consider all administrative and law enforcement remedies to have been fully exhausted without any possibility to prevent further misconduct and obstruction, thereby causing an immediate need for this Complaint to be filed due to the lethality of this conspiracy reaching a critical breaking point whereby it is now confirmed that named Defendants will not act to prevent additional terrorist plots that are known to the Plaintiff and still viable and pending against Americans located both inside and outside the United States, and

4

other innocent civilians around the world.  The preventable deaths attributable to the specific conspiracy described herein, is a reserved estimate that does not take into account the death toll from all Al-Qaeda attacks that took place during the course of this unlawful conspiracy, the most significant of which was the September 11th, 2001 attacks (the "911 attacks"), which Plaintiff is informed and believes was an attack that was completely preventable, yet deliberately allowed to occur.

There may be additional preventable deaths directly related to the actions of named Defendants that are still unknown to Plaintiff.  The preventable deaths that occurred in 2011 represent more than a ten-fold increase in deaths attributable to this conspiracy in just the time after Plaintiff met with unidentified individuals at FBI Headquarters in Miami on March 8th, 2011, the date when this criminal conspiracy should have been very quickly exposed and terminated.

Even after the Marrakesh bombing inadvertently triggered the alleged assassination of Osama Bin Laden and others in Pakistan on May 2nd, 2011, there were at least 40 additional preventable murders attributable to this conspiracy that have occurred since May 2nd, 2011, including the murder of Judah Johnson in Queens, New York on May 21st, 2011, the assassination of Ahmed Wali Karzai, the brother of the President of Afghanistan, Hamid Karzai, on July 12th, 2011 in Kandahar, Afghanistan, and the anti-aircraft missile attack upon a United States Special Forces Chinook Helicopter in Afghanistan on August 6th, 2011, killing 38.

Named Defendants either provided direct assistance, or otherwise deliberately allowed all these deaths to occur as part of a continued attempt to escape culpability for their unlawful actions.  Even after establishing Plaintiff to be a credible source of information on numerous occasions starting February 14th 1996, and after named Defendants essentially confirming that

5

Plaintiff did indeed have information relevant to preventing the Marrakesh attack, named Defendants have still refused to debrief the Plaintiff despite being apprised of these matters, and are refusing to accept information "on the record" in an attempt to continue to allow future attacks that are still viable and pending to proceed. As of the filing of this complaint, it appears to be a certainty that named Defendants will deliberately allow additional killings and terrorist attacks to occur as a matter of official government cover-up policy, thereby confirming that the only recourse left to Plaintiff to try and prevent such attacks is the filing of this complaint in the hope that a judicial body can intervene and prevent named Defendants from continuing to endanger the lives of numerous innocent civilians around the world.

## PARTIES

1.   Younes Kabbaj is a natural-born U.S. citizen of Moroccan, Tunisian and Spanish (Sephardic) descent, born in Manhattan, New York City. Plaintiff is a graduate of Queens College, C.U.N.Y., with a Bachelors degree in Psychology and Media Studies.

2.   Omar Abdel Rahman is an Egyptian citizen, born in Egypt in 1938. Sheikh Rahman is a well known political and spiritual figure in Egypt, and the spiritual leader of a militant Islamic movement that eventually evolved into the Al-Qaeda organization, headed by Osama Bin Laden. Sheikh Rahman is currently imprisoned in the Federal Medical Center at Butner, North Carolina. Sheikh Rahman is unable to file this Complaint on his own behalf, and is otherwise unable to facilitate any claim or litigation due to physical incapacity, lack of access to an attorney, the courts and/or other similar disability.

3.   Barak H. Obama is a natural-born U.S. citizen of Kenyan, English and German descent, born in Hawaii. Defendant Obama is a graduate of Harvard Law School, and the current President of the United States of America since 2009.

6

4. George W. Bush served as President of the United States from 2001 to 2009.

5. Department of Justice ("DOJ") is the United States federal executive department responsible for the enforcement of the law and administration of justice, equivalent to the justice or interior ministries of other countries. Divisions within the DOJ that are relevant to this complaint are the Federal Bureau of Investigation ("FBI"), the Drug Enforcement Administration ("DEA"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Bureau of Prisons ("BOP"), the Criminal Division ("Criminal Division"), the Civil Rights Division ("CRD"), the United States Attorney's Office ("US Attorney's Office" or "USAO") of the Southern District of New York ("SDNY"), the US Attorney's Office of the Eastern District of New York ("EDNY"), the United States Probation Department ("US Probation Department") for the Eastern District of New York, and the United States Probation Department for the Southern District of New York. The DOJ's headquarters is located at 950 Pennsylvania Avenue, N.W., Washington, DC 20530.

6. Department of State ("DOS") is the United States federal executive department responsible for international relations of the United States, equivalent to the foreign ministries of other countries. Divisions within the DOS that are relevant to this complaint are the Bureau of Diplomatic Security ("DS"), the United States Embassy in Rabat, Morocco ("US Embassy in Rabat"), and the Rewards for Justice Program ("RFJ"). The DOS's headquarters is located at 2201 C Street NW, Washington, DC 20520.

7. Department of Homeland Security ("DHS") is a cabinet department of the United States federal government, created in response to the September 11th, 2001 terrorist attacks ("911 attacks"), and with the primary responsibilities of protecting the territory of the Unites States and protectorates from and responding to terrorist attacks, man-made accidents, and natural disasters.

The United States Secret Service ("US Secret Service") is a Division within the DHS that is relevant to this complaint. The DHS's headquarters is located at 245 Murray Lane SW, Washington, DC 20528.

8. Central Intelligence Agency ("CIA") is a civilian intelligence agency within the Federal Executive Branch of the United States government. The CIA is responsible for providing national security intelligence assessment to senior United States policymakers, and also engages in covert activities at the request of the President of the United States. The CIA's headquarters is located in McLean (also known as Langley), Virginia 22101. The Office of General Counsel at the CIA is designated to receive process on behalf of the agency. The physical address of the headquarters is not listed.

9. New York City Police Department ("NYPD") is a law-enforcement agency administered under New York City Administrative Code, Title 14. The NYPD's headquarters is located at 1 Police Plaza, New York, NY 10038.

10. Metropolitan Police Department ("MPD") is the primary law enforcement agency for the District of Columbia. The MPD's headquarters is located at 300 Indiana Avenue, NW Washington, DC 20001.

11. Sunrise Police Department ("Sunrise PD") is a law enforcement agency of the City of Sunrise, a municipal corporation under its present name, "City of Sunrise," organized and operating pursuant to its Charter and the laws of the State of Florida. The Sunrise PD's headquarters is located at 10440 West Oakland Park Boulevard, Sunrise, Florida 33351.

12. Eric H. Holder, Jr. is the current United States Attorney General and head of the DOJ from 2009 until present.

13. Janet W. Reno served as the United States Attorney General from 1993 to 2001.

8

14. John D. Ashcroft served as the United States Attorney General from 2001 to 2005.

15. Alberto R. Gonzales served as the United States Attorney General from 2005 to 2007.

16. Michael B. Mukasey served as the United States Attorney General from 2007 to 2009. Defendant Mukasey is also the former Chief Judge of the United States Southern District of New York that prosecuted Sheikh Rahman, a blind Egyptian Islamic cleric convicted in the case titled "USA v. Rahman," ("Rahman Conspiracy"), case number 1:93-cr-00181-MBM-12 (SDNY 1993). Defendant Mukasey is not being sued for his role as Judge presiding over the prosecution of the Rahman Conspiracy, but for his role as United States Attorney General from 2007 to 2009.

17. William R. Clark ("Ramsey Clark") served as the United States Attorney General from 1967 to 1969. Defendant Clark is also a defense attorney assigned to represent Sheikh Rahman.

18. Lanny A. Breuer is the Assistant United States Attorney General for the Criminal Division, a component of the DOJ.

19. Glenn A. Fine served as Inspector General of the DOJ from 2000 until 2011. The Office of the Inspector General (OIG) conducts independent investigations, audits, inspections, and special reviews of United States Department of Justice personnel and programs.

20. Mark J. Kappelhoff is the Chief of the Criminal Section of the Civil Rights Division of the DOJ. Mr. Kappelhoff supervises and manages DOJ attorneys involved in the investigation and prosecution of federal criminal civil rights violations, including law enforcement misconduct.

21. Daniel S. Dorsky, at all times relevant herein, is an Assistant United States Attorney ("AUSA" or "Federal Prosecutor") from the Eastern Districts of New York, who prosecuted the Plaintiff as a defendant in a DEA investigation that took place in 1996, originating out of Peshawar, Pakistan and titled "USA v. Ghazi," ("Ghazi Conspiracy") case number 1:96-cr-00205-ERK-1 (EDNY 1996).

22. E. Scott Morvillo, Melissa Marrus, Licha M. Nyiendo, Walter M. Norkin, Claire S. Kedeshian are all Federal Prosecutors assigned to prosecute the case of "USA v. Mendez et al," ("Mendez Conspiracy") case number 1:07-cr-00107-ARR-1 (EDNY 2007).

23. Leslie Brown, at all times relevant herein, is the Federal Prosecutors assigned to prosecute a murder suspect named Abid Chaudhry, principle in the case of "USA v. Chaudhry et al," ("Chaudhry Conspiracy") case number 1:00-cr-01184-JSR-1 (EDNY 2001).

