transcripts of secret audio recordings made by an FBI informant named Emad Salem, who was the principle government informant against Sheikh Rahman (Exhibit 8). These tapes revealed an unlawful relationship between Emad Salem and his FBI handlers, Defendant John Anticev, Defendant Nancy Floyd and other unidentified FBI Agents. Through an analysis of the tapes, it is clear that Emad Salem was himself a principle player in orchestrating and provoking the participants of the 1993 plot to incriminate themselves and/or otherwise participate in the planning of that first 1993 attack upon the World Trade Center, such attack then being allowed to proceed by named Defendants despite the entire plot already being monitored by the FBI through their informant.

xx.  Emad Salem was paid over a million dollars to "infiltrate" the cell of terrorists responsible for the 1993 bombing, and was not just an idle participant, but an active organizer of the plot who subsequently become so involved with the plot that he himself questioned the legality of what he was being asked to do. As a result, Mr. Salem began to record all his telephone conversations with his FBI handlers, including Defendant John Anticev, whereby he even captured a conversation on tape essentially summarizing the 1993 bombing as having been primarily orchestrated by none other than Emad Salem himself, under the supervision of the FBI, with many other participants of the plot essentially subordinate to the stature held by Emad Salem.

xx.  It appears that the only reason these tapes did not get much attention from the general public, was the fact that the death toll from the 1993 bombing had been significantly less than the death toll inflicted as the consequence of a second terrorist attack upon the same location in September of 2001. If the World Trade Center buildings had fallen down in 1993 as a result of that previous bombing, Defendant John Anticev and Defendant Nancy Floyd and others in the

51

FBI would likely be facing criminal charges for conduct related to the manner in which the FBI conducted that previous investigation, especially when the secret tapes by Mr. Salem had surfaced.

xx.  Approximately 1994, Plaintiff became involved in another gang-related fight in Lefrak City, Queens.  In self-defense, Plaintiff subsequently caused substantial injuries to an individual that attacked him, a Pakistani national named Khalid.  Khalid then contacted the NYPD to report that he was assaulted by Plaintiff before being transported to the hospital to receive treatment for his injuries, which were unfortunately substantial and requiring hundreds of stitches.  After Plaintiff learned that the NYPD was looking to arrest him on assault charges related to that incident, Plaintiff subsequently contacted Defendant S/A John Hannah from the DEA's Explorer program, requesting assistance from him in helping to terminate the NYPD assault investigation of the Plaintiff that was initiated by Khalid.

xx.  Plaintiff was informed by Defendant Hannah that he should contact the Detectives that were looking to arrest him and meet with them, and to provide them with his business card so that they could contact him directly.  Plaintiff subsequently contacted Detectives from the 110th precinct in Queens, New York, and voluntarily surrendered to the Precinct, where he was arrested before he could even notify them that S/A Hannah wished to speak to them.  After being arrested, Plaintiff informed NYPD Detectives that Defendant Hannah wished to speak to them, and instructed them to retrieve Defendant Hannah's business card from his wallet.  Upon the Detectives leaving the room and contacting Defendant Hannah, the detectives subsequently released Plaintiff without charge, and dropped the investigation in its entirety, despite the victim lodging a complaint against the Detectives for not arresting the Plaintiff after he turned himself into the precinct.

xx.  Approximately 1994, Plaintiff learned details of another major heroin bust that had occurred at some previous point in time, although Plaintiff has not yet been able to identify the actual participants of this conspiracy.  Plaintiff learned that individuals he associated with were being sought by the DEA for questioning regarding this investigation related to an individual named "Danny," who was a Hispanic drug dealer from the Lower East Side of Manhattan that maintained a source of heroin from a major Chinese distributor.  Plaintiff learned that Danny was arrested by the DEA after they pulled him over on the LIE expressway and arrested him in possession of approximately two kilograms of "Double Dragon" brand name heroin.  The Chinese distributor who was arrested by the DEA in that case had informed upon Danny, and had additionally informed upon a location in Long Island where the DEA was alleged to have found over a million dollars in currency hidden in the walls.  Danny was subsequently sent to prison and the DEA was unable to locate other individuals still being sought in that investigation, despite Plaintiff associating with them at that time.

xx.  Plaintiff also learned that an individual named Alan Madrigal, brother to Max and Jose  Madrigal (of the Max and Keno Conspiracies), subsequently pawned a vehicle to a relative of Danny for approximately $10,000, which was an event that eventually led to the murder of an individual named Mohammad Syed in January of 1994.

xx.  Plaintiff witnessed the murder of Mohammad Syed in the Bronx approximately January of 1994.  At that time Plaintiff did not know the actual name of the victim, which was just recently discovered in 2009 after combing through newspaper archives searching for a murder that fit the description given to Plaintiff by the killers.  Even though the Plaintiff did not know the identity of this murder victim for almost 15 years due to obstruction by named Defendants, Plaintiff still knew the identities of his killers, the general location and manner in

53

which he was killed, the caliber of weapon and type of ammunition used in the killing as well as the entire motive for his murder. This murder was committed by another narcotics conspiracy that associated with members of the Maisonet organization, which appears to have never been discovered or prosecuted by any law enforcement entity to date. The murder of Mohammad Syed is yet another investigation being obstructed by named Defendants.

xx. Approximately January of 1994, Plaintiff was informed by the individual that orchestrated Mr. Syed's murder that one of his heroin suppliers had been arrested. He subsequently identified the supplier by showing Plaintiff a newspaper article that was written about him in a local newspaper. The article identified the supplier as being an individual named Gilbert Barbe, the principle in the Barbe Conspiracy. Mr. Barbe represented a separate source of Asian heroin that was competing with the "Double Dragon" brand name heroin being distributed by competing organizations. At approximately the same time Plaintiff witnessed the purchase of bricks of heroin imprinted with the Double Dragon logo, he additionally witnessed the purchase of bricks of heroin from the Lebarbe organization that were imprinted with a "Double UO Globe" logo. Plaintiff also recalls that bricks of heroin originating from China were packaged in quantities of between 300 and 400 grams, 700 grams, 762 grams, and 1200 grams. The Chinese version of a "kilogram" was not a strict 1000 grams, as Plaintiff would learn throughout his investigation.

xx. On May 5th, 1994, police misconduct eventually led to the acquittal of Vincent Basciano, a member of the Milan conspiracy, which was also one of the very first conspiracies infiltrated by Plaintiff. Vincent Basciano associated with another criminal conspiracy that Plaintiff had infiltrated in the neighborhood of Maspeth, Queens, which Plaintiff would later discover to be the "Bonanno crime family," which was headed up by a Mr. Joseph Massino.

xx.  Approximately this same time period of Mr. Basicano's acquittal in the Milan conspiracy, Plaintiff also acquired information regarding a murder committed by alleged associates of Joseph Massino, during the robbery of an Afghani drug supplier who was also a participant of the Rahimi Conspiracy.  The Afghani had provided approximately two kilograms of heroin to an individual believed to be of Romanian descent, who then attempted to sell the drugs to an alleged associate of Joseph Massino from Maspeth.  The Romanian was told to travel to a location in the vicinity of Metropolitan avenue, on the border of Maspeth and Ridgewood, where he was instructed to beep the purchaser of the drugs from a specific payphone to notify the purchaser of his arrival.  Upon beeping this unidentified drug customer, the Romanian was killed by a shot fired from a high powered rifle from across the street while waiting for the return call at the payphone.  The killer was then alleged to have collected the Romanian's body to be taken to a nearby butcher shop where the drug customer was known to work, where the Romanian was dismembered and placed in the trunk of a vehicle where the police eventually discovered the remains.  Plaintiff does not know the identity of this victim, and it is yet another murder investigation being obstructed by the named Defendants.

xx.  Approximately 1994, Plaintiff acquired information regarding the murder of another member of the TNS gang that was killed in Bayside, Queens, an individual known to the Plaintiff as "Trigger," not to be confused with another individual using the same nickname who was a participant of the Lefrak Conspiracy.  Trigger was choked to death with a telephone cord inside his home in Bayside, Queens.  Plaintiff learned that the murder was committed by individuals attempting to rob Trigger of approximately $35,000 that he had stashed in his home.  Police were alleged to have found numerous pictures of Trigger with numerous gang members upon searching the residence following the homicide.  Plaintiff was subsequently shown a picture of

the killer by members of the Mendez Conspiracy, and later informed that members of the

Mendez Conspiracy had located the killer and executed him. The investigation of the murder of

Trigger, and the retaliation murder of his alleged killer, are additional murder investigations

being obstructed by the named Defendants.

xx. On July 19th, 1994, a rape was reported to the NYPD, later identified as part of a

series related to a serial rapist targeting women at nightclubs in Manhattan. The serial rapist,

later identified to be an Afghani national named Mohammed Karimzada, was an associate of the

various heroin conspiracies and other Pakistani ISI funded gang operations that Plaintiff had

infiltrated. Plaintiff, through his associations with the various Pakistani funded ISI gangs, had

infiltrated numerous Afghani street gangs operating all throughout the tri-state area and Albany

in upstate New York.

xx. After discovering that Mr. Karimzada was allegedly committing assaults of women

at random times during these excursions to the nightclubs, Plaintiff then began to make video

recordings of Mr. Karimzada as he accompanied Plaintiff and others to various nightclubs

throughout Manhattan. Plaintiff recorded Mr. Karimzada picking up girls at various clubs they

frequented, including Webster Hall, the very same night club where it was later confirmed that

Mr. Karimzada picked up two of his victims. Plaintiff is informed and believes he subsequently

captured potential victims of this admitted serial rapist on video tape, although he was not made

aware of it until years later after discovering Mr. Karimzada was arrested for a second time for

the charges of rape, and subsequently identified to be a serial rapist. Mr. Karimzada's first arrest

for rape occurred shortly after the rape that was first reported on July 19th, 1994, but it is not

known if any other victims had reported similar incidents prior to July 19th, or if any victims

simply refused to report being raped. After that first conviction resulting from the July 19th,

1994 rape, Plaintiff recalls that Mr. Karimzada subsequently pled guilty to a misdemeanor offense in that case while apparently continuing to rape victims for several more years before his actions were subsequently discovered.

