# EXHIBIT 2

# EXHIBIT 3

| Free Republic | News/Activism |
| Browse · Search | Topics · Post Article |

Skip to comments.

## When Jihad Came to America (Omar Abdel Rahman)
**Commentary Magazine ^** | March 2008 | Andrew C. McCarthy

Posted on **Friday, March 28, 2008 5:08:28 PM** _____

When Jihad Came to America by Andrew C. McCarthy

On May 2 and 3, 1990, the U.S. embassy in Cairo alerted its counterpart in Khartoum that Egypt's "leading radical," Omar Abdel Rahman, was on his way to Sudan. Warning that his ultimate plan might be to seek exile in the United States, the Cairo embassy asked its colleagues to pass along any information they might learn about his activities on Sudanese soil.

What did U.S. officials already know about Abdel Rahman in 1990? As the 9/11 Commission would later determine, they knew that he

had been arrested repeatedly in Egypt between 1985 and 1989 for attempting to take over mosques, inciting violence, attacking police officers, and demonstrating illegally, and that he had been imprisoned and placed under house arrest until he left Egypt for Sudan.

And yet when, immediately upon arriving in Sudan, Abdel Rahman made application at the American embassy for a multiple-entry visa to the United States, the document was issued to him within a week.

Visa in hand, Abdel Rahman—then fifty-two years old and sightless from a case of childhood diabetes, which had led to his being dubbed the "blind sheikh"—relocated to the United States on July 18, 1990. He first took up residence in a house in Bay Ridge, Brooklyn, then settled in an apartment across the Hudson in Jersey City, New Jersey. In December 1990, fully six months after first learning that it had issued the visa in error, the State Department revoked it. By then, however, Abdel Rahman had exited and re-entered the United States on three occasions—one of them six days after the visa's revocation, when he avoided detection by employing a slight variation on the spelling of his name.

At the start of 1991, the New York office of the Immigration and Naturalization Service (INS) began an investigation to determine whether grounds existed to deport Abdel Rahman for fraud in the acquisition of his visa. At almost exactly the same moment, he officially sought permanent resident-alien status as a "Special Immigrant, Religious Teacher." Incredibly, the INS responded by granting his request and issuing him a coveted "green card" on April 8. It seems that, unbeknownst to the INS office in New York where he was being investigated, Abdel Rahman had applied for this upgrade in status in Newark, New Jersey. By the time he once again sought to re-enter the United States in July 1991, the authorities could detain him only briefly before letting him back in. After all, he was now a permanent resident.

As is well known, the blind sheikh would be the motive force behind the first effort to bring down the World Trade Center buildings, the bombing that killed six adults, one of them a woman well along in pregnancy, and wounded hundreds more in February 1993. I led the team of prosecutors who in 1995 successfully convicted him and nine others for that conspiracy.

But this was not the first terrorist act on American soil for which he bore some responsibility. It was preceded, only months after his arrival, by the assassination of the radical Jewish activist Meir

Kahane. Had American authorities understood the significance of this murder, connected it to what they already knew about Abdel Rahman's burgeoning activities in America, and worked to mine the reams of evidence left by Kahane's assassin in his car and home, they would have gathered the information necessary to break up a terrorist ring in its relative infancy and thereby prevent the 1993 bombing—and, perhaps, much else that was to follow. That is not what happened.

Omar Abdel Rahman's arrival in New York in July 1990 lit a fuse to the city's nascent but already functioning jihadist community. He went to work right away. It was time, the sheikh exhorted his flock in Brooklyn and Jersey City, to stop pretending that the challenge for Muslims lay elsewhere in the world. The challenge lay right here in the United States. This country, he preached, was "the big evil," the "fiercest enemy of Islam," and the real power behind not only the Middle East interloper Israel but such secular Islamic governments as Hosni Mubarak's Egypt.

Sheikh Omar pilloried his followers for their empty talk, talk, talk about jihad. He wanted the real thing. A tireless booster of Hamas and of the effort to funnel funds to the terrorist group Palestinian Islamic Jihad, he traveled the world to raise money and fighters for the Afghan mujahideen and for militant Muslims in Bosnia.