24. Special Agent ("S/A") Perry Cuocci, S/A Kelly O. Mahoney, S/A Michael Reigle, S/A Matthew Foster, S/A John Anticev and S/A Nancy Floyd are DOJ employees assigned to the FBI.

25. S/A John Hannah III, S/A Jimmy Arroyo, S/A Donald Baily and S/A Ken Bradley are DOJ employees assigned to the DEA.

26. Richard James, at all times relevant herein, is a United States Probation Officer ("Probation Officer" or "USPO") with the United States Probation Office for the Eastern District of New York.

27. Phill Wise, at all times relevant herein, was Warden of the Federal Medical Center, Rochester ("FMC Rochester"), a United States Federal Bureau of Prisons facility located in southeast Minnesota that is considered a maximum security facility.

28. Hillary R. Clinton is the United States Secretary of State, and the head of the DOS.

10

29. Samuel L. Kaplan is a DOS employee and the current United States Ambassador to Morocco.

30. Thomas T. Riley, at all times relevant herein, was the United States Ambassador to Morocco.

31. Edward M. Gabriel is a former United States Ambassador to Morocco, and upon information or belief, is currently a foreign agent acting on behalf of the Government of the Kingdom of Morocco.

32. Frank G. Wisner is a former United States Ambassador to Egypt and upon information or belief, is still actively assisting the CIA with confidential operations in the Middle East, including assisting the United States government to engage the arrest of the President of Egypt, Hosni Mubarak, after Defendant Wisner went to Egypt to facilitate President Mubarak's demise in February of 2011.

33. Donald B. Easum is a former United States Ambassador to Nigeria.

34. Robert P. Jackson is a DOS employee and United States Ambassador to the Republic of Cameroon, and former Deputy Chief of Mission for the US Embassy in Rabat, Morocco.

35. Donald E. Gonneville and George G. Frederick, at all times relevant herein, are Senior Regional Security Officers at the US Embassy in Rabat, Morocco.

36. Joseph I. Lieberman is a United States Senator for the State of Connecticut, and Chairman of the Senate Committee on Homeland Security and Governmental Affairs ("HSGAC"). HSGAC holds hearings to investigate, among other things, lapses in communications and intelligence sharing between agencies tasked with preventing terrorism. The address for the Committee is 605 Hart Senate Office Building, Washington DC 20510.

11

37.  Matt Leatherman, at all times relevant herein, is a member of the HSGAC Committee's staff.

38.  S/A Shamus Skelly is a DHS employee assigned to the Secret Service.

39.  Anthony Scalia, all times relevant herein, is law enforcement officer assigned to the NYPD's Cold Case Squad.

40.  Vito Spano is the former Commanding Officer of the NYPD's Cold Case Squad, and currently employed as Chief Investigator at the Office of the New York State Attorney General.

41.  Michael Farrish and Wilfredo Manlapaz are Captains assigned to the MPD. Defendant Farrish is the commander of the Homicide Branch, and Defendant Manlapaz is the commander of the Intelligence Branch.

42.  Matthew Kroger, David Forteza and Amanda Curet are law enforcement officers employed with the Sunrise PD.

43.  The true identities of Defendants DOES 1 to 100, inclusive, are presently unknown, therefore said Defendants are sued herein pursuant to the Federal Rules of Civil Procedure as fictitious persons.  Plaintiff is informed and believes that DOES 1 to 100, inclusive, are agents and/or assigns of each other and the named Defendants, and each of them, and have committed such wrongful acts and/or conspired to commit such wrongful acts and are directly and vicariously liable for such acts which caused damages to Plaintiff as alleged in this Complaint. After ascertaining the true identity of a fictitiously named Defendant sued herein as 'John Doe,' Plaintiff will amend this Complaint accordingly.

44.  John Does 1 and 2 are unidentified prison guards that were employed at the U.S. Medical Center for Federal Prisoners ("MCFP") in Springfield, Missouri, both of whom participated in an unlawful conspiracy to subject Sheikh Rahman to physical abuse while he was

12

an inmate at the prison. John Does 1 and 2 are identified in a letter authored by Sheikh Rahman describing the abuse (see attached Exhibit 1).

45. John Does 3 and 4 are unidentified prison guards at that were employed at FMC Rochester between January and May of 1998. John Doe 3 is a prison guard that assaulted Sheikh Rahman during a religious service at FMC Rochester in early 1998, such assault having been witnessed by Plaintiff and numerous other individuals, as well as having been recorded by prison officials on video tape via a camcorder set up to record the service. John Doe 4 is a prison guard that assaulted Sheikh Rahman during a subsequent incident witnessed by Plaintiff and others.

46. John Doe 5 is an unidentified prison guard employed at FMC Rochester that assaulted Sheikh Rahman approximately August 8th, 1999, and is described in media reports of the incident, as a "lieutenant" at the facility.

47. John Doe 6 is an unidentified U.S. Government employee (of Asian descent) that accompanied S/A Jimmy Arroyo during an interview with the Plaintiff at DEA headquarters in New York immediately following the September 11th, 2001 terrorist attacks.

48. John Does 7 and 8 are unidentified U.S. Government employees that interviewed Plaintiff in October of 2001, where they subsequently accused Plaintiff of involvement with participation in a well known terrorism conspiracy dubbed the "Anthrax attacks," as well as accusing Plaintiff of mailing an Anthrax hoax letter to FMC Rochester.

49. John Doe 9 is an unidentified U.S. Government employee that accompanied S/A Perry Cuocci during an interview with the Plaintiff, conducted at a FBI Field Office in Long Island, New York in 2003 regarding the Anthrax attacks.

50. John Doe 10 is an unidentified U.S. Government employee that accompanied S/A Shamus Skelly when he went to Plaintiff's job in December of 2004 to interview the Plaintiff

about the "anonymous" terrorism tip received from a Florida resident by the name of Marjorie E. Malone, who admitted to causing this false tip to be sent through a proxy to the DHS alleging Plaintiff was involved in activity related to terrorism.

51.  John Doe 11 is an alleged Central Intelligence Agency employee who claimed his name was "Richard" when he visited the Plaintiff at his job in 2005, causing Plaintiff to file a complaint with Defendant Skelly at the same FBI headquarters in Miami where Plaintiff went to report the imminent Marrakesh bombing on March 8th, 2011.

52.  John Does 12 and 13 are unidentified government employees that accompanied Defendant Skelly during an interview with the Plaintiff at FBI Headquarters in Miami in 2005 when Plaintiff went there to file a complaint against John Doe 11.

53.  John Doe 14 is a male individual named "David," who called the Plaintiff on his cell phone on January 22nd, 2010, at 2:05pm (Casablanca, Morocco GMT), from a phone number originating within the United States Embassy in Rabat.  David claimed to be a "legal attaché" at the US Embassy that was investigating an email Plaintiff sent to a Syrian Ambassador, which was apparently intercepted through unlawful surveillance engaged by named Defendants.

54.  John Does 15 and 16 are two unidentified individuals that interviewed Plaintiff at FBI headquarters in Miami on March 8th, 2011 before denying him access to speak to an FBI agent and directing him to retain an attorney if he wished to speak to an agent.

55.  John Does 17 and 18 are two unidentified Secret Service Special Agents that interviewed Plaintiff on July 1st, 2011 in an attempt to intimidate the Plaintiff and obstruct his efforts to disrupt the unlawful conspiracy described herein.

14

## JURISDICTION

xx.  The purpose of this action is to redress and restrain acts or practices by Defendants that federal law deems unlawful.

xx.  The Court has original jurisdiction over the subject matter of these claims pursuant to 5 U.S.C. §§702-706, 28 U.S.C. §§1331, 1343, 42 U.S.C. §§1981, 1983, 1985, 1986, 1988, under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and the First, Fourth, Fifth, Eight and Fourteenth Amendments to the United States Constitution.

xx.  Venue for this action properly lies in the Southern District of Florida pursuant to 28 U.S.C. §§1391(b).

## NATURE OF THIS ACTION

xx.  This is a case in which Defendants, individually and together, conspired and acted in concert and did violate the constitutional rights of the Plaintiff , Sheikh Rahman and all citizens of America and the world, by denying equal protection of the law and due process required under the Constitution of the United States in failing to investigate and prosecute, and hindering or obstructing the investigation and prosecution of criminal and related terrorism cases based upon discriminatory and other unlawful motivations.

xx.  Defendants additionally conspired to deny Plaintiff, Sheikh Rahman and all law-abiding citizens of America and the world, the right to be free from religious persecution, unlawful search and seizure, deprivation of liberty and property, and cruel and unusual punishments.  Named Defendants also unlawfully denied Plaintiff, Sheikh Rahman and others, access to legal procedures and services that would have the immediate effect of reducing or diminishing the threat of terrorism and other unlawful consequences of the conspiracy described herein.