      xx.  Approximately August 1st, 1994, Jimmy Cheng was arrested and charged with murder for his involvement in the shootout that Plaintiff witnessed back in 1988.  Mr. Cheng, was at best, guilty of involuntary manslaughter, as he was not the aggressor in the incident, and there are actually several other witnesses to the fact that the off-duty NYPD officer was the first to brandish the pistol, and the first to fire at Cheng's car during the event.  Jimmy Cheng was subsequently convicted of murder and sentenced to 25 years to life for defending himself against the overly aggressive and clearly criminal actions of an off-duty NYPD officer (Exhibit 9). Named Defendants therefore suppresses evidence in the form of witness testimony from Plaintiff that may have exonerated Mr. Cheng of the charges for which is currently and wrongfully incarcerated.

      xx.  On August 11th, 1994, another rape was reported to the NYPD by a victim later identified to have been raped by Mr. Karimzada.  By this time, Mr. Karimzada had already been apprehended for the July 19th, 1994 rape and had reluctantly accepted to take a plea bargain in that case, whereby he expressed to Plaintiff that the rape victim had wrongfully accused him. Unbeknownst to Plaintiff, and in an apparent act of revenge against the previous rape victim from July 19th, Mr. Karimzada then raped another victim on August 11th, 1994, the day before he was set to plead guilty to charges stemming from the previous July 19th, 1994 rape.  NYPD apparently never once made the connection between all these rapes, despite even the most cursory inspection of the investigative records clearly revealing the clear similarities between the various cases.

xx. On December 16th, 1994, another rape was reported to the NYPD by a victim that later confirmed Mr. Karimzada to be her assailant.  This victim again recounted details about the rape that should have enabled the NYPD to very quickly identify Mr. Karimzada as the perpetrator.  Although Plaintiff was hearing rumors and statements from numerous individuals that Mr. Karimzada was raping women, including Plaintiff learning about his arrest and conviction for the July 19th, 1994 rape, Plaintiff never directly witnessed any rape.  Nevertheless, Plaintiff continued to record Mr. Karimzada, hoping that he may somehow capture evidence or an admission on tape proving that he was involved in this activity.

xx. In 1995, Plaintiff was at an apartment building in Queens, New York, visiting the home of another drug kingpin subsequently indicted as a participant in the Mendez Conspiracy of 2003.  This drug kingpin is herein identified as Source of Information-1 ("SOI-1").  Plaintiff and SOI-1 were ambushed at his residence by assassins dressed as police officers that were attempting to murder SOI-1.  This attempted assassination was provoked by another individual known to the Plaintiff only by his nickname "Scarface," a drug supplier who was subsequently arrested and charged with being drug supplier to Lewis Corwise of the Corwise Conspiracy (thereby having been identified by named Defendants, although the true identity of this individual is still unknown to Plaintiff).  Scarface eventually cooperated against Lewis Corwise in a DEA heroin sting before Mr. Corwise was subsequently indicted by State authorities in the NYPD's "Operation Lefrak City I,"  which was the first of two NYPD investigations that comprised the Lefrak City Conspiracy (further illustrating how all the various conspiracies named in this complaint are interrelated).

xx. During the assassination attempt at SOI-1's residence in Elmhurst, Queens, Plaintiff grabbed the gun of one of the assailants that was about to murder both Plaintiff and SOI-1,

resulting in a struggle that allowed SOI-1 enough time to retrieve his own pistol to return fire. The assassins fled the scene only after a shootout in the hallway outside SOI-1's home, where numerous bullets ultimately penetrated into nearby apartments and with one bullet even penetrating through the jacket Plaintiff was wearing at the time without hitting him.

xx.  The shootout at SOI-1's home eventually resulted in a retaliatory murder being planned, and allegedly committed against the suspected mastermind of the attempted assassination, an individual known only to the Plaintiff as "Flaco" from Washington Heights in New York.  The Flaco murder is another murder investigation being obstructed by named Defendants.

xx.  Approximately 1995, Plaintiff captured individuals on video tape discussing additional murders and engaging in additional provocative and unlawful acts.

xx.  After several years of living a dual life whereby Plaintiff was an active participation of the DEA Explorer Program while witnessing multiple murders as he infiltrated various organized crime syndicates, Plaintiff was eventually arrested on February 14th, 1996, during a DEA drug sting operation (the Ghazi Conspiracy) conducted by Special Agents operating out of the same New York headquarters of the DEA that was frequented by the Plaintiff on a bi-weekly basis while attending the Explorer Post meetings.  Plaintiff had, by the time of his arrest, acquired substantial information regarding numerous unsolved homicides, shootings, rapes, potential terrorism related activity including arms trafficking in large shipments of automatic and semi-automatic firearms, silencers, grenades, C4 explosives, anti-aircraft missiles and an alleged explosive called "Mercury Red," as well as information related to money laundering and drug dealing on a fairly massive scale.  Plaintiff had additionally accumulated numerous audio and video recordings documenting and corroborating various events.

xx.  The group of DEA Special Agents involved in prosecuting the Ghazi Conspiracy were not informed by Plaintiff that he was also a DEA Explorer working directly with the top Agents in charge of that same New York Field Division that employed them.  Plaintiff decided that he would conceal his involvement in the Explorer program from arresting Agents, while also concealing his arrest from the Explorer Post Agents until after he could first resolve the instant case and work out a "peace treaty" with the unknown group of hostile DEA Special Agents that arrested him, which he believed he could easily accomplish by cooperating and dismantling the organizations he had successfully penetrated.  Plaintiff surmised that if he could first overcome the wrath of the Special Agents that had arrested him, that he would thereby be able to attain the forgiveness of the other Agents from the Explorer program that had mentored him for so many years.

xx.  Upon Plaintiff's arrest in the Ghazi Conspiracy, Plaintiff withdrew from participation with all criminal conspiracies by immediately attempting to cooperate with the group of DEA Special Agents that had arrested him, as is the procedure required for an individual to properly establish withdraw from a conspiracy.  At the time of Plaintiff's arrest in 1996, he had either witnessed or acquired information regarding several unsolved homicides.  Although Plaintiff was innocent of the instant charges for which he was arrested, Plaintiff admits that he periodically engaged in assisting with some limited drug distribution in the previous years in order to maintain the trust of these violent mafia figures, so as to continue to acquire information regarding violent crimes, which in Plaintiff's mind, far outweighed the sporadic drug distribution he engaged in to acquire such information.

xx.  The facts that led to the arrest of Plaintiff for involvement with the Ghazi conspiracy are as follows:  Asfand Ghazi, a Pakistani national residing in New York City, had conspired

with a DEA Informant in Pakistan to import heroin, in a scheme originally conceived by the informant to obtain financial payments from the DEA for information leading to significant drug seizures. The scheme was originally conceived by an informant in Pakistan named "Irfan" who would purchase a kilogram of heroin for approximately $3,000 in Peshawar, Pakistan, package it into a suitcase, then pay an unsuspecting courier approximately $500 to transport it to the United States with the promise of more money upon his arrival, whereby once the courier was on the plane, Irfan would then contact the DEA field office in Lahore, Pakistan and inform upon the very shipment he was sending for purposes of obtaining funds from the DEA that were being paid as a bounty for information leading to substantial drug seizures.

      xx. Since Defendant DEA paid Irfan a percentage of the value of drugs in America, and not a percentage according to the original value of the drug in Pakistan, Irfan would thereby make a profit on every shipment that he sent and informed upon, without ever having to attempt to distribute the drugs in America. By engaging in this manipulation of the DEA, Irfan essentially made a business out of sending heroin to America and then informing upon the drug shipments to the DEA, who would then make substantial payments back to Irfan for his informant services. It appears that the DEA, even after becoming suspicious of Irfan's activities, had then turned a blind eye to the clear evidence that Irfan was responsible for the shipments.

      xx. Asfand Ghazi, after learning that Irfan had access to high-purity heroin, subsequently convinced this informant in Pakistan to utilize him as a distributor for the drugs, as Mr. Ghazi informed Irfan that he would be able to sell the drugs for a substantial profit. Irfan then sent Mr. Ghazi a shipment of heroin that he did not inform the DEA about, and Mr. Ghazi sold the shipment and later told Irfan that he was robbed for the drugs. Irfan was subsequently informed by another individual that Mr. Ghazi had stolen his money, and thereby decided to retaliate

against Mr. Ghazi by offering to send him another shipment that he used to trap Mr. Ghazi into a drug case after informing upon the shipment and Mr. Ghazi to his handlers at the DEA.

xx. Irfan then conspired with Asfand Ghazi to send another courier on a flight from Pakistan to Kennedy Airport in Queens, New York in early 1996. At the same time, the DEA's number one informant in the entire country of Pakistan, which is how Defendant S/A Donald Baily described Irfan during an evidentiary hearing related to the case, then contacted DEA and informed them that a shipment that was on route to arrive in New York's Kennedy Airport. Irfan did not inform the DEA that he had allowed a previous shipment to slip through undetected. The DEA then intercepted this "retaliatory" shipment sent to Mr. Ghazi through another unsuspecting courier that was arrested at Kennedy Airport in January of 1996 after arriving with 2.2 kilos of 91% pure heroin secreted into a hidden compartment of his suitcase.

xx. After the courier was arrested, DEA agents then switched the courier with another professional paid informant that played the role of the courier, whom Asfand Ghazi had never met before, and thereby instructed the informant to contact Mr. Ghazi in an attempt to sell him the drugs that had already been intercepted. At a meeting between Mr. Ghazi and this second DEA informant, the DEA subsequently offered to sell the shipment of heroin to Mr. Ghazi for approximately $160,000, which was still substantially less than the actual wholesale value of the shipment. Mr. Ghazi then commenced to attempting further negotiations with the informant in the hopes he could acquire possession of the drugs on consignment and without paying any money, as he had done with the previous courier sent by Irfan. During the course of Mr. Ghazi's attempt to purchase this shipment, Plaintiff agreed to drive Mr. Ghazi to a restaurant in Manhattan where Mr. Ghazi would attempt to negotiate the terms of the transaction with the DEA informant.

xx.  While waiting outside for Asfand Ghazi as he engaged in this meeting with a DEA informant, Plaintiff was able to determine that the location of the meeting was being monitored by DEA agents after utilizing counter-surveillance techniques he learned while being trained by the DEA in their Explorer program.  Plaintiff subsequently obtained the license plate of one of the cars conducting surveillance, a New York license plate H2D 7WK (circa February, 1996), which by the next day he was able to confirm as being used by DEA officials.  After Mr. Ghazi returned to the car after having finished the meeting, Plaintiff then informed Mr. Ghazi that he would no longer accompany him or assist him with anything related to his attempts further negotiate with the informant or otherwise attempt to raise the $160,000 necessary to complete the transaction.  Plaintiff also informed Mr. Ghazi again the following day that the heroin scheme was a guaranteed DEA sting operation due to Plaintiff confirming it through access to DEA resources.