In his exhortations to his American followers, the blind sheikh cautioned against recklessness. "Child's play," he counseled, was to be avoided, and resources should be marshaled for deeds of greater impact. Next to the murder of Egyptian President Anwar Sadat in 1981, his favorite example of an effective jihadist operation was Hizballah's strike against the United States Marines in Lebanon in 1983. But the main point was this: one way or another, it was time to wage jihad in, and against, America.

Among those listening closely to Abdel Rahman's words was a thirty-four-year-old Egyptian-born immigrant named Sayyid Nosair. An engineer by education and by trade, Nosair was now working as a maintenance technician at the criminal court in lower Manhattan. More significantly, he was already known in jihadist circles as the "emir of marksmanship," working to build the Egyptian sheikh's American cell.

The cell's headquarters, a Brooklyn mosque, had come to the FBI's attention in the late 1980's because of potential violations of the Neutrality Act, which prohibits people inside our borders from making war against countries with which the U.S. is at peace. Officially, America was not in a state of armed hostilities with the Soviet Union or with Afghanistan, though covertly (through the Pakistani intelligence service) the CIA was arming the Afghan mujahideen in their struggle against the Russians. The FBI suspected the mosque was a hub for the international effort to recruit young Muslims to fight in Afghanistan—and so, in essence, the FBI was investigating as a potential violation that which the CIA was indirectly facilitating.

The cell, however, had other ideas. It was training its members to become a force capable of conducting jihad operations—bombings, kidnappings, political assassinations—anywhere the cause could be advanced, including the United States. In the summer of 1989, surveillance agents learned the mosque was serving as a weapons depot. On several July weekends, groups of men were seen carrying out boxes, loading them into vehicles, and driving them to a firing range in Calverton, Long Island. The boxes contained various kinds of guns, which the men spent hours shooting in practice drills.

On July 2, for example, Nosair, accompanied by Mahmud Abouhalima and Mohammed Salameh, among others, loaded up some cars near the mosque and drove slowly and warily to Calverton, stopping en route to pray by the side of a road. Upon arriving at the range, they spent the day firing at targets with an array of weapons, from high-powered AK-47 rifles to 9mm semi-automatic pistols.

Nearly identical trips occurred over the following weekends, with agents taking dozens of photos of the trainees, including another close Nosair associate named Nidal Ayyad.

The Bureau's surveillance initiative came to an abrupt end on July 23 when Nosair and Abouhalima, leading a group of sixteen men through shooting drills, sensed they were being watched. After dispatching one of their charges to check out a nearby van with darkened windows, Abouhalima led a group that pounded on the vehicle until an agent inside responded. Confronting him, they complained that they were being subjected to harassment based on religious bias. The investigation ground to a halt.

The training, of course, did not. And it was far more extensive than the sessions at Calverton, involving weekend-long exercises at remote outposts and featuring experimentation in explosives and assault tactics. Nosair and Abouhalima would report to the blind sheikh, then still in Egypt, about the training and other developments in overseas telephone calls that Nosair recorded, playing them aloud at the mosque to promote recruiting.

Nosair's other conversations with Abdel Rahman were similarly illuminating. For example, in the year before the cleric moved to the U.S., the two men commiserated by phone over the Mubarak regime's programmatic encouragement of birth control in poverty-stricken Egypt. This initiative, they complained to each other, was especially poorly timed just as Soviet Jews were stepping up the pace of emigration to "Palestine." Mubarak, they concluded, was shoring up Jewish control of the region.

At the time, the most radical proponent of Jewish migration to Israel was Rabbi Meir Kahane, who in the late 1960's had founded the Jewish Defense League (JDL) in New York. The JDL had been responsible for several terrorist attacks against Soviet targets in the United States, attacks ostensibly aimed at coercing the Soviets to free Russian Jews to move to Israel. After emigrating to Israel himself, Kahane was elected to the Knesset, occupying a seat until the late 1980's when his party, Kach, was disbarred for anti-Arab racism. (Among other things, Kahane had called for the expulsion of non-Jews from the West Bank and the Gaza Strip.)

During October and November 1990, Kahane embarked on a speaking tour of the United States. On the evening of November 5, he appeared in a ballroom at the Marriott Hotel in midtown Manhattan. Fifty or sixty people were in attendance for the two-hour lecture, including Nosair and two associates: Mohammed Salameh and Bilal Alkasi.