15

*Sheikh Rahman*

xx. Named Defendants deliberately violated the right of Sheikh Rahman, a foreign national currently incarcerated in the United States, to be free of cruel and unusual punishment by causing Sheikh Rahman to be issued a visa to travel to America, despite the fact that Sheikh Rahman was already on a DOS terrorist watch list that specifically banned him from entering the United States. When and individual is placed on such a watch list, the assumption is that it is completely necessary to prevent such individual from entering the United States because failure to do so will invariable increase the threat of harm to the lives of American citizens. Sheikh Rahman was then deliberately and unlawfully issued a visa to enter the United States, either directly or through the covert actions of the CIA, despite his already having been designated a threat to the lives of Americans by the DOS and subsequently banned entry into the United States.

xx. Plaintiff is informed and believes that named Defendants specifically instructed Sheikh Rahman to travel to Khartoum, Sudan, where he was then instructed to file an application for entry into the United States, which named Defendants already knew they were going to wrongfully approve despite already being informed that Sheikh Rahman was a security threat due to his commitment to the destruction of Israel, and Israel's subsequent commitment to the destruction of Sheikh Rahman in retaliation for his aggressive rhetoric. Named Defendants thereby caused America to become the battlefield for this ideological military dispute, and in doing so, caused the deaths of numerous Americans and other citizens of the world who were unfortunate enough to be caught in the crossfire.

xx. In what the CIA claims was a simple "clerical" error, Sheikh Rahman was in fact deliberately and unlawfully lured to the United States for purposes of prosecution. Even after

16

Sheikh Rahman arrived in the United States to be greeted with great fanfare and much media attention, the CIA did nothing to resolve the clerical error that allowed an ideological nuclear weapon, in the form of a human being, to be "smuggled" into America.

xx.  Shortly after his arrival in America, Sheikh Rahman was eventually implicated in having associated with individuals that committed the assassination of a Jewish Rabbi and the first World Trade Center bombing in 1993, crimes for which he was never charged as there was not sufficient evidence to establish his direct participation in those plots.  Named Defendants were clearly put on notice and still did nothing to revoke Sheikh Rahman's visa based upon the fact that it was not issued in accordance with the law, despite both the assassination of a Jewish Rabbi and the subsequent bombing of the World Trade Center having been directly linked to individuals with whom he associated.

xx.  Named Defendants then engaged an aggressive investigation directed at Sheikh Rahman immediately following the 1993 World Trade Center bombing in an attempt to provide cover for the "clerical error" made by unidentified individuals located at the United States Embassy in Khartoum, Sudan, such individuals believed to be in the employ of the CIA.  Named Defendants then secured a conviction against Sheikh Rahman for his alleged participation in a subsequent terrorism conspiracy to bomb bridges and tunnels in New York City that occurred sometime after the 1993 terrorist attack upon the World Trade Center.  Named Defendants exacerbated the situation with Sheikh Rahman beyond bounds by aiding, abetting, directing and then causing his arrest on terrorism charges, rather than simply arresting him on clear immigration violations from the start, especially since the immigration violations would have accomplished the same effect of neutralizing the "clerical error" made by the CIA in a much less provocative fashion.

xx.  Instead of simply incarcerating Sheikh Rahman for making the mistake of accepting an unlawfully issued visa to travel to the United States, named Defendants then conspired to allow Shiekh Rahman to become embroiled in a subsequent terrorism conspiracy being plotted against New York instead of revoking his visa immediately following the World Trade Center bombing in 1993, despite his already being implicated as an associate of individuals that committed bombing and the previous assassination of a Jewish religious leader in New York. Named Defendants continued to permit Sheikh Rahman to do exactly what they knew he would do if allowed to immigrate to America, which was to skirt the line between advocating for violence and issuing direct orders to engage in violence, such behavior being likely to result in possible exposure to a potential criminal indictment regardless of whether Sheikh Rahman was actually or technically innocent of the charges.

With the stage set for disaster, all it would take for named Defendants to create a catastrophe is a properly placed FBI informant that could engage Sheikh Rahman, with a particular eye towards trying to draw him into actual or perceived complicity with a terrorism plot, in order to unlawfully effectuate his arrest on terrorism charges instead of the actual charges applicable to his situation, which was immigration fraud.  This is exactly what happened after named Defendants recruited the services of an Egyptian double-agent named Ahmed Salem to "guide" the 1993 bombing of the World Trade Center with the intention of "preventing" the bombing from being completed, while at the same time engaging in misconduct that ensured the bombing would be allowed to proceed.  Mr. Salem was then paid over a million dollars for his cooperation after essentially blackmailing the FBI with secretly recorded tapes of conversations with his FBI handlers, such tapes providing confirmation that the FBI knew about the 1993

18

bombing plot before it was actually allowed to come to fruition, yet deliberately failed to prevent it.

xx. By directing, targeting, assisting and eventually allowing Sheikh Rahman to "put himself in jail," named Defendants hoped to avoid being blamed for imposing an incarceration upon him that was clearly imminent from the very moment the clerical error to issue him a visa had occurred, whether such incarceration be due to a visa fraud or terrorism, whereby they eventually opted to engage a terrorism prosecution. The moment that named Defendants realized Sheikh Rahman was allowed to enter the United States in error, the only proper and lawful course of action, although clearly undesirable, is to then detain Sheikh Rahman pending repatriation elsewhere, which would have been far less lethal an outcome than the eventual course of actions engaged by named Defendants which eventually contributed to, or directly caused the 911 attacks and the subsequent deaths of hundreds of thousands of people around the world, with the threat of millions or billions of deaths looming on the horizon if this unlawful conspiracy is not disrupted immediately.

xx. After securing a life sentence against Sheikh Rahman via a targeted terrorism conviction, named Defendants then subjected Sheikh Rahman to perhaps one of the most prolonged campaigns of complete isolation ever visited upon an inmate of even the most lethal stature, notwithstanding the fact that Sheikh Rahman is completely blind, elderly and in frail health due to complications from diabetes. Named Defendants engaged an unlawful attempt to deny Sheikh Rahman the ability to participate in his own continued legal defense by designating him a "security threat" to the United States for a second time since they first placed him on the terrorist watch list, and then used that designation to incarcerate him in complete isolation and under the most restrictive conditions imaginable, despite the fact that such a designation did not

19

previously prevent him from obtaining a visa and travelling to the United States. Named Defendants then exerted unlawful control upon Sheikh Rahman's Defense attorneys in order to defeat any possibility that Sheikh Rahman could obtain legal relief for his condition.

xx. Even after imposing a life sentence against Sheikh Rahman, to be served in solitary confinement, named Defendants continued to deprive Sheikh Rahman of his right to be free against cruel and unusual punishments by periodically engaging in direct physical assaults of Sheikh Rahman during his incarceration so as to attempt to continue to influence and provoke him to release political opinions supportive of violence out of revenge for the abuse, rather than allowing him to explore non-violent rhetoric more in tune with and in accordance with established principles of peaceful and democratic resolution to conflict.

xx. Upon Plaintiff becoming incarcerated with Sheikh Rahman at one of the facilities where he was being held, Plaintiff became a direct witness to the abuse of Sheikh Rahman in 1998. Plaintiff and others reported this abuse directly to Defendant Phill Wise, the Warden of the prison, during a meeting that took place with the Muslim population immediately following the abuse, yet nothing was done to investigate or neutralize it. Instead, Sheikh Rahman was himself punished for the abuse by being subsequently denied the ability to participate in additional religious services, only because his participation in such services greatly increased the likelihood that his abuse would be witnessed by others.

xx. Named Defendants were already apprised of the abuse of Sheikh Rahman by prison guards starting approximately 1996, but did nothing to prevent it or investigate it, even after the assaults in 1998 were witnessed by numerous inmates, as well as at least one of the incidents having been videotaped. Even after Sheikh Rahman was treated by doctors for injuries sustained in yet another incident in 1999 at that same prison, the named Defendants only engaged a

20

cosmetic and superficial investigation of the abuse designed to ensure that a criminal prosecution against prison guards is never rendered viable, especially since they had already been apprised that there was a witness to previous abuse of the Sheikh that took place at the same facility just a year earlier. Due to the fact that Sheikh Rahman is blind, it is impossible for him to actually identify the individuals physically assaulting and abusing him. As a result of his handicap, named Defendants were then presented with a scenario whereby they could engage in assaults against Sheikh Rahman without fear of being discovered, even in situations where the abuse is obvious due to Sheikh Rahman having sustained visible signs of injuries, or the abuse having otherwise been captured on videotape.

xx. Due to Sheikh Rahman being blind, the only possibly way Sheikh Rahman could ever obtain a conviction against individuals that are abusing him, was if a witness came forth to report the abuse or the existence of video tapes of the abuse, as there must always be at least one other witness to the abuse that is not blind and who is not the actual perpetrator of the abuse in order to allow for the possibility that someone could be in a position to make a physical identification of the offender, as the offenders are not likely to admit to their conduct. Sheikh Rahman can only bear witness to being assaulted, but cannot bear witness to the physical description of the perpetrator since he cannot see him. Sheikh Rahman also would not be in the position to inform any law enforcement investigating his claims that actual recordings of the abuse exist, because he is blind and cannot see the recording devices to know that a recording of the abuse is being made at the very time the abuse is happening. Being blind makes it nearly impossible to assist in your own defense, and being kept in solitary confinement keeps other independent witnesses from being able to either confirm or deny the abuse.

xx.  Upon Plaintiff attempting to come forward as a witness to the abuse starting in 1999, named Defendants then obstructed any investigation that would allow Plaintiff the opportunity to physically identity the guards involved in the abuse, especially after being notified at that time that there were independent witnesses to the abuse, in addition to the video tapes.  Plaintiff would not have even been required to actually identify the guards, especially in light of the video tapes of the abuse, such tapes being available to them at any time for their review.  Regardless of the existence of this incontrovertible evidence, named Defendants then additionally obstructed every single possible criminal investigation, whether related to terrorism or not, where Plaintiff could establish himself to be a credible source of information, including numerous murder investigations to which Plaintiff was a direct witness.

xx.  The obstruction of the investigation into the abuse of Sheikh Rahman at FMC Rochester, along with other previous misconduct by Federal officials witnessed by Plaintiff starting approximately 1996, subsequently propelled the additional obstruction of numerous additional criminal and terrorism related cases for over a decade after Plaintiff attempted, in rather spectacular fashion, to provide information relevant to the 911 attacks shortly after they occurred.  This course of events that evolved from this ever-expanding unlawful conspiracy directly caused the continued obstruction of additional terrorist investigations that allowed the Marrakesh bombing to proceed unchallenged, when otherwise it would have normally been disrupted.  Named Defendants then continued the obstruction even after the Marrakesh bombing, thereby allowing the death toll to increase dramatically in just several months time since the Marrakesh bombings.

xx.  By circumventing and/or thereby obstructing the immediate effect that a proper law enforcement investigation would have upon preventing certain specific and imminent terrorist

22

threats from materializing, the named Defendants have also ensured that this litigation could not possibly proceed quick enough to restrain named Defendants from continuing their unlawful activities in order to prevent them the ability to allow additional terrorist attacks to proceed.