xx.  At the time of these events, Plaintiff also owed Asfand Ghazi $1,000 due to a gambling debt accrued while playing Billiards with Mr. Ghazi for money.  When Plaintiff informed Mr. Ghazi that he would not participate in raising any money to purchase drugs being sold by DEA Agents, Mr. Ghazi misinterpreted Plaintiff's statements regarding the DEA as being made solely in an effort to avoid having to provide Mr. Ghazi with any money, including the $1,000 that was already owed to Mr. Ghazi by Plaintiff due to the gambling debt.  Mr. Ghazi then announced his intention to proceed with the heroin transaction and insisted that Plaintiff still provide him with at least the money he was owed from the previous gambling debt.  Plaintiff then provided Mr. Ghazi with the $1,000 that he owed him, knowing that Mr. Ghazi was still going to forge ahead undeterred in his attempts to raise the rest of the money to try and purchase the heroin.

xx.  After being shunned by the Plaintiff, Asfand Ghazi then approached a drug distributer known only as "Robert," and had thereby convinced Robert to provide him with additional money that Mr. Ghazi would use to attempt purchase the drug shipment from the DEA, in exchange for the heroin he was to receive after the transaction was complete.  Far from obtaining the remaining $159,000 necessary to take possession of the entire shipment, Robert only provided Mr. Ghazi with approximately $5,000, which left Mr. Ghazi with a grand total of $6,000 that he raised towards the purchase of the DEA heroin.  Mr. Ghazi then travelled to Manhattan on his own in an attempt to purchase $500,000 worth of heroin already undervalued by the DEA at a price of $160,000, for nothing more than $6,000.

xx.  The DEA, being the ever-accommodating drug dealers that they are, subsequently capitulated and agreed to sell Asfand Ghazi the entire $500,000 shipment for nothing more than a "down-payment" of $6,000 once they realized that Mr. Ghazi would not be able to raise such large amounts of money.  Just when Mr. Ghazi was ecstatic to be getting the bargain of the century, he was subsequently arrested by the DEA and charged with attempting to purchase $500,000 worth of heroin after showing up to the transaction with $6,000 in his pocket.

xx.  Immediately upon his arrest, Asfand Ghazi notified the DEA that Plaintiff had already determined the transaction to be a DEA sting operation utilizing some unknown means to confirm it.  This caused Defendant Baily to take an extreme interest in arresting the Plaintiff over arresting "Robert," who was already known to the DEA to be the actual recipient of the drugs. Defendant Baily was not capable of making the connection between the Plaintiff and his participation in the DEA's Explorer program due to the fact that Plaintiff separated all communications he maintained with Special Agents from the Explorer program from his normal modes of communication due to certain mafia figures being unaware of Plaintiff's participation

in the program, as discovery of this fast could endanger Plaintiff or otherwise result in his execution. The disclosure by Mr. Ghazi that Plaintiff had somehow penetrated the DEA headquarters is memorialized in DEA investigative materials provided as part of discovery in that case (Exhibit 10), although the DEA never discovered that the "course" referred to in the handwritten notes taken by Defendant Baily, was the DEA's Explorer program. Plaintiff is informed and believes that they mistook Mr. Ghazi's information to mean that Mr. Ghazi was stating that Plaintiff was an informant for the DEA, and upon the DEA having queried their information systems to establish if this was true, they would have discovered that Plaintiff was never a registered informant with the DEA and thereby discounted the information as false.

xx. After Asfand Ghazi was arrested in the DEA sting operation, he additionally refused to implicate the intended recipient of the heroin, an Italian mafia individual named Robert from Starret City, Brooklyn, despite Robert having provided Mr. Ghazi with $5,000 in exchange for some undisclosed amount of heroin (which was 5 times the amount provided by Plaintiff). Plaintiff later discovered that Mr. Ghazi had raised an additional $5,000 towards the scheme only after Plaintiff was arrested and framed by Defendant Baily and Mr. Ghazi as the sole intended recipient of the drugs (in an attempt to cover for Robert). The testimony put forth describing that event by Mr. Ghazi was that the money was actually loaned to him by family members that were unaware he was going to attempt to purchase heroin with it. Mr. Ghazi then proceeded to falsely accuse Plaintiff as sole intended distributor of the heroin, either on his own or after being asked to do so by Defendants Baily and the other DEA Agents that arrested him.

xx. Plaintiff was subsequently arrested on February 14th, 1996 by Defendant Baily after admitting that he providing Asfand Ghazi with $1,000 that he owed him. Plaintiff immediately attempted to provide Defendant Baily with information related to various homicides he

witnessed and/or gained information about, starting with a 1994 homicide that occurred in the Bronx that was committed by an individual later identified to be Abid Chaudhry, a person that Plaintiff already knew was wanted by the DEA for his involvement with that 1994 murder, as well as for his involvement with a previous shipment of heroin intercepted in New Jersey. Defendant Baily took handwritten notes documenting that Plaintiff was offering information on a homicide, although subsequent Privacy Act requests have failed to obtain that documentation.

xx. Plaintiff, after being arrested for suspicion of committing what was at best, a low-level drug charge, was subsequently offering information regarding crimes as serious as homicides, yet Defendant Baily terminated the interview of the Plaintiff immediately after he searched through Plaintiff's wallet and discovered the business card of another high value target of one of their biggest investigations at that time. The business card that Defendant Baily found in Plaintiff's wallet, belonged to a high-profile defense attorney from the Bronx, and individual named Pat V. Stiso, who was apparently already under investigation by the DEA for being "house counsel" to the Maisonet Conspiracy. After discovering Mr. Stiso's business card in Plaintiff's wallet, with Mr. Stiso's personal pager number and other personal numbers also handwritten by Mr. Stiso on the card, Defendants Baily indicated to Plaintiff that he knew who Pat Stiso was. Defendant Baily thereby became informed that Plaintiff was in contact with a high value target of another prominent investigation they were conducting at that time, which Plaintiff later identified to be the Maisonet Conspiracy.

xx. The significance of the DEA finding Mr. Stiso's business card in Plaintiff's wallet is not to be understated. Pat V. Stiso had defended the heroin trade in the Bronx throughout the entire timeline of all the major conspiracies, as he previously defended Ralph Hernandez from the Rivera Conspiracy, and later defended Heriberto Rosario and Sonia Rivera of the Milan

66

Conspiracy, and finished off his career by defending various members of the Maisonet

Conspiracy, including its leader, Francisco Maisonet.  In defending members of these three

conspiracies, Mr. Pat Stiso essentially became "house counsel" and witness to a large portion of

the mega-drug conspiracy alleged in this complaint.  By virtue of the fact that Plaintiff had

penetrated these same three conspiracies and others related to Mr. Stiso, Plaintiff was thereby

rendered a direct witness to the unlawful activities of Mr. Stiso with regards to his clients.

xx.  After realizing that charges for which they were holding the Plaintiff were not strong

enough to either get a conviction, or otherwise subject the Plaintiff to substantial jail time,

Defendants Baily and Dorsky then proceeded upon an unlawful course of activity meant to

illegally subject Plaintiff to vastly inflated legal liability for what was at most, a minor drug

charge, in an unlawful attempt to utilize the threat of significant jail time as a form of leverage

against the Plaintiff to ensure his following through with providing information and cooperating

with the prosecution of homicide investigations, especially in the event that Plaintiff later refused

to cooperate after being released from their custody.  This unlawful course of action was

instituted against Plaintiff despite his already having offered to cooperate without asking for

anything in return and without any preconditions whatsoever.

xx.  Defendant Baily and Defendant Daniel Dorskey, the prosecutor assigned to prosecute

the Plaintiff in that drug case from 1996, then engaged an unlawful prosecution of the Plaintiff

by charging him with conspiring to purchase approximately $500,000 of heroin that was

previously intercepted at Kennedy airport in Queens, New York, under the legal theory that

according to the conspiracy laws, if the Plaintiff had not been arrested after that first transaction

where he provided $1,000 to a codefendant that ultimately attempted to purchase approximately

$6,000 worth of heroin, that Plaintiff would have continued to engage in numerous additional

67

transactions by first selling the total $6,000 worth of heroin that Asfand Ghazi was attempting to purchase, and then taking his profit from his initial $1,000 investment and reinvesting it back into the heroin distribution scheme until the entire shipment was distributed, thereby asserting that Plaintiff was predisposed to committing dozens, if not hundreds of additional small-scale heroin purchases, over the course of weeks or months or years if necessary, until the entire distribution of the shipment was completed. This flawed legal theory enabled Defendant Dorsky and Baily to justify an unlawful prosecution of Plaintiff for allegedly "attempting" to purchase $500,000 worth of heroin by providing $1,000 to an individual whom he owed the money to as the result of a gambling debt.

xx. Defendants Baily and Dorsky then concealed evidence from the Plaintiff that proved that the intended recipient of the drugs was an individual named Robert and not the Plaintiff, in an attempt to claim that Plaintiff was the sole distributor of the drugs that Asfand Ghazi was attempting to purchase, thereby making Plaintiff liable for the entire shipment, instead of at most, a *pro rata* share equivalent to one-sixth of whatever drugs could be purchased with $6,000, according to the $1,000 "contribution" made by Plaintiff. Defendant Baily and Defendant Dorsky instead decided to pursue these bizarre and clearly overreaching legal theories to justify the unlawful prosecution of the Plaintiff on much more severe charges, expressly for the purpose of obtaining unnecessary and unlawful legal leverage against the Plaintiff that they hoped to utilize to be able to force Plaintiff's continued cooperation against Mr. Stiso and Maisonet, as well as the murder they had been investigating since 1994 that Plaintiff indicated to them he had information about. At this time and for 15 years since, Plaintiff was voluntarily offering information about this murder without any pre-conditions.