At the conclusion of his speech, Kahane mingled with audience members near the podium. Nosair approached, concealing a .357 magnum Sturm Ruger revolver, fully loaded with hollow-point rounds, its barrel shortened, the sight filed down (to avoid inadvertent hooking on clothing at the moment of truth), and the serial number obliterated—the trademarks of an assassin. Worming his way into a small knot of people, Nosair suddenly drew from a distance of about seven feet, pumping two shots into Kahane and killing him instantly.

As the onlookers recoiled, Nosair fled, trailed by one of Kahane's retinue. At the rear door, he ran into a plucky septuagenarian, Irving Franklin, who struggled briefly with the assassin until he fired again, striking Franklin in the leg. As Franklin (who would survive) fell bleeding to the floor, Nosair dashed out of the hotel and into the night.

He was almost certainly looking for a particular yellow taxi, the one usually driven by his associate Mahmud Abouhalima. Failing to find it, he randomly picked another, dove into the rear passenger seat, and ordered the driver to step on it, jabbing him in the back of the head with his gun. But his pursuers closed in. At a traffic light, the terrified cabby alighted, gesturing to the back seat. Nosair, gun in hand, bolted.

As he sprinted south on Lexington Avenue, the clock struck 9 p.m.—time for Carlos Acosta, a postal police officer fully garbed in his blue uniform, to close the local post office for the night. Acosta heard the commotion and saw Nosair running in his direction as others gave chase. The officer's training took over. Shifting to present a smaller target, he simultaneously drew his service revolver and identified himself. Nosair blasted from about eight feet away, his first shot striking Acosta in the chest and a second whizzing within inches of his head. Fortunately, the officer was wearing a bullet-proof vest that deflected the chest shot into his right shoulder, causing severe pain and profuse hemorrhaging but nothing worse. He retained enough control to return fire, catching the assailant with a shot to the neck. Nosair fell to the ground, blood pooling at his back, the gun lying at his side. He was rushed to Bellevue Hospital. Though critically wounded, he survived.

In the aftermath, Abdel Rahman refrained from telling his followers outright that he had authorized the murder, but he boldly declared that to have issued a fatwa calling for Kahane's death would have been "an honor. . . . We ask Allah . . . that we be worthy to issue a fatwa to kill tyrants, oppressors, and infidels."

The authorities in New York City quickly realized they had a powder keg on their hands. Kahane had been a lightning rod—but Nosair, it was clear, was a fanatic. Within four days of the murder, the New York Times was describing him as "devoted to strict Muslim religious practices" and as a voracious consumer of Middle East news, a man who at his place of work "would not listen to music and . . . spread out a rug or a piece of plastic twice a day . . . to perform his prayers at the appointed hour, . . . often read[ing] the Qur'an during breaks."

It required no intensive scrutiny to grasp that Nosair was part of something much larger than himself—a fact already clear from the detail that, after his capture, someone had deliberately moved the car that had carried him to the hotel. When the car was subsequently located, a notebook was found inside with scribblings of the names of chemical compounds for bomb-making and an elaborate plan to carry out an assault or robbery at a store. The plan included a sketch and instructions:

1—When he exits from the car to the store, 2—Block him between two cars front and back and approach him while in his car. 3—Standing beside him in the car and firing upon him, one of the brothers advancing toward [illegible]. 4—Create an accident; one brother hit him from the back and when he goes down to see what happened to his car; he carries out the job.

Three Nosair associates had littered the notebook with their fingerprints: Salameh and Alkasi (the men who accompanied Nosair to the Marriott that night), and Nidal Ayyad (who, like Salameh and Abouhalima, had been seen by the FBI in 1989 at Calverton). Four years later, Salameh, Ayyad, and Abouhalima would be convicted for their participation in the World Trade Center plot. The next year, 1995, Nosair's conviction on terrorism charges relating to the bombing, the Kahane murder, and other crimes would be secured by my trial team.

But back in 1990, evidence of the paramilitary effort, and the evidence recovered from Nosair's car, were somehow not enough to signal a broad conspiracy. Neither, apparently, were the 47 boxes of documents, photographs, ballistics, and other items seized by police searching Nosair's home and locker at work. It would take time to translate much of the Arabic-language evidence that was recovered, but one would have had to go very far out of one's way to miss the plain fact that Nosair was hardly an independent actor.