*Protection of Witnesses*

xx.  Named Defendants deliberately invoked a necessity for this complaint be filed, rather than allowing for the matter to be resolved confidentially and through the normal course of a proper law enforcement investigation.  By forcing Plaintiff to be left with no way to prevent terrorist plots he knows to be imminent from being allowed to come to fruition, named Defendants have forced Plaintiff to make disclosures of information that could potentially identify private sources of information, as well as forcing Plaintiff to disclose publically his previously secret attempts to cooperate with law enforcement.  By denying Plaintiff and others equal protection under the law, named Defendants have deliberately provoked the disclosure of confidential information that not only puts Plaintiff's safety in danger, but the safety of his family and various sources of information located in the United States, Canada, Mexico, Central and South America, Puerto Rico, Cuba, Dominican Republic, Trinidad, Jamaica, Morocco, Egypt, Spain, Italy, Greece, Germany, Britain, Russia, France, Pakistan, Bangladesh, Nigeria, China and Afghanistan and elsewhere.

xx.  By refusing to protect the Plaintiff, his family and his various sources of information, the named Defendants are applying the principles of witness protection in a discriminatory manner by deliberately subjecting the Plaintiff and his sources of information to potentially lethal consequences at the hands of corrupt domestic and foreign governmental agencies, organized crime entities and individuals of wide-ranging racial or religious backgrounds that may have a discriminatory or otherwise unlawful motive to engage obstruction of this litigation.

Named Defendants have thereby caused Plaintiff and others further damage by endangering his life and/or the lives of innocent, law-abiding citizens around the world.  Plaintiff is thereby requesting the court to file this complaint under seal, so as not to endanger the lives of Plaintiff's sources of information.

*Patriot Act*

xx.  Named Defendants also conducted an illegal surveillance campaign of the Plaintiff and other law-abiding citizens for over a decade immediately following the 911 attacks. Defendants additionally implemented the Patriot Act as a law enforcement tool they claimed would be utilized to prevent terrorism, and then used it to prevent the prevention of terrorism. Named Defendant utilized its provisions to obstruct the prevention of terrorism based upon discriminatory principles.  Due to the potential abuse inherent in the provisions of the Patriot Act, and as a result of named Defendants having abused its provisions by utilizing them to obstruct the prevention of terrorism, Plaintiff is requesting this court declare the Patriot Act unconstitutional.

xx.  Named Defendants are additionally utilizing Patriot Act provisions to illegally monitor attempts by non-violent Muslims to utilize peaceful and universally compatible dispute-resolution methodologies to adjudicate outstanding conflicts within their own populations, simply because such methodologies are far more successful than the methodology employed by named Defendants in utilizing discrimination and violence against entire populations of people as a form of collective punishment against all those that do not share their ideological beliefs.

xx.  Named Defendants deliberately sabotaged and obstructed Plaintiff's attempts to assist with the capture of Osama Bin Laden immediately following the September 11th, 2001 attacks because Plaintiff was utilizing, with great success, a proprietary methodology of lawful

24

and non-violent Islamic principles to acquire valuable, actionable intelligence, as well as other concessions from both militants and (what was later discovered to be) foreign security services, such information critical to the prevention of terrorism. These proprietary methods are clearly far more efficient and successful at preventing terrorism than the unlawful and discriminatory policies engaged by named Defendants. Named Defendants then continued to engage this unlawful obstruction against Plaintiff for another ten years following the 911 attacks by preventing him the ability to provide information to law enforcement, information that he risked his life to acquire for purposes of preventing terrorism.

xx. The Patriot act is also unconstitutional in that it vastly increases the potential for an unlawful invasion of privacy, with such activity being allowed to occur with virtually no oversight whatsoever, and such unlawful acts resulting in infringement upon the sacred constitutional rights of citizens. Named Defendants have utilized Patriot Act provisions against Plaintiff to continue to disguise as lawful, the illegal monitoring of the Plaintiff for purposes of obstructing his ability to prevent terrorist attacks, such behavior being completely contradictory to the alleged and intended purpose of the Patriot Act legislation.

xx. Plaintiff is requesting that this court provide declaratory and injunctive relief establishing the Patriot Act unlawful and unconstitutional due to the wide-ranging potential for the abuse of its provisions and the certainty that by giving government officials greater leverage to engage in the abrogation of constitutional protections that all Americans deem sacred, such flexibility would invariably increase abuses of the law rather than decrease them, whereby suppression of scandalous Patriot act abuses has been proven, by virtue of the conduct that gave rise to this complaint, to transcend the obligation by named Defendants to protect people from terrorism.

25

## *Withdrawal from Conspiracy*

xx.  State and Federal conspiracy laws make it unlawful for two or more people to conspire to commit a crime.  Once an individual agrees to participate in a criminal conspiracy, he becomes liable for all the actions of his coconspirators in furtherance of such a conspiracy.  The only remedy available to limit the liability of an individual that makes the unlawful decision to join a criminal conspiracy, is for that individual to either withdraw from the conspiratorial agreement prior to the commission of an overt act in furtherance of the conspiracy, or to establish withdrawal from the conspiracy after an overt act has already been committed so as to nullify criminal liability that might otherwise be applicable for additional overt actions committed by co-conspirators in furtherance of the conspiracy, such acts taking place after the date of the established withdrawal by such a participant.

xx.  According to all available case law that describe the procedure by which individuals can successfully establish their withdrawal from a conspiracy, the only indisputable and unequivocal method considered impervious to any legal assault or invalidation whatsoever, is to simply alert law enforcement authorities directly to the existence of such a conspiracy and the inner workings thereof, thereby establishing a "liability-termination timestamp" that would protect an individual from prosecution for any actions taken by co-conspirators in furtherance of such conspiracy starting the moment an individual has made the decision to withdraw from it by reporting it directly to the police.

xx.  Starting February 14, 1996 and continuing until at least July 1st, 2011, Plaintiff made numerous attempts to inform federal officials regarding the existence of numerous criminal conspiracies Plaintiff had penetrated during the time period spanning approximately 1991 to 1996, so as to establish undeniable and categorical non-conformance with such conspiracies by

26

informing upon their existence in an attempt to repudiate them.  Defendants refused to allow Plaintiff the ability to inform upon numerous criminal conspiracies starting approximately February of 1996 and continuing until today, thereby allowing such unlawful conspiracies to continue for years after they should have first been disrupted, invariably causing incalculable harm by deliberately allowing the subsequent distribution of tons of cocaine and heroin, which additionally led to the commission of homicides by certain individuals in furtherance of these various criminal conspiracies.  Named Defendants additionally allowed these offenders the ability to continue to provide direct material support to terrorism in the form of financing through the reinvestment of drug proceeds.

xx.  Unlawful actions committed by named Defendants additionally violated Plaintiff's right and the rights of others to equal protections under the law, as well as rendering the concept of the conspiracy law unconstitutional due to the discretion that law enforcement can exercise to deliberately and unlawfully deny individuals the ability to definitely and unequivocally establish their nonconformance with, or withdrawal from, a criminal conspiracy after having become intentionally or unwittingly associated with its participants, or after having actually participated in the conspiracy.  Named Defendants denied Plaintiff the right to inform upon criminal activity he witnessed for 15 years, and in doing so they engaged a loophole in the conspiracy law that allowed them to retain sole discretion on whether Plaintiff could even establish his non-conformance with, or withdrawal from, a criminal conspiracy prior to such time when the named Defendants could engage an unlawful or time-barred prosecution of the Plaintiff in an attempt to retaliate against him for having become a witness to their crimes.

xx.  By denying Plaintiff the right to "confess," in person and directly to a law enforcement, to having associated with members of a criminal conspiracy (even if such

27

confessions do not pass the threshold of invoking criminal liability), the named Defendants hope to keep viable the "legal" ability to indict Plaintiff for actual or perceived criminal liability for conspiracies that may have continued to operate for years after Plaintiff had already attempted to establish his irrefutable withdrawal and repudiation of such conspiracies. By engaging this loophole, named Defendants conspired to negate the appropriate statute of limitations applicable to any previous conduct by Plaintiff that may or may not have constituted criminal liability according to the conspiracy statute as it stands today, and as such, deliberately subjected the Plaintiff to prolonged emotional anguish over the fact that he was specifically being denied the ability to withdraw from conspiracies according to the manner prescribed by law in what was proven to be an attempt by named Defendants to keep viable the threat of an unlawful prosecution of Plaintiff, in the hopes that they may deter Plaintiff from his continued attempts to expose the unlawful actions of named Defendants.