68

xx.  At the time that Defendants Baily and Dorsky were attempting this unlawful prosecution, Plaintiff was not aware that they already had evidence in their possession in the form of an audio recording made by the DEA and Defendant Baily after the mysterious "Robert" had contacted Asfand Ghazi complaining about not having received the drugs and requesting his money back.  Plaintiff had simply assumed that Mr. Ghazi was entirely responsible for deceiving Defendants Baily and Dorsky, and that they were only pursuing an unlawful prosecution because they had no evidence to suggest that their prosecution was based upon false information provided by Mr. Ghazi, who was himself desperately attempting to evade serious jail time for his arrest in that drug case as he was already a previously convicted felon that served a three year prison sentence for shooting and attempting to murder another Pakistani national named Amir Bhutt several years prior.

xx.  Approximately March of 1996, Plaintiff, through his attorney at the time, a Mr. Roger Bennet Adler, had again attempted to engage Defendant Baily and Dorsky to provide them with the information regarding numerous homicides, but again Defendants Baily and Dorsky refused to debrief Plaintiff regarding these homicides unless he first agreed to plead guilty to the inflated drug charges, which Plaintiff refused to do.  At the same time Plaintiff received word that the DEA, after having receiving the very limited information regarding the 1994 homicide from Plaintiff, thereby attempted to locate the whereabouts of the only murder suspect known to them in that case, Mr. Abid Chaudhry, by asking Asfand Ghazi to contact other acquaintances of the Plaintiff to attempt to solicit information from them regarding Mr. Chaudhry's whereabouts.  Mr. Chaudhry had fled to the Dominican Republic, and then Pakistan shortly after police started looking for him for questioning in the 1994 murder, and Plaintiff was one of only a handful of people in America that knew where Mr. Chaudhry was hiding in

Pakistan. Nevertheless, Defendants Baily and Dorsky then set out to attempt to solve the 1994 murder without any assistance from Plaintiff, which was ultimately impossible for them to accomplish at that time.

xx. After Defendants Baily and Dorsky refused to interview the Plaintiff regarding the homicides he witnesses after his arrest on the minor drug charge, Plaintiff again continued his evidence gathering mission in order to "force" Defendants Baily and Dorsky into acquiescing and finally accepting his cooperation. Prior to Plaintiff's arrest in February of 1996, Plaintiff had sporadically attempted to record conversations and gather evidence of serious crimes while associating with organized crime figures, but was limited in his ability to do so because getting caught engaging in this activity would mean certain death. Prior to 1996, Plaintiff only managed to record a handful of conversations and video recordings, only one of which is relevant to the 1994 murder described herein, and not sufficient in terms of content to be able to ensure a conviction for the murderers. After his arrest in February of 1996, Plaintiff then purchased more advanced surveillance equipment and subsequently outfitted two cars that he was utilizing at that time with a secret recording devices that he subsequently utilized to record over a hundred hours of conversations with mafia figures throughout the time period spanning his arrest in February 1996, until he finally surrendered to serve a prison sentence on March 10th, 1997.

xx. On April 15th, 1996, while Plaintiff was already under indictment in the Ghazi Conspiracy and fighting the case, a newspaper article was printed in the New York Times detailing the abuse of Sheikh Rahman by prison officials at the Federal Medical Center in Springfield, Missouri (Exhibit 11). The article is printed in response to a letter written by Sheikh Rahman while incarcerated in Springfield, Missouri, where he complains about the abuse and recounts the names of the guards that abused him after possibly hearing them call each other by

70

name (as he is blind and would not be able to know the proper spelling of the names he may have heard).

xx.  On April 19th, 1996, a terrorist attack was committed in Egypt against tourists by Sheikh Rahman's followers in Egypt in response to the Springfield letter and the newspaper articles printed about it just 4 days prior, describing how their spiritual leader was being abused by prison guards while being incarcerated at the Federal Medical Center in Springfield, Missouri. The death toll of this revenge attack was 18 innocent civilians killed.  This is the first known terrorist attack to have resulted as retaliation for the unlawful conditions of Sheikh Rahman's incarceration.

xx.  In May of 1996, Plaintiff also managed to record a conversation with another murder suspect, herein identified as SOI-2, that was admitting to having committed a murder in East New York.  Plaintiff did not notify the DEA of this new homicide information due to the fact that they still did not respond to the previous information he provided regarding the 1994 murder that was first offered by Plaintiff upon his arrest, which he was still attempting to acquire information about through the surveillance operation he was now conducting by and through engaging conversations with mafia figures inside of his cars that were outfitted with secret recording devices.

xx.  In the months between February of 1996 and March of 1997, Plaintiff was able to record several additional conversations with members of the criminal conspiracies identified previously in this complaint, including conversations implicating mafia figures in additional alleged murders and alleged conspiracies to commit murder, and an alleged rape that was committed by an individual other than Mr. Karimzada.

xx.  In November of 1996, Plaintiff finally managed to secretly record two lengthy conversations with an individual of Ecuadorian descent known as Raoul Campana, who was at this time a participant in the Paan conspiracy in Florida, as well as a former associate of the Maisonet organization and a primary conspirator in the 1994 murder of Mohamed Syed, as well as two other murders taking place between approximately 1991 to 1994.  The conversations with Raoul Campana clearly implicates Mr. Campana, Abid Chaudhry and others in the 1994 murder, and additionally implicated Mr. Campana in the crime of conspiring to murder Abid Chaudhry in order to eliminate him as a witness to the 1994 murder.

xx.  In other recordings with Mr. Campana that took place during that time period, Mr. Campana also admits to having caused the murder of another unidentified individual named "Juan," who is also an associate of "Chewey Louie" and "Chinito," with Chinito being the son of "Chino," a known member of the "Chingalings" motorcycle gang in the Bronx.  As previously asserted, Plaintiff does not know the actual names of these individuals, yet named Defendants could very easily identify these nicknames and who they belong to since they are already known to them by virtue of them having an extensive file on the Chingalings gang and other individuals associated with them in the Bronx.

xx.  Additionally, and as a result of having infiltrated the Paan Conspiracy through Mr. Raoul Campana, Plaintiff learned for the first time that the Paan Conspiracy was essentially identical to the conspiracy against Sheikh Rahman in that it was originally conceived by Federal authorities in an attempt to subject Fidel Castro, the leader of Cuba, to a criminal indictment in America.

xx.  The Paan Conspiracy, although coming close to attempting to implicate Fidel Castro in criminal wrongdoing, had fallen apart due to the likely hood that previous top secret

documents that had been released would confirm the existence of this pervasive and unlawful plot to subject Mr. Castro to criminal indictment in America.  This previously unlawful "false-flag" operation conducted by the United States government against Fidel Castro, was subsequently dubbed "Operation Northwoods."  This is the first known and acknowledged attempts by United States government officials to claim it is lawful for the United States government to kill innocent civilians in order to increase the political stature of the United States government among the world community (Exhibit 12).  Operation Northwoods is the precursor to the unlawful attempt to lure Sheikh Rahman to America for purposes of causing the 911 attacks to occur, which could then be used as a pretext to subjugate the Middle East.

xx.  On December 6th, 1996, another rape was reported to the NYPD by a victim who later confirmed Mr. Karimzada to be the assailant.  All throughout the time period when Plaintiff was arrested on the heroin case, Plaintiff continued to gather additional evidence of Mr. Karimzada by continuing to video record his activities without ever being able to capture Mr. Karimzada admitting to the rapes on video tape.  Mr. Karimzada was also a potential witness and/or participant in a large scale criminal conspiracy by Afghani organized crime, as evidenced by the FBI subsequently approaching him to interview him following the 911 attacks.

xx.  Sometime after obtaining the recorded conversation documenting the details behind the 1994 murder of Mohammad Syed that the DEA was still obstructing, Plaintiff contacted his attorney Roger Adler and travelled to his office in Manhattan to review the tapes with him, whereby Mr. Adler again contacted Defendant Dorsky and alerted him that he had just reviewed an audio recording related to the 1994 murder and was again requesting to arrange an interview between Plaintiff and Defendants Baily and Dorsky to provide this recording and others that Plaintiff had informed them existed.  Defendant Dorsky again informed Mr. Adler that they

73

would not meet with Plaintiff to review any recordings or evidence he acquired unless Plaintiff first pled guilty to the unlawfully inflated drug charges.

xx.  On December 24th, 1996, Pedro A. Morales was murdered in Washington, D.C. during an attempted robbery of approximately $500,000 in cash that was being stored at some undisclosed location by an individual described herein as SOI-2.  Due to the obstruction of murder investigations by Defendants Baily and Dorsky after Plaintiff's last attempt to cooperate with them in November of 1996, SOI-2 was subsequently allowed to evade prosecution for the East New York murder he confessed to Plaintiff, whereby SOI-2 was subsequently allowed to remain free long enough to commit the additional murder of Pedro A. Morales in Washington, D.C., in December of 1996, which is the first homicide that Plaintiff could identify as completely preventable if not for the deliberate obstruction by Defendants Baily and Dorsky starting approximately February 14th, 1996.  After SOI-2 was thereby allowed to remain free to be able to commit the murder of Mr. Morales in December of 1996, he again subsequently confessed his involvement in that second murder to the Plaintiff just days after it happened, but since the DEA was already refusing to receive information on the previous homicides, there was no attempt to again inform the DEA that they had allowed a murder to occur since they effectively and unlawfully banned Plaintiff from cooperating with them on any matters.

xx.  Due to the refusal by Defendants Baily and Dorsky to resolve these murder cases, and due to the fact that they were pursuing an unlawful and aggressive prosecution that subjected the Plaintiff to a minimum of 10 years in jail with a possibility of up to 40 years if convicted, Plaintiff was forced to eventually plead guilty to the conspiracy charge in an attempt to limit the potential of a 10 to 40 year sentence by opting to fight the weight of drugs attributable to him in an evidentiary hearing known as a "Fatico" hearing.  Plaintiff decided to plead guilty to a crime

he didn't commit in order to eliminate exposure to the mandatory ten year sentence triggered by the drug weight that Defendants Baily and Dorsky were unlawfully attempting to force upon the Plaintiff.

xx. In light of the very aggressive strategies being employed by Defendants Dorsky and Baily, it thereby became necessary for Plaintiff to plead guilty to an open conspiracy charge to distribute an unspecified amount of heroin as a strategy to eliminate the mandatory minimum 10 year sentence through a provision in the sentencing guidelines law called the "safety valve," which was only available upon a plea of guilty to the charges. After pleading guilty, Plaintiff could then attempt to fight the weight attributable to Plaintiff in a Fatico hearing rather than to attempting to fight the charges in their entirety and risk 10 to 40 years if convicted.

xx. Plaintiff pled guilty to the only crime for which he was ever convicted because at that time of his conviction, he did not yet have access to the exculpatory evidence that proved Plaintiff was innocent of the charges in their entirety. Defendant Baily and Dorsky, far from simply having been deceived by Asfand Ghazi, were knowingly in possession of evidence confirming that they were deliberately proceeding with an unlawful prosecution. Approximately November of 1996, Plaintiff finally managed to acquire exculpatory evidence in that case only after Defendants Baily and Dorsky refused to receive the murder recordings in November of 1996, which was the last time Plaintiff attempted to cooperate with Defendants Baily and Dorsky until approximately 1999.