And yet the authorities went far out of their way to do just that. Long before anything approaching a competent investigation could have gotten to the bottom of things, Joseph Borelli, chief of detectives for the New York City Police Department (NYPD), announced that the shooting had been carried out by a "lone, deranged gunman." As for the FBI, an unidentified official told the New York Times:

"Either the man is a lone nut. Or he's a lone nut and someone whispered something in his ear knowing he'd do it. Or there's an enormous international conspiracy." With an international conspiracy staring it in the face, the Bureau, too, went with the "lone nut" theory.

A dozen years later, after radical Islamists had finally destroyed the World Trade Center and murdered 3,000 Americans, an embarrassed FBI would blame others for the failure to deal with jihadism in America when it was still relatively young. In testimony to Congress in 2002, FBI officials would claim that the NYPD and Manhattan District Attorney Robert Morgenthau had

resisted attempts to label the Kahane assassination a "conspiracy" despite the apparent links to a broader network of radicals. Instead, these organizations reportedly wanted the appearance of speedy justice and a quick resolution to a volatile situation. By arresting Nosair, they felt they had accomplished both.

This was nonsense. Federal authorities do not, ever, allow themselves to be hemmed in by New York State law-enforcement officials, and nothing had prevented the FBI from pursuing a broader conspiracy angle against Nosair and his fellow jihadists. The Bureau simply decided it was not worth the effort. In December 1990, after a mere six weeks of investigation, the FBI let the Times know that it believed "more strongly than ever that Mr. Nosair had acted alone in shooting Rabbi Kahane."

And what about Abdel Rahman? The federal investigators said they regarded his presence in New York "as a tantalizing but possibly meaningless footnote." There was, they claimed, "no evidence that the sheikh had known Mr. Nosair or had ever spoken with him in private." No evidence, that is, other than the cassette tapes seized from Nosair's home that no one had troubled to analyze and that contained recordings of Nosair and Abouhalima bantering with the blind sheikh about paramilitary training for jihad.

After 9/11, Detective Borelli would similarly deny that he had ever instructed his subordinates "not to look at the conspiracy angle." But this, too, was arrant revisionism. At the time, Borelli had painted Nosair as a solitary ne'er-do-well who "was taking a prescription drug for . . . depression." He added: "The impression we're getting is that he had menial jobs here. . . . He couldn't fulfill his potential. He had a serious accident at work that crippled up his legs. He didn't see any future." The Times dutifully talked up the depression story, noting reports that patients on anti-depressants "became far more hostile, despairing, and uncontrollable than they had ever been before" taking them. In other words, Prozac made him do it.

The trove removed from Nosair's house, in addition to gun-related materials and assassination manuals, included sheaves of handwritten notes, mostly but not all in Arabic. Some of these covered procedures and formulas for the manufacture of explosives. In a section entitled "Goals," Nosair noted that in "guerrilla wars"—the kind Abdel Rahman frequently urged—it made more sense to use home-made ammunition than "military ammunition that the police forces use."

Most significant, however, was the extensive notebook Nosair kept on plans and philosophy. "To those against whom war is made," he wrote, "permission is given to fight [back] because they are wronged and verily Allah is most powerful in their aid." He described what he foresaw as a "counter-psychological war against God's enemies for their attempt to demonstrate their might." And, three years before radical jihadists would bomb the World Trade Center, and more than a decade before they would succeed in annihilating it, he wrote of "exploding the structure of their civilized pillars . . . such as the touristic infrastructure which they are proud of and their high world buildings which they are proud of and their statues which they endear and the buildings in which gather their leaders."

For anyone with eyes to see, this "lone, deranged gunman" had, with the murder of Kahane, propelled himself into the pantheon of jihad warriors. This is certainly the way it seemed to the countless members of Abdel Rahman's budding New York militia who would beat a path to Nosair's prison cell. From the moment he was moved to Riker's Island to await trial from the hospital where he had been recuperating from his bullet wound, he was in continuous contact with his associates. Prominent among them was Ibrahim El-Gabrowny, his cousin and chief confidant. El-Gabrowny not only became the coordinator of all jailhouse visits; he also formed the Nosair Defense Committee, raising funds internationally that included a $20,000 contribution from one Osama bin Laden.