xx.  Plaintiff is requesting declaratory and injunctive relief establishing the conspiracy law unconstitutional absent a clear definition of the statute that articulates an unassailable legal mechanism by which an individual can exercise his right to report criminal activity in a confidential setting whereby the information is documented and time-stamped, a copy of such information immediately available to an individual for whatever legal purpose necessary. Generally, when an individual reports a crime to State law enforcement authorities, he is entitled to a "police report" of the information provided, which can then be utilized for legal purposes as an official report of the information provided and the manner in which it was provided. Such a police report could also establish an individual's non-conformance with, or withdrawal from, a potential criminal conspiracy, especially in the case where an individual discovers law enforcement misconduct that could suggest an imminent and unlawful conspiracy to subject the

28

individual to a malicious prosecution. With regards to Federal jurisdiction, there is no equivalent "police report" that can be obtained by an individual once he submits information to any Federal law enforcement entity, and as a result, there is no mechanism by which to obtain legal documentation that can be utilized as protection to prevent unlawful conduct by Federal officials.

xx. For ten years since the 911 attacks, Plaintiff was denied the ability to obtain a "police report" from Federal law enforcement entities regarding information and evidence he provided them over the course of nearly 15 years while continuously attempting to fulfill the "withdrawal from conspiracy" requirements articulated in the conspiracy case law, which he only became familiar with after being arrested on a Federal conspiracy charge in February of 1996.

xx. In one instance, it took Plaintiff eight years to discover that named Defendants were denying having received evidence and information previously provided, when for the entire duration of those eight years Plaintiff had repeatedly attempted to obtain status updates of the evidence and information provided without any response or even the slightest indication that named Defendants were preparing to claim something as outlandish as having never received such information and evidence to begin with, despite the fact that this evidence and information is the subject of hundreds of pages of emails between Plaintiff and named Defendants that went unanswered for almost a decade.

xx. Since there is currently no legal requirement that Federal authorities provide Plaintiff with a "police report" documenting interactions between Plaintiff and various named Defendants, Plaintiff has been denied proper relief from the unlawful activities of named Defendants through the unconstitutional implementation of a Federal conspiracy law that invokes expansive legal liability upon individuals without any established methodology by

29

which to limit such expansive liability from being abused by federal law enforcement for unlawful or discriminatory purposes.

*Privacy Act*

xx. As a result of the refusal of named Defendants to acknowledge having received information from the Plaintiff, and in light of Plaintiff becoming aware that the Marrakesh bombing was imminent and thereby requiring affirmative action by the Plaintiff if it was to be prevented, Plaintiff proceeded to file Privacy Act requests with all Federal agencies named in this complaint approximately February of 2011 in order to try and determine, if possible, the exact source of the obstruction being engaged by named Defendants. It is now September and Federal agencies have still not complied with these requests in a continued attempt to obstruct Plaintiff's ability to determine the source, or sources, of this obstruction. Plaintiff is asserting named Defendants have failed to comply with the provisions of the Privacy Act, and is requesting this court to intervene to enforce Plaintiff's rights.

xx. The DEA and DOS have refused to respond to the Privacy Act requests filed by Plaintiff in their entirety, not even to deny the requests, despite acknowledging having received the request. The CIA, DOJ and DHS deny existence of any records, and are therefore refusing to provide records related to events where Plaintiff himself submitted complaints to them openly and publically and for the exact purpose of having those complaints memorialized and documented in a manner that he could later retrieve, especially in the event that such complaints may be found to be relevant at some later point in time. Plaintiff has confirmed that named Defendants have unlawfully set up an elaborate system of receiving information and terrorism tips from the public that essentially preserves their right to be able to deny having received information, especially if it is too provocative and likely to expose their unlawful activities.

30

xx.  Named Defendants, by refusing to comply with provisions of the Privacy Act, are thereby attempting to assert that records which they have in their possession, which were only generated after Plaintiff first initiated communication with them to provide information, are not records that are retrievable via the Privacy Act or any other legal process, thereby preventing Plaintiff access to proof that such communications actually existed, and proof regarding the nature of the information conveyed by Plaintiff to various Federal authorities.  Essentially, named Defendants are attempting to assert that once a person submits information to them regarding the specific topic of terrorism or any other topic they deem provocative, a "police report" corroborating the receipt of such information will not be provided if requested, nor could it even be obtained through lengthy and costly litigation of the Privacy Act, not even by the very person that provided the information to begin with.

*Rewards for Justice*

xx.  The United States government established a "Rewards for Justice" program through the 1984 Act to Combat International Terrorism, Public Law 98-533.  This Program is administered by the U.S. Department of State's Bureau of Diplomatic Security, and offers a reward of up to $25,000,000 for information that leads to the arrest or conviction of anyone who plans, commits, or attempts international terrorist acts against U.S. persons or property, that prevents such acts from occurring in the first place, that leads to the location of a key terrorist leader, or that disrupts terrorism financing.

xx.  The Secretary of State is authorized to pay a reward greater than $25 million if he/she determines that a greater amount is necessary to combat terrorism or to defend the United States against terrorist acts.  By refusing to prevent the Marrakesh bombing and assassinating Osama Bin Laden prior to Plaintiff securing his capture on May 12th, 2011, named Defendants

31

caused an additional consequence of attempting to deny, or otherwise deprive Plaintiff of access to reward money that he was otherwise eligible to collect. Plaintiff is informed and believes that rewards being offered for the arrest of certain individuals, including Osama Bin Laden, were fictitious awards and that named Defendants never intended to arrest these suspects. Additionally, Plaintiff asserts that these rewards were being offered in an attempt to identify anyone offering tips meant to secure the arrest of high-level terrorism suspects for the express purpose of ensuring that such suspects are only assassinated and not captured alive, due to the fact that these suspects (if captured alive) will provide evidence and testimony to corroborate wrongdoing by named Defendants described in this complaint.

## FACTUAL ALLEGATIONS

*Background*

xx. Plaintiff's father was an Islamic religious leader in New York City and the partner of another well-known Islamic religious leader by the name of Sheikh Daoud Ahmed Faisal ("Sheikh Daoud"). Sheikh Daoud founded the first official Mosque to be opened in New York City, known as the "State Street Mosque" in Brooklyn, New York, which was established in the 1940's. Sheikh Daoud spent the following decades preaching a peaceful interpretation of Islamic doctrines that forsake all forms of violence (Exhibit 2).

xx. During the years prior to the 1993 World Trade Center bombing in New York, which was the first time Islamic militants targeted the World Trade Center for a terrorist attack, Plaintiff's father met and associated with Sheikh Rahman. During their associations, Sheikh Rahman requested permission from Plaintiff's father to preach his fiery sermons at the State Street Mosque, but Plaintiff's father declined the request for fear that Sheikh Rahman may spark

tensions with his abrasive rhetoric, which Plaintiff's father believed to be counterproductive and not in strict accordance with proper and peaceful interpretation of Islamic doctrines.

xx.  Despite this conflict in ideologies, Plaintiff's father maintained cordial relations with Sheikh Rahman despite being ideologically opposed to his rhetoric, based upon the fact that the CIA openly gave safe haven to Sheikh Rahman in America by issuing him a visa to come to the United States, a fact known to the entire Muslim community all around the world but not much known to the general public in America at that time or at any time since.  Plaintiff's father and many other Muslims in America, had trusted that the CIA was acting in the best interests of America (rather than Egypt) in endorsing Sheikh Rahman's activities and allowing him to immigrate to America in what all Muslims were led to believe was an attempt by the United States government to recruit Sheikh Rahman into assisting with the dismantling of the tyrannical Egyptian regime that had been committing horrible atrocities against its citizens for decades.

xx.  While most people generally knew that Sheikh Rahman approved of using violence to retaliate against violent oppression of Arabs by these despotic regimes in the Middle East and their various support networks, the CIA endorsement of Sheikh Rahman by allowing him to continue to reside in America and express these very opinions ran counter to the impression that he was a threat to Americans, although the American government already knew otherwise (Exhibit 3).  The common assumption was that Sheikh Rahman was only a threat to the fanatic, despotic regime of Hosni Mubarak, former President of Egypt, who has since been deposed in February of 2011 after Mr. Mubarak ordered the murder of thousands of innocent, unarmed protestors for protesting against his tyrannical control of the country.

xx.  At approximately the same time period when Plaintiff's father had begun to associate with Sheikh Rahman in the years before the first 1993 World Trade Center bombing, the

Plaintiff, at approximately 13 years of age, had himself inadvertently embarked upon a twenty-year long "detour" after joining "Post 9910," a Federal Law Enforcement Explorer Program ("Explorer Program") comprised of children 13-18 years old and chartered to the Drug Enforcement Administration's New York Headquarters at 99 Tenth Ave in Manhattan, New York (Exhibit 4). This program was originally implemented to allow children the ability to explore a possible career with the DEA upon successful graduation from college. Plaintiff was never asked to obtain permission from his parents before enrolling in this program, and Plaintiff's parents did not know that they could veto his involvement with the program by simply asking the DEA not to allow the Plaintiff to participate.