xx. The judge assigned to prosecute the Ghazi Conspiracy, Judge Edward R. Korman, eventually called a Fatico hearing in January of 1997 to resolve the dispute between Plaintiff and the DEA regarding the maximum weight attributable to Plaintiff based upon his "offense conduct." Even though Plaintiff was not guilty of the charges in their entirety, Plaintiff and his

attorney decided that the best way to ensure Plaintiff was not subjected to the mandatory

minimum ten year sentence for attempting to distribute over 2 kilograms of heroin was to instead

advance an alternate legal theory to contradict the one being offered by Defendants Dorsky and

Baily.  Plaintiff, by and through his attorney, then stipulated to providing $1,000 towards the

commission of a drug transaction that involved a maximum $6,000 purchase of heroin, a the

most could only be held liable for a *pro rata* quantity of heroin consistent with whatever amount

the $1,000 could purchase, with the alternate drug customer Robert being responsible for the

remaining $5,000 worth of heroin that Asfand Ghazi was attempting to purchase.

xx.  In January of 1997, a Fatico hearing was conducted by Judge Edward R. Korman

("Judge Korman") during proceedings related to the Ghazi conspiracy.  The Plaintiff was found

not guilty of conspiring to distribute over 2 kilograms of heroin after Defendant Dorsky and

Baily failed to prove, by nothing more than a bare preponderance standard of evidence, that

Plaintiff was guilty of conspiring to distribute over 2 kilograms of heroin.  During the hearing,

there was also evidence presented whereby Defendant Dorsky admitted that the vehicle bearing

license plate H2D 7WK was indeed a DEA surveillance vehicle, confirming that Plaintiff's

identification of the DEA surveillance vehicle was accurate, although no attempt by Defendant

Dorsky was ever made to inquire as to how the Plaintiff was able to acquire this information, nor

did they know that Plaintiff confirmed it using access he acquired to the DEA through the DEA's

Explorer program.

xx.  During the hearing, Asfand Ghazi, Defendants Baily and Dorsky offered perjured

testimony denying the existence of the intended recipient of the heroin, the individual known

only as "Robert."  During direct and cross examination, Asfand Ghazi subsequently perjured his

testimony by claiming Plaintiff was the sole intended distributor of the 2 kilograms being sold by

76

a DEA informant, and Asfand Ghazi additionally denied having a post-arrest conversation with anyone named Robert regarding his failed attempt to purchase heroin directly from the DEA. Defendants Baily and Dorsky did not know that Plaintiff had already acquired the exculpatory recording of that very conversation Mr. Ghazi was denying to have taken place, such conversation already having been intercepted by the DEA and Defendant Baily.

xx. Plaintiff and his attorney, Mr. Adler, then surprised Defendants Baily and Dorsky in open court by playing a copy of the exculpatory audio recording for the Judge immediately after Asfand Ghazi denied having the conversation, thereby proving, at the very least, that the individual that provided Ghazi with the remaining $5,000 was not one of his family members as previously alleged, but was actually a drug dealer that was expecting heroin in return for the money he gave, but was, for whatever the reason, never arrested by the DEA and given a complete pass for his crime.

xx. Judge Korman immediately declared Asfand Ghazi not to be a credible witness, and subsequently sentenced the Plaintiff to having participated in a conspiracy, the goal of which was at most, the purchase of whatever amount of heroin that $6,000 could buy, which was settled at an amount no greater than 100 grams. Judge Korman then sentenced the Plaintiff according to the guidelines applicable to at most, 100 grams of heroin. Judge Korman additionally utilized a combination of sentencing recommendations that subjected the Plaintiff to a total of 15 months in a prison, which was far less than the minimum 10 to 40 years being unlawfully sought by Defendant Dorsky.

xx. Plaintiff would not have pled guilty to the overarching conspiracy charge in that 1996 case had he only been facing a prosecution for at most, 100 grams of heroin, in which case he would have opted to exercise his right to a trial. Plaintiff was denied his right to plead not

77

guilty to the charges by being forced upon him, and was subsequently forced to endure the risk of a potential penalty far greater than that which he would have been facing had Defendants Dorsky and Baily not conspired to proceed with a unlawful prosecution of Plaintiff on charges so severe that Plaintiff was thereby subjected to a minimum 10 to 40 years in prison if he had been convicted during trial.

xx. Even after Plaintiff was acquitted of the major charges in that case in January of 1997, Defendants Baily and Dorsky still refused to approach Plaintiff regarding the unresolved homicides for which Plaintiff was already voluntarily offering information and recordings that corroborated his information. Plaintiff patiently waited from January 1997 until March of 1997 for Defendants Baily and Dorsky to approach him and request the audio recordings and other evidence regarding crimes a serious as homicide, especially since Plaintiff had subsequently proven that he was subjected to a clearly unlawful prosecution after dispensing with the more serious allegations being forced upon him due to perjured testimony orchestrated by Defendants Baily and Dorsky. Defendants Baily and Dorsky never approached Plaintiff to follow up on the information regarding the homicides, and Plaintiff eventually self-surrendered to the Federal Medical Center in Rochester, Minnesota ("FMC Rochester") to serve his sentence.

xx. Prior to the date when Plaintiff self surrendered to prison to start serving his time, on February 9th, 1997, an associate of the Plaintiff named Scott Schulman was killed in Rego Park, Queens. This was the second preventable murder to take place while Plaintiff was out on bail, as Plaintiff had acquired information regarding another murder committed by Mr. Schulman prior to his execution, and if not for the obstruction by named Defendants, Mr. Schulman would have been arrested and incarcerated in time to prevent his own death. Mr. Schulman and several other members of the Mendez Conspiracy, were also members of the Spaghetti Park conspiracy

78

(Exhibit 13).  The murder case of Mr. Schulman, was eventually tried in front of Judge Randall Eng, an Asian judge that was known to other Chinese organized crime syndicates that Plaintiff met at Brooklyn Tech, although it is not alleged in this complaint that Judge Eng was in any way involved in criminal activity, despite Plaintiff having met individuals from Brooklyn Tech that were related to Chinese mafia individuals that claimed to have known him, although they did not describe how.

xx.  Even after Plaintiff began serving his sentence at FMC Rochester, he wrote a handwritten letter to his attorney Mr. Adler stating that he still wished to cooperate in the prosecution of the homicides for which he acquired information and recordings, and that he wished to make another attempt to cooperate with authorities regarding these matters the moment he was released from prison.  Mr. Adler then responded to Plaintiff's letter to acknowledge having received it (Exhibit 14).   A subsequent attempt to retrieve the original letter from Mr. Adler approximately 2009 went unanswered.

xx.  Additionally, both the Plaintiff and Mr. Campana were informed that Mr. Campana was himself in danger of being murdered by several different mafia organizations in New York due to a reward being offered by these organizations for information regarding the whereabouts of Mr. Campana following a dispute that occurred with the hit man that was the actual triggerman in the 1994 murder.  The issuance of a bounty on Mr. Campana's life by members of the mafia that had already committed numerous murders, including the murder of Mohamed Syed in 1994, eventually caused Mr. Campana to flee New York and move to Florida shortly after the murder he committed in January of 1994, where Mr. Campana remained a resident until two months after Plaintiff was incarcerated in March of 1997.

79

xx.  On March 6th, 1997, just four days before Plaintiff self-surrendered to FMC

Rochester to begin serving his sentence, the NYPD announced the conclusion of Operation

Lefrak City I (Exhibit 15).  In that first "disruption" of the Lefrak Conspiracy, Judah Johnson

and Trevor Baily were arrested for conspiracy to commit murder, as the murder plot was

disrupted by police before it could occur.

xx.  Two months after Plaintiff went to prison in March of 1997, Raoul Campana was

himself murdered in North Carolina approximately April of 1997 (Exhibit 16) by an Asian gang

leader that Plaintiff also associated with back in New York.  Mr. Campana's murder was yet

another completely preventable death that was allowed to occur as a result of obstruction by the

DEA and Defendants Baily and Dorsky, whereby they refused to arrest and detain Mr. Campana

in time to prevent his imminent death, despite the fact that Mr. Campana was already implicated

recordings made by Plaintiff admitting to murder.  At any given time, Plaintiff was aware of

many imminent threats to numerous individuals, but Plaintiff was never in a situation where he

was informed that death was clearly imminent until the time when he attempted to prevent the

Marrakesh Bombing.

xx.  Defendants Dorsky and Baily, by refusing to received the recordings that Plaintiff

made with Raoul Campana, additionally took a chance with allowing the murder of Mr. Abid

Chaudhry to proceed after Plaintiff discovered it to be imminent during those same recorded

conversations with Mr. Campana, such murder only having been thwarted after Mr. Campana

was himself killed.  Although Plaintiff was informed of the threat upon Mr. Chaudhry's life,

Plaintiff did not deem his death imminent due to the fact that Mr. Chaudhry was hiding out in

Pakistan to avoid arrest by American authorities for his involvement in the Mohamed Syed

murder in 1994.  Mr. Campana could only kill Mr. Chaudhry if he returned to America, which

Mr. Chaudhry was not likely to do unless already in United States government custody, which is eventually how he was brought back to America following Plaintiff's attempts to cooperate after the 911 attacks. Nevertheless, Defendants Baily and Dorsky would have successfully prevented the death of Mr. Campana if they had not deliberately obstructed Plaintiff's ability to turn him in for the Mohamed Syed murder.

xx. On May 11th, 1997, while Plaintiff was already incarcerated in Minnesota, another rape was reported to the NYPD by a victim later identified to have been raped by Mr. Karimzada. This was the last known rape to have been reported to the NYPD by victims of Mr. Karimzada, which by this time included 5 rape victims already known to the NYPD, and the possibility that Plaintiff may have in his possession actual video recordings of the victims or other women still not identified as victims. Due to obstruction by named Defendants starting February 14th, 1996, there are at least two preventable rapes committed by Mr. Karimzada attributable to the obstruction by named Defendants by virtue of their refusing to arrest Mr. Karimzada when Plaintiff first offered to cooperate with Defendant Baily and Dorsky. If Plaintiff had been allowed to cooperate after his arrest in February of 1996, Mr. Karimzada would have certainly been arrested at that time and denied the ability to engage in the additional rapes that took place in December of 1996 and May of 1997.

xx. Mr. Karimzada was eventually arrested and convicted for the two rapes he committed between 1996 and 1997, and sentenced to 8 to 16 years in State prison for those two rapes. At the time of his conviction and sentencing for the rapes in 1996 and 1997, the NYPD still did not make the connection between Mr. Karimzada and the rape victims from August 11th and December 16th of 1994.