Even as he pleaded not-guilty in court to the charge of murder, attempted murder, and weapons offenses, Nosair brazenly used his newfound celebrity to promote fundraising and recruitment for jihad. He made rousing audiotapes, distributed by El-Gabrowny, citing the threat posed by Jewish immigration to "Palestine" and braying that "God the Almighty commanded us to fight" the Israelis. He also sought to stiffen his listeners' resolve with a glorious rendition of his sneak attack on Kahane:

In New York, God the Almighty enabled His extremely brave people, with His great power, to destroy one of the top infidels. They were preparing him to dominate, to be the prime minister, someday. . . . So, brothers, begin the jihad! Begin the jihad! Begin the jihad! There is no honor without jihad.

Meanwhile, among his confederates, Nosair used the prestige bestowed on him by Kahane's slaying to spur others to act against the United States and the Jews, who, he said, controlled the American government, justice system, and foreign policy. He chided his visitors for "doing nothing," adding the incessant refrain: "I did my part, what are you doing?" After his trial and his incarceration at Attica prison in upstate New York, his specific proposals would include killing the judge in his case. Countering the concern that such an operation would require a sharpshooter, he mimicked an assassin with a pistol held close to the belt, reminding his visitors that "I didn't need to be a sharpshooter."

A year after killing Meir Kahane, Nosair was put on trial. The state had considered the case against him to be so overwhelming that it could afford to paint him as a deranged loner whose motives were irrelevant. But Nosair's lawyer, the notorious radical William Kunstler, exploited this opening to turn the trial into precisely the sort of political spectacle the state was trying to avoid.

In selecting the jury, Kunstler made no bones about the fact that he and Nosair "want[ed] a third-world jury of non-whites, or anyone who's been pushed down by a white society." On December 21, 1991, after five weeks of tendentious testimony, the jury they had selected brought unbridled elation to a courtroom throng of Islamic activists. Stunningly, and quite incoherently, the jurors cleared Nosair of both the homicide of Kahane and the attempted murders of Irving Franklin and Carlos Acosta, even as they found him guilty of the lesser charges of assault and coercion in the course of the very shootings from which they exonerated him, and of unlawful possession of the firearm that was proved beyond cavil to have been fired at all three victims.

An undercover FBI informant named Emad Salem was among those invited to a victory celebration the following day at the Abu Bakr mosque in Brooklyn. Given the mood, no one seemed to mind that Salem was videotaping the festivities, like a wedding photographer preserving the moment for posterity. Thus were Mohammed Salameh, Nidal Ayyad, and other future conspirators in the 1993 World Trade Center bombing captured in full revelry.

True, Nosair was not yet out of the woods: sentencing still had to be pronounced, and the weapons offenses carried potentially serious penalties. But, the celebrants reasoned, his acquittal on the major charges meant that the judge would have to go light. America had a jury system, and the jury had spoken. Their "champion" would soon be back in the fold.

About this they turned out to be wrong. Judge Alvin Schlesinger, who had presided over the circus of a trial, castigated the jury's findings as "against the overwhelming weight of evidence and . . . devoid of common sense and logic." On January 29, 1992, he imposed the maximum sentence: seven-and-one-third to twenty-two years' imprisonment. In a blatant message to the parole board, he also made it clear that if there were a legal way to lock the cell door and throw away the key, he would do so. Nosair, he said, had "conducted a rape of this country, of our Constitution and of our laws, and of people seeking to exist peacefully together."

Miserable and enraged, the champion was banished to the wasteland of Attica to serve what promised to be a very long stretch. It was a bitter pill for his friends to swallow. Nosair, a hero for killing Kahane, and touched by the grace of Allah in being acquitted of the murder he had unquestionably committed, had now become the victim of a despicably unjust sentence.

Salem, the FBI informant, adroitly capitalized on the fever pervading the jihadists. Equipped with military training, he had been indispensable to El-Gabrowny in setting up a security perimeter for the Muslims at the rambunctious courtroom sentencing (there was constant fighting at the trial between Kahane supporters and Muslim activists), and he soon found himself welcomed into Abdel Rahman's New Jersey home. There, the blind sheikh registered his special pleasure that Salem was helping re-start the paramilitary training of jihadists that had been dormant since Nosair's arrest. The time was coming, Sheikh Omar declared with pregnant emphasis, "when all would need to be trained."