xx.  The Explorer Program was administered by Special Agent in Charge ("SAC") of the DEA in New York at that time, Carlo Boccia, as well as the second in command in the DEA, Assistant Special Agent in Charge ("ASAC") Ken McCreary. Other Special Agents that administered the program were Bob Busky (the DEA's head recruiter in New York), Jim Mokwa and Debbie Gibson (both of which were also decorated and accomplished Special Agents from that New York Field Division of the DEA), and Defendant John Hannah III (who also assisted with providing security to Diplomats and UN Officials, as well as being a member of the Air Marshals Program).

xx.  While participating in this program, Plaintiff was eventually subjected to unlawful behavior by the supervising Special Agents, behavior that was clearly and unequivocally inappropriate for children. For example, Plaintiff and numerous other Explorers were taken to Camp Smith, a military camp located in upstate New York, and trained in the use of semi-automatic handguns, fully automatic machine guns and even a vehicle-mounted .50 Caliber fully automatic machinegun. This firearms training, conducted with live ammunition, also occurred

34

periodically using the Explorer Agents' semi-automatic service pistols at an indoor shooting range located within DEA headquarters at 99 Tenth Ave in Manhattan. Plaintiff, at approximately 13 years of age, was rendered proficient in the use of firearms by the DEA as a result of the training provided to him by the top Special Agents in the New York Field Division.

xx.  As part of his participation with the DEA Explorer program, Plaintiff was also subjected to other unlawful behavior by Special Agents that were administering the program. One such unlawful act occurred when Special Agents administering the program had taught the Plaintiff how to make a silencer for a firearm. In another "lesson" at DEA headquarters, SAC Carlo Boccia had commenced to showing the entire class of underage Explorers, a slide show containing numerous graphic crime scene photos from various murder investigations, including a photograph of one of the murder victims from the 1993 World Trade Center bombing, as well as several other graphic photos of murders that involved sexual mutilations. All the images that were presented during that lesson were completely inappropriate for display to children. At no time were Plaintiff's parents ever informed about all these activities that the DEA was engaging in with their child.

xx. DEA Agents also provided Explorers access to numerous sensitive areas within the DEA and trained them on confidential law enforcement investigative procedures and counter-surveillance techniques, thereby providing secret information to children not authorized to receive such information. The "toys for tots" being offered by the DEA to all these children turned out to be life-altering for many of them as at least seven child participants in the program eventually fell into experimenting with criminal activity, including some who, like the Plaintiff, went on to associate with large-scale drug organizations.

35

xx. A summary of participants in the Explorer Program that eventually violated the trust of the Special Agents in the program is as follows: A DEA Explorer had broken into a military armory located in uptown Manhattan and acquired a Humvee (which is a military vehicle) to take for a joyride around uptown Manhattan. This same Explorer also broke into another military armory and stole several M-16 automatic rifles. The Special Agents that ran the Explorer program were alerted to the activities of this DEA Explorer and were so enraged that they subsequently went to his home and arrested him themselves. Another DEA Explorer was arrested by the NYPD when police stopped his vehicle and discovered a Tec-9 semi-automatic sub-machine gun concealed on his person. Due to the fact that this Explorer was also the son of a foreign diplomat and had diplomatic immunity that protected him from being searched and/or arrested by police, the NYPD eventually released this Explorer without charge, and the Special Agents from the Explorer program still allowed him to remain in the program despite being informed about the arrest. Another Explorer was rumored to have engaged in arms trafficking, and yet another Explorer had become a large-scale drug trafficker that was distributing kilogram quantities of cocaine in uptown Manhattan. Plaintiff, after enrolling in this program, also went on to associate with the upper level hierarchy of numerous large-scale drug distribution organizations.

xx. Shortly after enrolling in the Explorer Program, Plaintiff openly witnessed the manner in which other Explorers were behaving and the general reaction to it from the Special Agents whereby they did not seem too terribly concerned about Explorers being caught committing "low-level" crimes. Plaintiff then took it upon himself to attempt to infiltrate drug organizations that infested his neighborhood in Lefrak City, Queens, primarily out of childish curiosity and a desire to impress Agents from the DEA's explorer program by proving that age

36

was not a limiting factor in Plaintiff's ability to perform undercover work. Plaintiff, at the approximate age of 15, was then recruited into participation with several international drug distribution networks after having attracted interest from the upper level hierarchy of such networks by demonstrating an extensive knowledge of DEA investigative tactics and procedures, information that proved valuable to leaders of these various criminal conspiracies.

xx. Plaintiff infiltrated these conspiracies by virtue of associating with their participants during the course of the investigations he undertook after joining the Explorer program with the DEA. Plaintiff eventually discovered numerous State and Federal indictments filed against various factions of these conspiracies. Other conspiracies known to Plaintiff, are still unidentified via a specific case caption and may have never been prosecuted, or in the alternative, they may have been charged but still remain undiscovered by Plaintiff due to lack of information regarding actual names of participants. The following is a partial list of known conspiracies relevant to this complaint.

1. USA v. Millan et al. ("Millan Conspiracy"), 1:91-cr-00685-SWK-1 (SDNY 1991)
2. NYPD's "Operation Big Shot" ("Barbe Conspiracy"), NYPD 1993
3. USA v. Martinez et al. ("Martinez Conspiracy"), 1:94-cr-00219-RPP-2 (SNDY 1994)
4. USA v Ghazi et al. ("Ghazi Conspiracy"), 1:96-cr-00205-ERK-1 (EDNY 1996)
5. USA v. Paan et al. ("Paan Conspiracy"), 1:96-cr-00035-JAL-1 (SDFL 1996)
6. USA v. Corwise et al. ("Corwise Conspiracy"), 1:96-cr-01094-RR-1 (EDNY 1996)
7. USA v. Sethi ("Sethi Conspiracy"), 1:97-cr-00106-JG-1 (EDNY 1997)
8. NYPD's "Operation Lefrak City" ("Lefrak Conspiracy") NYPD 1997 & 2003
9. USA v. Maisonet et al. ("Maisonet Conspiracy"), 1:97-cr-00817-DC-1 (SDNY 1997)
10. USA v. Camacho ("Camacho Conspiracy"), 1:97-cr-01111-SJ-1 (EDNY 1997)
11. USA v. Max Madrigal et al. ("Max Conspiracy") 1:98-cr-00100-LMM-1
12. USA v. Jose Madrigal et al. ("Keno Conspiracy") 1:98-cr-00654-NG-1
13. USA v. Chaudhry et al.("Chaudhry Conspiracy")1:00-cr-01184-JSR-1 (EDNY 2001)
14. NYPD's Operation Byte Size Bust Out ("Khan Conspiracy"), NYPD 2002
15. USA v. Rahimi et al. ("Rahimi Conspiracy") 1:03-cr-00486-DC-3 (SDNY 2003)
16. USA v. Myles et al. ("Myles Conspiracy") 1:2003-cr-00536 (NDIL 2003)
17. USA v. Noorzai et al. ("Noorzai Conspiracy") 1:05-cr-00019-DC-1 (SDNY 2005)
18. USA v. Mendez et al. ("Mendez Conspiracy") 1:07-cr-00107-ARR-1 (EDNY 2007)

37

xx.  The eighteen conspiracies listed above share common acquaintances that link them through agreements between conspiracy members to further their own criminal activity, as well as the criminal activity of others and their respective overarching organized crime entities.  They also relate to each other through the Plaintiff having infiltrated them all, with the named Defendants obstructing Plaintiff's attempts to resolve crimes related to these specific conspiracies, such obstruction still being engaged until this day.

xx.  Two additional conspiracies were allegedly semi-disrupted by Federal law enforcement, and whose prosecutions were concluded prior to time when Plaintiff infiltrated them and discovered them to still be active.  The first is the case of USA v Sindona, case number S75-cr-00948-TPG (SDNY), which Plaintiff infiltrated after directly associating with one of the Participants of the case, a Mr. Robert Venetucci (Exhibit 5), whereby upon that time he discovered that the conspiracy was still active and had evolved to include potential terrorism related activity.  Plaintiff was additionally able to discover the reason why Michele Sindona was directly murdered by the Italian government while in their custody, which turned out to be the same reason why Osama Bin Laden was murdered by the CIA despite being in the custody of the Pakistani ISI whereby Plaintiff discovered that the Pakistani ISI is actually a "veritable arm" of the CIA in South East Asia.  The second case is USA v. Rivera ("Rivera Conspiracy"), case number 1:89-cr-00346-LAP-1 (SDNY 1989), which Plaintiff infiltrated after directly associating with a member of the conspiracy that was never arrested, and individual known to the Plaintiff as "Jimmy Matos," although Plaintiff later confirmed this to be an alias and not his real name.

xx.  The Rivera Conspiracy, upon having been semi-disrupted by law enforcement between approximately 1989 and 1991, had still retained elements that evolved into the Maisonet Conspiracy, the Milan Conspiracy, the Martinez Conspiracy, the Barbe Conspiracy and several

other conspiracies not yet identified as part of this Complaint. These "factions" belong to an overarching criminal conspiracy to distribute heroin in New York, such conspiracy having proven itself impervious to disruption by law enforcement due to the unsuccessful methodologies employed by named Defendants that do nothing but allow these various factions to continue to transform, adapt, and oscillate between assisting and competing against each other for attainment of the heroin distribution resources largely organized by Rivera.

xx. The ever-persistent criminal conspiracy to distribute heroin in New York will continue to reestablish itself under changing leaderships, thereby generating new indictments indefinitely and until the end of time unless named Defendants significantly alter the types of unlawful conduct that has given rise to this complaint, such as the unlawful implementation of covert intelligence operations engaged abroad for purposes of ensuring that a consistent supply of heroin will always be made available for importation into the United States.

xx. The Rivera, Maisonet, Milan, Martinez and Barbe conspiracies, along with several other named and unnamed conspiracies either described in this complaint or otherwise known to the Plaintiff, represent a complex network of unlawful agreements comprising an overarching conspiracy by heroin suppliers in Latin America, Asia and Southeast Asia and their various distributors in America, to turn the New York City into both an open air drug market and weapon of mass destruction, thereby merging the "war on drugs" and the "war on terror" into one and the same unlawful conspiracy, which is to convert drug shipments into covert chemical weapons attacks upon the citizens of America that could then be utilized as a pretext by which to unlawfully subjugate the global populace .