xx. On November 17th, 1997, members of Sheikh Rahman's organization committed a terrorist attack upon a tourist destination in Luxor, Egypt, killing approximately 62 tourists. As a result of this attack, Sheikh Rahman was subsequently shipped to FMC Rochester, the same prison where Plaintiff was already serving his sentence on the heroin conviction, in what appears to be an attempt by the Clinton administration to ease the conditions of Sheikh Rahman's incarcerations and thereby prevent violent retribution by his followers back in Egypt. This easing of restrictions against Sheikh Rahman had the immediate effect of causing Sheikh Rahman to endorse a ceasefire proposal, ordering his group to cease all violent hostilities pending attempts to peacefully negotiate a resolution to the issues that were affecting them.

xx. Approximately January of 1998, Plaintiff and the other Muslims that attended prayer services on a regular basis at FMC Rochester were subsequently informed by the Warden of the prison, Defendant Phill Wise, that Sheikh Rahman was being transferred to the prison to participate in religious services with the prison's Muslim population, which only numbered about 20 active participants at that time. Plaintiff did not inform the prison that his father was also an associate of Sheikh Rahman, as he feared that would cause him to be sent to a different prison.

xx. Once Sheikh Rahman proved willing to renounce violence and order his group to engage in a ceasefire, named Defendants then decided (for reasons still unknown), that they preferred it better when Sheikh Rahman endorsed violence. Instead of continuing to nurture Sheikh Rahman's attempts to abandon his previously violent rhetoric in exchange for an endorsement of non-violent peace initiatives upon which he was able to exert tremendous influence, prison officials at FMC Rochester then began a deliberate and inexplicable course of conduct against Sheikh Rahman that appears to have no other purpose other than to provoke

82

Sheikh Rahman into reversing his endorsement of a ceasefire so as to essentially ensure that he continues to influence people to commit acts of violence against targets in Egypt and elsewhere.

xx.  Between January of 1998 and May of 1998, Plaintiff had numerous monitored and unmonitored contacts with Sheikh Rahman in that prison.  Plaintiff, and numerous other inmates both Muslim and non-Muslim, also witnessed the assault of Sheikh Rahman by prison officials at different times, including one event witnessed by over twenty individuals whereby Sheikh Rahman was assaulted and physically dragged out of a prayer service for essentially doing nothing more than what he was brought there to do, which was to pray.  This assault was also captured on video tape by a camcorder set up in the cage where Sheikh Rahman was praying at the time.

xx.  The existence of a video tape of this assault, which was also witnessed by approximately twenty other independent witnesses who will also confirm that the assault occurred and was captured on video tape, is proof that named Defendants either sanctioned, or refused to investigate prison guards who were unlawfully attempting to cause Sheikh Rahman to rescind his endorsement for the ceasefire that he had issued following the terrorist attack that was committed by his organization in Egypt on November 17th, 1997, whereby his followers had murdered approximately 62 tourists at the Luxor tourist site in Egypt.

xx.  Plaintiff understood the significance of the acts being committed by the guards, and in some ways considered their actions even more provocative than all the previous information he had acquired regarding numerous homicides, especially since the deliberate attempt to cause Sheikh Rahman to renounce his endorsement of a ceasefire, which he eventually did, would pose a threat that could ultimately result in mass-casualty terrorist attacks committed by Islamic militants, the death tolls of any one such attack certain to easily surpassing the total number of

mafia-related homicides Plaintiff acquired information about in all the years of his investigative efforts. Once the impossible was achieved by the United States government in getting Sheikh Rahman to even agree to a ceasefire to begin with, the logical and rational decision for named Defendants would be to then do everything possible to make sure that Sheikh Rahman remained supportive of the ceasefire, rather than attempting everything possible to provoke him into reverting back to endorsing violence.

xx. After Plaintiff was released from prison, he continued to investigate potential terrorism-related conspiracies with even greater urgency following the events he witnessed with Sheikh Rahman at FMC Rochester. Plaintiff was eventually approached by militants after informing various Pakistani and Afghani nationals that he had been incarcerated with Sheikh Rahman at FMC Rochester. These alleged militants then attempted to enlist Plaintiff into a plot to break Sheikh Rahman out of prison, but Plaintiff quickly neutralized the plot by informing them it was impossible to accomplish such a feat. This represents the first known potential terrorist plot disrupted by Plaintiff by his simply advising against it, although Plaintiff did not deem the plot credible at that time and only discovered the relevance of these matters after the 911 attacks.

xx. After beginning to gain access to what Plaintiff believes were sleeper cells of militants operating out of New York and elsewhere, Plaintiff again attempted to contact Defendant Baily by sending him a letter via postal service to DEA Headquarters in Manhattan in early 1999 after Plaintiff enrolled at Queens College in pursuit of his Bachelors degree. Plaintiff believed that even though Defendant Baily was proven to have obstructed a murder investigation and subsequently allowed the death of Pedro Morales and Raul Campana to occur, which he was informed about in that letter sent by Plaintiff to him at DEA headquarters in 1999, that

Defendant Baily would abandon his attempts to continue his obstruction when faced with a matter as serious as terrorism. There was no response from Defendant Baily on this matter, not even to acknowledge receiving the letter.

xx. Plaintiff continued to investigate the terrorism leads after again establishing that the obstruction by Defendant Baily was permanent and non-negotiable, no matter what information or investigation the Plaintiff offered to assist with, including identifying individuals that were inquiring about the feasibility of an attempted prison-break of Sheikh Rahman.

xx. Plaintiff would later learn that the DEA had never stopped investigating Plaintiff after his 1996 arrest. Even after the DEA received the letter sent to them by Plaintiff in 1999, whereby he was again attempting to initiate a dialogue with them, they were still refusing to approach Plaintiff directly yet were still actively operating multiple units of informants that they were directing against Plaintiff in an attempt to lure him into involvement with criminal activity. At the time when Plaintiff sent Defendant Baily the letter in 1999, the DEA was already actively investigating a close associate of Plaintiff, a Mr. Farooq Syed Ahmed, who was receiving heroin send by Abid Chaudhry from Pakistan, Mr. Chaudhry being the same murder suspect they were attempting to arrest for years but were refusing to do so. Plaintiff is informed or believes that the DEA had already located Mr. Chaudhry's whereabouts in Pakistan by determining that he was the source of heroin shipments to the United States, yet still did not act to take him into custody between 1999 and 2001 because they were possibly allowing the conspiracy to continue for purposes of hoping to snag Plaintiff into involvement with it despite his clearly announced intention to disrupt it the moment he could be given a chance.

xx. Between approximately 1999 and 2001, Mr. Chaudhry eventually became the principle defendant in the heroin distribution case known as the Chaudhry Conspiracy, a heroin

importation scheme that would have never been allowed to proceed forward if the DEA had arrested Abid Chaudhry in 1996 for his role in the 1994 murder, which Plaintiff had first offered to resolve in February of 1996.

xx. On August 21st, 1999, a newspaper article was written in the New York Times describing the abuse of Sheikh Rahman at FMC Rochestor (Exhibit 17). The article states that Special Agent Paul McCabe with the FBI was confirming an investigation into the abuse of Sheikh Rahman. Although the FBI went to visit Sheikh Rahman at FMC Rochester to investigate the claims, it was not possible for Sheikh Rahman to relay information about the abuse to them since he was blind and could not identify those involved. Because Sheikh Rahman is blind, he was also unaware that there were numerous witnesses to his abuse during the prayer ceremony and other events. Since Sheikh Rahman did not know the identity or even existence of other witnesses to the abuse, he could not inform the FBI as to the existence of such witnesses in order for them to properly investigate the abuse, even when they finally became involved in investigating it only after this last reported incident from 1999.

xx. Plaintiff made numerous attempts to inform Federal authorities regarding this abuse that was only once investigated in 1999, starting with the letter he mailed Defendant Baily that same year. Named Defendants clearly obstructed knowledge of the events witnessed by Plaintiff from reaching the appropriate FBI agents in Minnesota tasked with investigating this abuse at the prison in 1999.

xx. On or about June 14, 2000, Lynne Stewart, Sheikh Rahman's defense attorney at that time, had issued a press release stating that Sheikh Rahman "is withdrawing his support for the cease-fire that currently exists." By releasing this communication, Lynne Stewart subsequently joined the conspiracy by named Defendants as an "unauthorized co-conspirator" in taking

86

actions that are clearly contrary to the best interests of her client, as such actions were certain to sabotage any possibility that her client could be repatriated back to Egypt in order to prevent further scrutiny of the process that ended with his being sentenced to life in prison in solitary confinement.

xx. Sheikh Rahman was being deliberately subjected to unlawful conduct by prison officials and named Defendants that eventually caused him to revert back to being vengeful and supportive of violence.  In the situation whereby Lynne Stewart was confronted with the choice to allow Sheikh Rahman to hurt his own defense by renouncing his support for the abandonment of violence, it was incumbent upon Lynne Stewart to deny named Defendants the fruits of their unlawful conspiracy by refusing to either assisting, encourage and/or endorse Sheikh Rahman to communicate his abandonment of a ceasefire position.  The focus of Lynne Stewart, as a Defense attorney tasked with rendering effective assistance of counsel, is to abandon attempting to assert her role as "commander of the rebel forces" by issuing military orders, and instead focus upon rendering assistance and counsel to otherwise defeat the unlawful actions of prison guards and the named Defendants that allowed Sheikh Rahman to be transformed into a political tool to ensure that the 911 attacks were allowed to proceed.

xx. In the event that Sheikh Rahman was demanding such a renunciation of peace be made, it was incumbent upon Lynne Stewart to not release this information without a proper investigation and every effort made to enable Sheikh Rahman the legal right to release his own communications in the same manner afforded other inmates.  If Lynne Stewart could not present Sheikh Rahman's abandonment of the ceasefire within the proper context under which it happened, then she should have withdrawn as Sheikh Rahman's attorney rather than engaging in negligent acts that are completely against the best interests of her client.