And so they were. Their worldwide company would include Nosair's friends Salameh, Ayyad, and Abouhalima, all of whom took occasional time-outs from constructing the World Trade Center bomb to make the trek to Attica for consultations with Kahane's assassin. It would also include the nineteen men trained to hijack planes simultaneously and use them as missiles on September 11, 2001—trained in this case not by the blind sheikh but by the organization run by Osama bin Laden, the man who a decade earlier had contributed $20,000 to the Sayyid Nosair Defense Fund and who would publicly credit the blind sheikh, by then languishing in an American prison, with issuing the fatwa authorizing the 9/11 attacks.

Would a successful interdiction of Kahane's murderer, or swift and thorough investigation of Abdel Rahman's circle in its aftermath, have prevented the monstrous deeds of subsequent years? That is of course unknowable. But an aggressive effort by United States authorities would have indicated a seriousness of purpose toward the threat of Islamic terrorism that itself might have changed the story of our times for the better. We still live, and will continue to live, with the consequences of our own blindness.

About the Author - Andrew C. McCarthy directs the center for law and counterterrorism at the Foundation for Defense of Democracies. In somewhat different form, this article will appear in his book, Willful Blindness: A Memoir of the Jihad, soon to be released by Encounter Books. Copyright 2008 by Andrew C. McCarthy.

---

**TOPICS:** News/Current Events
**KEYWORDS:** abdelrahman; gwot; jihadinamerica; radicalislam; rahman

1 posted on **Friday, March 28, 2008 5:08:30 PM** by **K-oneTexas**
[ Post Reply | Private Reply | View Replies]

---

To: **K-oneTexas; NormsRevenge; elhombrelibre; Allegra; SandRat; tobyhill; G8 Diplomat; Dog; Cap Huff;** ...

Saw McCarthy on Hannity and Colmes ....

Detail on his book:

<u>**Willful Blindness: Memoir of the Jihad (Hardcover)**</u>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*EXCERPTS and REVIEWS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Editorial Reviews**

**From Publishers Weekly**
In this annotated retrospective, the prosecutor responsible for leading the investigation of Blind Sheikh Omar Abdel Rahman and others involved in the 1993 World Trade Center bombing dissects the miscues between federal agencies that led to that event while laying bare the challenges facing the war on terror today. The pre-1993 comedy of errors begins with the CIA's decision to funnel arms and money to Afghanistan during the Soviet-Afghan war and continues with inexplicable lapses of communication between the State Department and immigration officials (despite having been placed on a State Department terror watchlist, the sheikh travels freely to the United States). The most enduring oversight, however, at least from McCarthy's perspective, is the refusal among academics and political leaders to confront fundamentalist Islamic tenets, the 800-pound gorilla that is somehow always in the middle of the room when terror strikes. The jihadist philosophy that guided the Blind Sheikh is traced through generations of Islamic thinkers to the Prophet Mohammed himself. Though McCarthy's language is at times cumbersome, his firsthand account of jihad's rise and the sheikh's trial of the century is an important contribution (and in some instances, counterpoint) to existing literature on the attack that foreshadowed disaster to come. *(Mar.)*
Copyright © Reed Business Information, a division of Reed Elsevier Inc. All rights reserved.

**Book Description**
Andrew C. McCarthy takes readers back to the real beginning of the war on terror--not the atrocities of September 11, but the first bombing of the World Trade Center in February 1993 when radical Islamists effectively declared war on the United States. From his perch as a government prosecutor of the blind sheik and other jihadists responsible for the bombing, Andrew McCarthy takes readers inside the twisted world of Islamic terror.

**2** posted on **Tuesday, April 15, 2008 1:39:09 PM** by **Ernest_at_the_Beach** (No Burkas for my Grandaughters!)
[ **Post Reply** | **Private Reply** | **To 1** | **View Replies**]

To: **All**

Custo,er Review of book:

<u>**an important, timely read , April 6, 2008 By John E. Drury "jedrury"**</u>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*EXCERPT\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

McCarthy, a talented writer, draws deep insights from his experience into the shortcomings of prosecuting terrorists as criminals. He ends with a thoughtful exposition of the disconnect between national security and criminal law. He is a voice of clarity, reason and experience in the dialogue now going in America on issues of law and national security.