*Partial listing of relevant events – in chronological order*

xx.  During the early morning hours of October 23rd, 1988, Plaintiff was present along with numerous individuals from his neighborhood that traditionally congregated by grocery store located in the vicinity of Martense avenue in Corona, Queens.  The assembled group then witnessed an altercation between two vehicles whose occupants were shooting at each other. The car with the single occupant appeared to be the aggressor, whereby the car with two occupants, one of whom was an individual named Jimmy Cheng (who was also known to several members of the assembled group including Plaintiff), appeared to be returning fire with an assault rifle.

xx.  Plaintiff and the group of individuals that witnessed the shootout, thereby disbanded before police arrived at the scene, and the next day Plaintiff became informed by one of the other witnesses that someone was killed in the shootout, but at the time Plaintiff believed that the individual relaying the information was just lying to sensationalize the event.  After that shootout, Plaintiff did take notice that Jimmy Cheng, who also owned a Chinese Restaurant and grocery store down the block from Plaintiff (which is why Plaintiff immediately recognized him in the car), had disappeared shortly after the shootout and Plaintiff did not see him again until sometime later.

xx.  On November 5th, 1990, an Egyptian national and "follower" of Sheikh Rahman named El-Sayyid Nosair, assassinated a Jewish leader named Rabbi Martin Davide Kahane ("Rabbi Kahane") in Manhattan.  Upon the event of this assassination, named Defendants were then required to immediately deport Sheikh Rahman to Egypt.  It was made abundantly clear to named Defendants that Sheikh Rahman's mere presence in America, regardless if he was actively involved in participating in specific criminal plots or not, was still an issue in that it was

40

proven to provoke violence by virtue of this very assassination.  By deliberately luring Sheikh Rahman to America for purposes of giving him a pulpit from which he could incite violence, named Defendants thereby denied Rabbi Kahane, who is not known to have ever killed anyone personally, his constitutional right to be free from an unlawful, extrajudicial assassination.

xx.  Both Sheikh Rahman and Rabbi Kahane were religious leaders that were skillful at utilizing a "loophole" in the Freedom of Speech laws to advocate violence and to hurl insults and provocations at entire religions with whom they disagree, while at the same time still barely remaining within the law.  While this behavior is undesirable and certainly not a preferable exercise of the right to Freedom of Speech, it is still currently lawful under the laws of the United States of America and should not be met with either assassination or unlawful incarceration.

xx.  Sheikh Rahman, in operating against the principles of Islam that prohibit racism, had expressed to his "followers" a disdain for the entire Jewish people, thereby accusing all adherents of Judaism of being involved in a grand conspiracy against Islam.  Utilizing these methodologies, Sheikh Rahman then skillfully persuaded his constituency to believe that the entire Jewish peoples were an imminent threat to global security, and Muslims were thereby obligated to use any means necessary, including violence, to prevent a massacre at the hands of the evil Zionist Jewish empire that was threatening to kill everyone on Earth if they were not simply "given" all the land from Israel to Iran by the United Nations to avoid their having to engage a military assault to acquire it.

xx.  Similarly, Rabbi Kahane utilized the same unlawful and manipulative methodologies by engaging racial and religious bias and rhetoric against all Muslims and Arabs, and by advocating for violent and forceful suppression of the Arabic "dogs" in order to punish then for

41

what he apparently perceived to be an attempt by Muslims to steal Jewish land and Jewish "intellectual property" and by infringing upon a Judaic "patent" on the concept of religion and how it is to be applied in the Middle East and elsewhere.

xx. Although Plaintiff is filing this complaint on Sheikh Rahman's behalf as "next friend," Plaintiff is not in any way an adherent to many of the statements made by Sheikh Rahman against Jewish people, and similarly repudiates Rabbi Kahane for his equally despicable (yet unfortunately lawful) conduct. Notwithstanding this fact, it was still unlawful for named Defendants to chose to mitigate this dispute in manner by which they did, as named Defendants have chosen to make an example out of both Rabbi Kahane by causing his assassination, and Sheikh Rahman in causing his unlawful incarceration, to the detriment of hundreds of thousands of innocent people in Iraq, Afghanistan and the entire Middle East that have absolutely no connection to either Sheikh Rahman or Rabbi Kahane, yet still find themselves being punished for the dispute that occurred between them in New York in the early 90's.

xx. As a result of the Rabbi Kahane assassination and the fact that Sheikh Rahman was already known to have been associating with Plaintiff's father, Plaintiff then began to take an interest in attempting to investigate the exact nature of why such conflicts were occurring between Jews and Muslims, especially since the religious texts and methodologies utilized by the two religions were actually very similar to each other with regards to their ideological makeup. For example, Rabbi Kahane was a strict adherent of religious principles that enforced separation of Jewish men and women, and when Rabbi Kahane attempted to enforce such "militant" principles while serving as Rabbi at the Howard Beach Jewish Center in New York, other members of the synagogue turned against him and then refused to renew his contract. Such separations between men and women are also advocated by Sheikh Rahman, and he is also

42

considered a "militant" for holding such views, yet on this matter and many others, it actually appears that both Sheikh Rahman and Rabbi Kahane were actually following a script derived from fairly similar ideological foundations.

xx.  Approximately 1990, Plaintiff began to infiltrate various organized crime networks operating out of his primary neighborhood in New York, which was an area that pretty much ran along the main thoroughfare of Queens Boulevard, stretching across the Corona, Jackson Heights, Elmhurst, Maspeth, Rego Park and Forest Hills sections of Queens.  Plaintiff also infiltrated Asian heroin distribution networks through associations with gang members he befriended immediately upon starting classes at Brooklyn Technical High School ("Brooklyn Tech"), and additionally infiltrated Chinese organized crime conspiracies based in Queens, Manhattan and Brooklyn.  Plaintiff subsequently met sources of heroin and introduced them to members of the Maisonet Conspiracy, who then lavished Plaintiff with financial gifts for making the introductions.

xx.  At the same time Plaintiff had managed to gain the full trust of high-ranking associates of the Maisonet Conspiracy, Plaintiff had also begun to infiltrate the Milan Conspiracy, the Barbe Conspiracy, the Martinez Conspiracy, the Mendez Conspiracy, the Corwise Conspiracy, the Byte Size Conspiracy, the Ghazi Conspiracy, the Chaudhry Conspiracy, the Rahimi Conspiracy, the Noorzai Conspiracy and the Paan Conspiracy between 1991 to 1996, before Plaintiff was himself arrested as part of the DEA investigation and prosecution of the Ghazi Conspiracy on February 14th, 1996.

xx.  At approximately the same time that Plaintiff engaged his private investigations of these criminal networks, he also began to attempt to document the events he was witnessing using various audio and video recording devices.  Plaintiff eventually amassed a library of video

43

and audio recordings corroborating various events described in this Complaint. The early recordings made by Plaintiff between approximately 1991 and 1996, include video and audio recordings of various conversations with people discussing drug dealing, murders and other related criminal activity, including a video recording documenting the kidnapping and assault of an individual that later became a Federal informant for the Secret Service, a Mr. Domingo Hasbun. Mr. Hasbun's credibility in other cases would have been seriously challenged had named Defendants not suppressed this evidence for 15 years.

xx. Plaintiff will exercise personal discretion throughout this complaint regarding whether to publically disclose the existence of certain events known to the Plaintiff, or the existence of various recordings made during the course of his attempts to document the issues raised in this complaint. Lack of notification regarding the existence of certain events, or audio or video recordings documenting an event described in this complaint, is not to be misconstrued as a denial of such events or recordings or the existence thereof.

xx. On March 30, 1991, Manuel Mayi was killed in a gang-related attack in Corona Queens (Exhibit 6). Plaintiff acquired information regarding that murder and received multiple accounts of who was involved and how it happened from several different participants of an Italian organized crime conspiracy that operated out of the "Spaghetti Park" area in Corona, Queens ("Spaghetti Park Conspiracy"). Although an individual was arrested and charged for this murder, but later acquitted, the police still refused to pursue other participants and/or witnesses in the slaying that had fled to Italy, and others that the police may have never been informed of their involvement.

xx. Although the killing of Mr. Mayi was initially described as a racially motivated attack by Italians upon a Hispanic teenager, Plaintiff acquired information and confirmation that

the killing was not in any way racially motivated, but gang motivated and resulting from traditional territorial disputes between youth gangs in the area. The obstruction of the Mayi murder investigation by law enforcement likely occurred upon the event that the murder was described by local Hispanic residents as racially motivated, thereby causing law enforcement to unlawfully obstruct the investigation so as not to allow a conviction to be mischaracterized or erroneously interpreted by the public as a conviction against all Italians.