87

xx.  On or about October 12, 2000, in Aden Harbor, Yemen, two terrorists piloted a bomb-laden boat alongside the United States Navy vessel, the U.S.S. Cole, and detonated a bomb that ripped a hole in the side of the U.S.S. Cole approximately 40 feet in diameter, murdering seventeen crew members, and wounding at least forty other crew members.  It was later revealed during a subsequent prosecution of Lynne Stewart in 2002, that the attack on the U.S.S. Cole was committed in response to Lynne Stewart's press release made four months earlier in June of 2000.

xx.  Despite the direct link between Lynne Stewart's military-type orders and the subsequent compliance by terrorists in their attack upon the U.S.S. Cole, and despite named Defendants eventually confirming this to be true through surveillance of communications between Lynne Stewart's legal team and terrorists located oversees, named Defendants still did not attempt to arrest Lynne Stewart until several months after the September 11th, 2001 attacks in an attempt to cover for their complicity in having previously guided Lynne Stewart into facilitating the return to hostilities by terrorist through ideological support from Sheikh Rahman, such hostilities being directly responsible for causing the 911 attacks to occur.

xx.  Named Defendants, as part of an unlawful conspiracy to discriminate, had eventually developed a continued need for Sheikh Rahman to publically issue statements endorsing violence in a manner calculated to give Islamic militants the impression that these orders were somehow being violently suppressed through the brutal isolation of their spiritual leader, for no other reason other than that they were completely true and justified.  Sheikh Rahman was considered the spiritual leader of both his organization in Egypt and Al-Qaeda, and Osama Bin Laden desperately needed justification and ideological support from Sheikh Rahman to be able to continue to commit acts of violence, especially since Osama Bin Laden was not regarded as a

scholar of Islamic jurisprudence on the level of Sheikh Rahman. Bin Laden would have quickly been rendered incapable of engaging in spectacular attacks without continued endorsement from Sheikh Rahman or his followers, which is why he continued to reference Sheikh Rahman in his various statements, as well as having taken custody of several of Sheikh Rahman's children that eventually fled Egypt to Afghanistan.

xx. Named Defendants then successfully provoked both the attack on the U.S.S. Cole and the September 11th, 2001 terrorist attacks by not specifically attempting to again convince Sheikh Rahman to revert back to endorsing a ceasefire after having first causing him to lash out against his America captors after years of abuse at the hands of prison guards starting approximately 1996. Even after they solicited the assistance of an unwitting Lynne Stewart in this plot, they did not arrest her after the bombing of the U.S.S. Cole because that attack, and the previous embassy attacks in Africa were still not considered "provocative" enough to justify enacting Patriot Act type legislation, which they hoped to use to further their unlawful and discriminatory conspiracy. Lynne Stewart was allowed to continue her activities, despite violating specific orders from named Defendants not to do so, in the hopes that named Defendants could continue to benefit from the release inflammatory statements that may succeed in provoking an attack far greater than anything previously witnessed.

xx. Named Defendants could not have prevented any random release of military-type orders from Lynne Stewart from causing an attack, so it was clear that by allowing her to remain Sheikh Rahman's attorney even after she was in violation of Special Administrative Measures that she agreed to as a pre-condition of her representation, named Defendants simply intended to give Lynne Stewart the ability to continue to release inflammatory directives and statements by Sheikh Rahman, such activity having already been deemed unlawful by the named Defendants

89

based upon Ms. Stewart signing a declaration that she would not engage any such communications.

xx. Named Defendants additionally did not immediately arrest Lynne Stewart after the September 11th, 2001 attacks in an attempt to obstruct the ability of the public to make a direct connection between Defendant Stewarts actions and the resulting 911 attacks, as scrutiny would have been sure to expose the conspiracy that is the subject matter of this complaint. Lynne Stewart was therefore allowed to remain free until 2002 for offense conduct known to the named Defendants since 2000, offense conduct that they later alleged to be directly connected to Osama Bin Laden and his conspiracy to wage war against America through ideological justification provided by Sheikh Rahman and the harsh conditions of his incarceration that resulted from an completely unlawful prosecution.

xx. As the increase in terrorists attacks linked to Sheikh Rahman and Osama Bin Laden continued, and after Plaintiff was himself informed in late 2000 that the bombing of the U.S.S. Cole was conducted in an attempt to win the release of Sheikh Rahman and in response to his previous withdrawal of the ceasefire announced by Defendant Stewart, Plaintiff had then begun to devise a plan to travel to Afghanistan to meet with Osama Bin Laden directly for purposes of attempting to nullify the military orders allegedly issued by Sheikh Rahman through Defendant Stewart. Plaintiff additionally warned militants in New York and elsewhere that the issuance of a press release indicating Sheikh Rahman's abandonment of a ceasefire was completely contradictory to the information Plaintiff received from Sheikh Rahman while incarcerated with him, whereby Sheikh Rahman had also confirmed his endorsement of the ceasefire to Plaintiff while they were incarcerated together, and any such change in Sheikh Rahman's position could

only be due to the failure of Plaintiff to effectuate an investigation into the abuse of Sheikh Rahman based upon continued obstruction of all these cases by the DEA.

xx.   Plaintiff continued to infiltrate cells linked to the individuals that were still attempting to solicit Plaintiff's assistance with terrorism-related conspiracies while also monitoring other activities of other conspiracies he had infiltrated, resulting in another incident relevant to the subject matter of this complaint.   In November of 2000, Plaintiff again attempted to disrupt an event that eventually led to the attempted murder of a NYPD police officer by a member of one of the Pakistani street gangs named "Main Street Posse" that was also originally funded by Pakistani ISI, but later abandoned after the gang splintered and eventually came into conflict with the main Pakistani funded ISI gang known as the "Medina Boys."

xx.   In November of 2000, Plaintiff acquired information that an associate by the name of Mohamed Ali was being threatened by an individual named Mohammed Khan, another previous associate of the Plaintiff who was residing in the same building as Mr. Ali, located on Sanford Avenue in Flushing, Queens.   Plaintiff was informed by Mr. Ali, that Mr. Khan was threatening him with a firearm.   Mr. Ali sought out assistance from Plaintiff because he knew Plaintiff was capable of using his influence and connections to Mr. Khan's gang, the "Main Street Posse," which was headquartered on Main Street in Flushing, Queens, to order Mr. Khan to cease and desist with his threatening activities against Mr. Ali.   Plaintiff attempted to reach out to Mr. Khan to order him to cease threatening Mr. Ali, but could not locate him on that day he went looking for him.

xx.   Plaintiff subsequently provided the identity of Mr. Khan's probation officer to Mr. Ali, and instructed Mr. Ali to contact Defendant James and report the fact that Mr. Khan was

threatening him, which Mr. Ali communicated to Plaintiff that he had done so without any response or arrest of Mr. Khan for his violation of the terms of his probation.

xx. Mr. Khan was already a previously convicted felon at the time he was making these threats against Mr. Ali, and barred from possessing a firearm. Mr. Khan's previous conviction stemmed from an event whereby he assaulted and robbed an FBI agent of his gun, a .38 caliber Smith and Wesson revolver, during an assault that allegedly took place in Jackson Heights. Mr. Khan subsequently threatened to kill Federal agents that were attempting to capture him for that assault, and was eventually captured without incident and sent to federal prison for several years before being released.

xx. Upon Plaintiff instructing Mr. Ali to contact Defendant Richard James to report that Mr. Khan was in possession of a firearm, which Mr. Ali described to be a black .380 caliber handgun that Mr. Khan had allegedly acquired from his sister "Shaquilla," Mr. Ali then subsequently contacted and informed Defendant Richard James that Mr. Khan was threatening his life, and requesting Defendant James to immediately intervene and arrest Mr. Khan.

xx. Defendant James failed to act in time to arrest Mr. Khan, and shortly thereafter, Mr. Khan had engaged in a shootout with NYPD officers using that same gun whereby he subsequently shot NYPD Officer Harrington "Harry" Marshall in the arm before being killed in that same shootout. The shooting of Officer Marshall and the death of Mr. Khan in November of 2000 was again, an event that was completely preventable had Defendant James responded to arrest Mr. Khan, as was his responsibility to do so after having been informed by Plaintiff, through Mr. Ali, of the imminent threat that Mr. Khan posed to himself and others.

xx. In December of 2000, Plaintiff was contacted by a NYPD Detective named Mark Valencia from the 111th Precinct in Bayside, Queens, regarding his investigation into the robbery

of a Star Nissan car dealership located on Northern Boulevard in Bayside, Queens.  Plaintiff was contacted via telephone at his home by Detective Valencia, who was investigating a former "Medina Boys" member by the name of Dabir "David" Hussein for having plotted the robbery. Mr. Hussein, who was working at the dealership at that time, had subsequently set up the elaborate robbery of a secretary that worked at the location who was known to deliver large amounts of cash to the bank, and Detective Valencia was somehow informed that Plaintiff had information regarding the robbery, but is not informed how he came to acquire that information.

xx.  Plaintiff had no previous knowledge of the robbery when contacted by Detective Valencia, so he informed the Detective that he had no information about the event.  Plaintiff subsequently made contact with various individuals and quickly discovered who committed the robbery, whereby he then interviewed the robbers directly and confirmed Mr. Hussein's involvement in the planning the robbery, for which he was never arrested, making this yet another investigation being obstructed by named Defendants as Plaintiff repeatedly attempted to resolve that matter as well in the years following the 911 attacks.

xx.  In December of 2000, Plaintiff was again a direct witness to another homicide that occurred outside a nightclub in Queens, New York on December 30th, 2000, and was even detained briefly by police during the investigation.  By the time of this homicide, Plaintiff had additionally infiltrated an identity fraud organization previously identified in this complaint as the Byte Size Conspiracy (Exhibit 18).  An individual named Ahmed Hassan, the brother of Rami Hassan, the alleged "enforcer" for the Byte Size Conspiracy, was subsequently murdered outside a night club in Astoria, Queens during a shootout with a rival gang.  Plaintiff was part of a group of individuals including Ahmed Hassan that were present on the scene that day when a

rival gang attempted to murder Rami Hassan, whereby they subsequently killed Rami Hassan's brother and wounded another individual named Jason Amato from Maspeth, Queens.

xx.  This shootout additionally occurred in full view of two NYPD officers that arrived on the scene to attempt to break up the fight that immediately preceded the shootout, and thereby took cover behind their police car once the shooting started and remained there until after the shootout had finished.  Ahmed Hassan was subsequently shot in the head during that shootout, and Jason Amato was shot in the torso.  Plaintiff then utilized his car to transport Mr. Amato to Elmhurst Hospital in Queens after they both fled the scene of the shootout with another individual named Joseph Gambetta.  Upon arrival at the hospital with Mr. Amato, Plaintiff and Mr. Gambetta, Plaintiff and Mr. Gambetta were then taken into custody by NYPD police and transported to the 114th Precinct in Queens to be interviewed as part of the investigation into that shooting.  Plaintiff and Mr. Gambetta were quickly cleared of involvement in the murder of Ahmed Hassan, and they were subsequently released from the precinct and allowed to return to the hospital to check on the status of Mr. Hassan and Mr. Amato, only to find that Mr. Hassan was brain dead and eventually taken off life support that morning and pronounced dead.  Mr. Amato survived his injuries and was released later that morning.