xx. Named Defendants cannot unlawfully obstruct the due course of an investigation based upon what the public may erroneously infer from a valid conviction that would have resulted in this case upon a proper law enforcement investigation. Defendant NYPD was obligated to investigate and prosecute the case based upon the certainty that murder is not a lawful way to respond to avenge an insult based upon a graffiti-related incident. Named Defendants had no right to obstruct the investigation into the murder of Mr. Mayi by refusing to make a request of the Italian government to extradite individuals that were alleged to have either witnessed or participated in the assault. Named Defendants were required to pursue all options to resolve the case with absolutely no consideration as to whether a conviction resulting from the incident could be accidently or deliberately misconstrued as a validation of the event being a racial attack, and thereby misused by politically motivated individuals not directly involved with the case. The primary motive driving any murder investigation, should be justice for the victim, without any consideration as to how such justice could be misused by others seeking to profit from the situation in some way.

xx. Additional evidence acquired by the Plaintiff regarding the murder of Mr. Mayi is that members of the Spaghetti Park Conspiracy were already supplying large-scale Dominican drug dealers from that same area with heroin imported from Europe and Asia, which was then

45

being distributed by Dominican drug gangs in the Bronx and Manhattan in furtherance of various heroin distribution conspiracies already identified in this complaint, and others not yet identifiable via case caption.  This is an additional proof that the killing was not racially motivated in any way, or due and owing to some racial hatred on the part of the Spaghetti Park conspiracy to specifically harm Dominican residents in the community based upon racism.

xx.  Plaintiff acquired information related to the Mayi killing due to his association with several Italians linked to the upper level hierarchy of the Spaghetti Park Conspiracy, such individuals being large scale drug traffickers.  Named Defendants have refused to receive information from Plaintiff that is relevant to the Mayi killing, and are thereby obstructing that investigation.  Plaintiff knows the identity of several other participants in that murder, and is being obstructed the ability to provide that information as a result of the unlawful conspiracy described herein.

xx.  Approximately 1991, Plaintiff witnessed another murder whose investigation is being obstructed by named Defendants.  Plaintiff does not know the real name of the victim, only his nickname and other identifying information such as the fact that he was also murdered on Martense Avenue in Queens, New York, just a short distance away from where the victim of the Jimmy Cheng shootout in 1988 was killed.  The victim of this second shooting on Martense avenue is an individual known only to the Plaintiff as "Boodah," and his murder occurred at night in the summer months of 1991 following the victim's ongoing dispute with numerous gang members in the area, including members of the Lefrak City Conspiracy and an individual named Judah Johnson, who was alleged to be a participant in the murder.

xx.  Judah Johnson was also involved in several other murders in the area, including another murder on 57th Avenue in the Lefrak City area of Queens that Plaintiff acquired

information about through his investigations.  Mr. Johnson was additionally involved in a shooting that occurred approximately 1991 or 1992 at John Bowne High School in Flushing, Queens, where a teenager was shot in the leg with a .357 revolver by Mr. Johnson after being accompanied to the location by two other participants of the Lefrak Conspiracy, known to the Plaintiff by the names "Trevor" and "Little Cricket."

xx.  Approximately September 11th, 1992, Plaintiff witnessed the murder of Kevin Ramson, and shooting-related paralysis of Thomas Brosky on Broadway Avenue in Queens on September 11th, 1992, following a drive-by shooting conducted by a street gang from Woodside, Queens called "The Amazing 7" ("TA7"), targeting two Elmhurst, Queens street gangs named "78th Street Boys" and "Taking No Shorts" ("TNS").  Subsequent to that drive-by shooting by TA7 against the neighborhood of Elmhurst, Plaintiff witnessed the planning of a retaliatory drive-by shooting conducted by TNS against the neighborhood of Woodside.  Plaintiff does not know the identities of the victims of the retaliatory strike, except that the shooting likely occurred somewhere in Woodside, Queens, and resulted in the death of one victim and the paralysis of another.  This retaliatory drive-by shooting is another murder investigation being obstructed by named Defendants.

xx.  The 1993 World Trade Center bombing occurred on February 26, 1993, when a truck bomb was detonated below the North Tower of the World Trade Center in New York City, killing seven people and injuring thousands.  Plaintiff's father was subsequently questioned by the FBI as part of the investigation due to the fact that he once associated with a target of that investigation, Sheikh Rahman.

47

xx.  On June 24th, 1993 Sheikh Rahman was arrested and charged with terrorism related offenses, not for the previous February 26th bombing of the World Trade Center, but for a separate conspiracy to bomb additional New York City landmarks.

xx.  Between approximately 1991 and 1993, Plaintiff began to expand his surveillance operation by using various ruses to attempt to record the activity he witnessed more openly, as it was clearly safer to do so then attempting to video record individuals covertly.  In one such incident, Plaintiff devised a complex scheme to "trick" the individuals he was associating with into allowing him to openly video-tape criminal activity.  After continuing to obtain recorded evidence of crimes, Plaintiff simply waited for the opportunity to provide the recordings and other information to the police either voluntarily, or upon request by any Federal law enforcement entity should Plaintiff be approached and asked to provide information.

xx.  Approximately the same time period Plaintiff began to introduce the camcorder into his investigations, Plaintiff penetrated a sleeper cell of the Pakistani Government's Intelligence services ("Pakistani ISI")  that was actively involved in criminal activity ranging from large scale heroin distribution to providing material support to terrorist organizations, as well as targeted subversive activities engaged against Indian communities located within the United States. Plaintiff subsequently discovered that various unlawful activities were being funded and sanctioned by Pakistani intelligence services operatives that had not properly declared their foreign agent status in the United States.

xx.  One operation funded by Pakistani ISI was a plot to enlist various street gangs in New York into a prolonged and sustained unlawful conspiracy to "crash" Indian social events in an attempt to disrupt and impede the lawful celebratory activities of Indian residents in New York, Long Island, New Jersey and Connecticut.   The Pakistani government conspired to wage a

covert war against India inside the United States through the use of proxies such as various Pakistani, Afghani, Arab, African-American and Latino street gangs operating out of New York City, New Jersey and Connecticut.

xx. Approximately August of 1993, Pakistani ISI agents had ordered a Pakistani gang leader named Farooq to assemble approximately 50 gang members from Coney Island, Elmhurst and Jackson Heights to crash the Indian Day Parade that was set to take place that month. Plaintiff was present when Pakistani government agents provided gang members Pakistani flags and money to purchase three machine-guns that they would take along for their protection when they went to protest against the Indian Day Parade.

xx. On August 16th, 1993, Plaintiff joined approximately 50 gang members that assembled in Queens and Brooklyn before being dispatched to Manhattan where they were instructed to assemble along the route of the Indian Day Parade to chant and taunt peaceful parade goers with anti-Indian and pro-Pakistani slogans while waving Pakistani flags and concealing numerous firearms in what appeared to be a Pakistani government operation essential designed to incite a riot and ensuing bloodbath in Manhattan.  Shortly after parade goers noticed the large assembly of Pakistani gang members that were clearly engaged in provocative behavior, a mob of comprised of several hundred parade participants eventually gathered and attempted to physically attack the Pakistanis that were taunting them, resulting in a riot whereby the mob of approximately 50 Pakistani gang members were eventually separated into several groups that were either fighting against the onslaught or attempting to flee the scene.

xx. After the initial riot had occurred, a Pakistani gang member named Mohammed Ashraf eventually used a firearm he had also brought along with him to that event, which Plaintiff recalls to be a .22 or .25 caliber semi-automatic handgun, and Mr. Ashraf then

proceeded to shoot and nearly kill an Indian Parade participant by the name of Gurmukh Sing, who was shot in the head several times yet miraculously survived (Exhibit 7).

xx.  It was only a miracle that Pakistani government mass casualty "defensive" assault upon the Indian parade goers was averted.  Upon the event of the riot, Plaintiff and Farooq immediately ordered the more heavily armed unit of gang-members that were concealing multiple machine-guns to stand down and flee the scene back to Queens, thereby averting a catastrophe whereby the Indian Parade goers that were stirred up into a fit of violence had no idea they were in danger of being sprayed with automatic weapons if they had continued to chase and attack the heavily-armed gang members.

xx.  Plaintiff was present on the scene during numerous Indian social events that were deliberately crashed by these various Pakistani gangs in an attempt by Pakistani ISI to continue to provoke sectarian violence between Pakistanis and Indians residing in the Unites States.  Additional subversive activities of this nature occurred when Pakistani ISI instructed the Medina Boys to crash an Indian fashion show that was being held at a Stadium in Forest Hills, Queens, causing another semi-riot, and another significant event occurred when the Medina Boys crashed yet another social event being held at a party hall named "Gujarati Samaj," located on the Horace Harding Expressway in Fresh Meadows, Queens, whereby numerous Indians youths were assaulted and sent to the hospital with serious lacerations and other injuries.  The Pakistani ISI additionally funded and orchestrated many gang wars between Pakistani gangs and Indian gangs that also ended in substantial injuries, but only by chance there was never a confirmed casualty that resulted from any of these unlawful activities by the Pakistani government.

xx.  On October 26th, 1993, Named Defendants were subsequently exposed to what should have been the termination of this unlawful conspiracy after being forced to disclose

50