xx.  The murder of Ahmed Hassan is yet another homicide investigation being obstructed by named Defendants, as it appears to remain unsolved until today despite the arrest of several suspects in that case, as well as the Plaintiff being a direct witness to the murder that was actually detained during the investigation but subsequently rendered reluctant to cooperate due to his inability to first resolve the ongoing dispute he was having with the DEA.  Plaintiff could not understand why the DEA was obstructing the previous murder investigations, and Plaintiff was compelled to save all information he acquired for the express purpose of providing it specifically

to the DEA so as to make amends with the Agents at the Explorer Program, hopefully to be able to be forgiven by them for having overstepped his boundaries while conducting his own personal investigations without their authorization.  The murder of Ahmed Hassan was also preventable due to the fact that Plaintiff had acquired information regarding another murder allegedly committed by his brother, Rami Hassan, in retaliation for the attempted murder of another individual named "Boris," whose attempted murder was also investigated by Detectives from the 114th precinct in Astoria, Queens.

xx.  In the events leading up to the murder of Ahmed Hassan, an individual named Boris was shot in the head in Astoria while he sat in a black Mercedes owned by Rami Hassan after a gunman accidently mistook Boris for Rami.  After Boris was shot in the head, Rami Hassan eventually returned to his car and noticed Boris had sustained a gunshot wound to the head from an assailant that fled the scene, whereby Rami then transported Boris to the hospital before fleeing the scene thereafter, causing the police to search for him to question him regarding that shooting incident.  Although Boris subsequently survived the shooting incident, Rami Hassan was then alleged to have murdered the individual he suspected was responsible for attempting to murder him in Astoria, and Plaintiff had acquired information about this murder prior to the subsequent murder of Rami's brother, Ahmed Hassan.

xx.  Even after the Ahmed Hasan murder in December of 2000, Plaintiff continued to acquire information about murders while still actively investigating more substantial terrorism leads.  Due to the unprecedented obstruction by the DEA, Plaintiff was simply resigned to continue to collect information while awaiting some opening or ability to again attempt to resolve the cases through the DEA without having any plan or timeline by which to attempt to again approach the DEA.  Plaintiff could not anticipate imminent homicides, as he was being

surprised with them throughout these events. Plaintiff only had forewarning of an imminent death twice, the first time being when he was informed that Raoul Campana was requesting assistance from Plaintiff in executing Abid Chaudhry, and the second time after acquiring confirmation that the Marrakesh bombing was imminent. The DEA could have, at any time, approached the Plaintiff to acquire such information that they already knew him to possess, which would have resulted in the immediate incarceration of multiple individuals whose ability to continue to participate in criminal activity would have been disrupted, resulting in the prevention of homicides. In the event of the murder of Ahmed Hassan, if the DEA had stopped their obstruction and approached Plaintiff in the time period following Boris's attempted murder in Astoria, and the time when Ahmed Hassan was also killed in Astoria, such an event would have had the effect of allowing Plaintiff the ability to incarcerate Rami Hassan for a previous murder in time to prevent the murder of his brother, Ahmed Hassan, and a subsequent retaliation killing that was alleged to have occurred as a result of his brother's murder.

xx. Another coincidence regarding the murder of Ahmed Hassan, was that it occurred across the street from another location where another associate of Plaintiff was also shot and killed, an individual known to the Plaintiff as "Ceasar." In that shootout, another gang member from TNS named "Will" from South Side, Brooklyn, was involved in the shootout and returned fire at the assailants that had killed Ceasar, and subsequently wounded one of the assailants. Both Will and Ceasar's killer were arrested, but again, just as the Hassan murder (were all the participants were arrested), the police botched both cases and everyone ended up being acquitted of both the Ceasar murder and the Hassan murder. Plaintiff is informed and believes that if he was allowed to bear witness to those events, both murder cases would have resulted in convictions.

96

xx.  The death of Ahmed Hassan again provoked Plaintiff to attempt to inform upon potential terrorist organizations he infiltrated by enlisting the services of another individual to convey information to the DEA in a manner whereby the DEA would not know it came from Plaintiff.  The theory was that whenever the DEA determined that information they were receiving was coming from Plaintiff, they would simply obstruct it.  Plaintiff then arranged for another letter, this time anonymous, to be sent to the DEA attempting to inform upon a certain individual connected to this cell of Afghani and Pakistani drug suppliers with ties to Pakistani ISI.

xx.  Plaintiff later confirmed that this letter was sent by the individual whose assistance he solicited for this experiment, which he believed would result in the immediate arrest of certain individuals located both in America and overseas, at which point Plaintiff would then attempt to come forward and identify himself as the source of the information.  For years following that event, there was no indication that the letter was even received by the DEA until Plaintiff finally acquired information that individuals targeted by Plaintiff had been arrested years later.

xx.  At approximately the same time that Plaintiff arranged for this anonymous letter to be mailed to the DEA in 2001, Plaintiff neared the attainment of his Bachelors degree at Queens College and eventually began to make preparations to undertake a trip to Afghanistan to meet with Osama Bin Laden for purposes of attempting to secure a ceasefire from Bin Laden that he hoped to utilize as leverage to ensure that all the murder investigations that were being obstructed, as well as the investigation into the abuse of Sheikh Rahman, were finally allowed to proceed forward to a proper and lawful resolution.

xx.  In May of 2001, Plaintiff obtained an invitation that allegedly came directly from Osama Bin Laden through an intermediary, asking Plaintiff to travel to meet with Bin Laden in

Afghanistan regarding the situation with Sheikh Rahman. In response to this request, this individual asked Plaintiff for information related to his father and his father's partner, Sheikh Daoud Ahmed Faisal, that they wished to submit to Osama Bin Laden so as to corroborate that Plaintiff's father was a known and respected religious leader from New York that had also associated with Sheikh Rahman. Plaintiff provided this individual with several documents related to the activities of his father and Sheikh Daoud, including the photocopy of a speech that was alleged to have been given by Sheikh Daoud to a General Assembly of the United Nations (Exhibit 19).

xx. Plaintiff was going to undertake a trip to Afghanistan to attempt to convince Osama Bin Laden to at least agree to submit to a temporary ceasefire pending the investigation of the abuse of Sheikh Rahman, knowing that media attention that would be generated by such ceasefire would thereby ensure that at the very least, a proper investigation would be conducted by the FBI into the abuse of Sheikh Rahman, the outcome of which would have likely resulted in the immediate repatriation of the Sheikh to Egypt to finish serving his sentence in an environment less likely to cause a backlash against America.

xx. Despite Plaintiff formulating a viable, actionable plan to attempt to institute a major terrorist ceasefire after securing an interview with the most notorious terrorist leaders currently known to authorities, Plaintiff thereby informed the intermediary that he would not be able to travel to Afghanistan until after he first attained his journalism degree from Queens college in the Spring of 2001. The trip was then scheduled for August of 2001, whereby Plaintiff was going to first travel to Morocco, and then Pakistan, where he would be met by his connection and taken across the border to Afghanistan as the "honored" guest of a powerful tribe that controlled

98

the Swat Valley region of the North West Frontier Province of Pakistan, as well as Plaintiff also being an "honored" associate of yet another tribe of Afghani's from Kundahar.

    xx.  Although Plaintiff was scheduled to graduate from Queens College approximately July of 2001, an unexpected racial attack against him by a professor at the Media Studies department of the school ultimately delayed his planned August trip, forcing Plaintiff to then take an additional course in August of 2001 to complete the requirements for the degree in time to graduate by the September 1st, 2001 graduation date.  A professor at Queens College named Mr. Murray Foreman, who has not been named as a Defendant in this case due to the inability of Plaintiff, as of yet, to acquire any evidence suggesting that Mr. Foreman conspired with others to deliberately delay the Plaintiff from taking this planned trip to Afghanistan, subsequently subjected Plaintiff to a bizarre and completely unexpected racial attack after issuing Plaintiff a clearly unjustified failing grade in a class required by Plaintiff to complete the requirements of the Media Studies portion of his degree.  Mr. Foreman then left the school and New York City, literally the same day he issued the failing grade, to teach at Northeastern University in Boston, Massachusetts.  Due to the fact that Mr. Foreman left Queens College approximately the same day he issued the grade to Plaintiff, Mr. Foreman also knew that he would not have to explain his actions to anyone and could thereby escape culpability and accountability for what he did.  Mr. Foremen thereafter refused to respond to numerous inquiries from the school and Plaintiff to explain the grade, which eventually caused Plaintiff to delay his trip to Afghanistan that was originally planned for August of 2001.

    xx.  Plaintiff was therefore forced to retake Mr. Foreman's class in August of 2001 in order to graduate by September of 2001, thereby causing Plaintiff to contact the intermediary that had secured the meeting with Osama Bin Laden in an attempt to reschedule the trip to take

place sometime in late September or early October of 2001. When Plaintiff informed the intermediary of this, the intermediary informed Plaintiff that he should not attempt to retake the class in August as the completion of the degree was not more important than the meeting with Osama Bin Laden, and that Plaintiff should still make the trip to Afghanistan in order to maintain "credibility" with Osama Bin Laden. Plaintiff refused to acquiesce to this demand and insisted that he needed to complete the degree prior to attempting any travel to Afghanistan. The intermediary then informed Plaintiff that he would communicate the delay to Osama Bin Laden and attempt to reschedule the trip for sometime in September or October of 2001. Absolutely no indication whatsoever was provided to Plaintiff that any terrorist attack was imminent in September.

xx.  Plaintiff was later informed that although Osama Bin Laden was aware of the specifics regarding the 911 plot, that the actual order to attack America on September 11th, 2001, was not issued by Osama Bin Laden directly, but by an unidentified intermediary that was the communication link between him and the 911 hijackers.

xx.  On September 10th, 2001, Plaintiff was finally able to obtain relief from Queens College officials in expunging the "F" grade unlawfully assigned to him by Murray Foreman, who currently still employed as a professor at Northeastern University in Boston, Massachusetts. School officials at Queens College described Mr. Foreman's acts to have provoked an 'unprecedented' situation (Exhibit 20).

xx.  On September 11th, 2001, four airplanes were hijacked and utilized as missiles to attack various locations including the World Trade Center in New York City, which had been unsuccessfully targeted for destruction in 1993 yet revisited as a target once again.