# EXHIBIT 8

| The New York Times | **Archives** |
|---|---|

## Tapes Depict Proposal to Thwart Bomb Used in Trade Center Blast

By RALPH BLUMENTHAL
Published: October 28, 1993

**Correction Appended**

Law-enforcement officials were told that terrorists were building a bomb that was eventually used to blow up the World Trade Center, and they planned to thwart the plotters by secretly substituting harmless powder for the explosives, an informer said after the blast.

The informer was to have helped the plotters build the bomb and supply the fake powder, but the plan was called off by an F.B.I. supervisor who had other ideas about how the informer, Emad A. Salem, should be used, the informer said.

The account, which is given in the transcript of hundreds of hours of tape recordings Mr. Salem secretly made of his talks with law-enforcement agents, portrays the authorities as in a far better position than previously known to foil the Feb. 26 bombing of New York City's tallest towers. The explosion left six people dead, more than 1,000 injured and damages in excess of half a billion dollars. Four men are now on trial in Manhattan Federal Court in that attack.

Mr. Salem, a 43-year-old former Egyptian army officer, was used by the Government to penetrate a circle of Muslim extremists now charged in two bombing cases: the World Trade Center attack and a foiled plot to destroy the United Nations, the Hudson River tunnels and other New York City landmarks. He is the crucial witness in the second bombing case, but his work for the Government was erratic, and for months before the trade center blast, he was feuding with the F.B.I. Supervisor 'Messed It Up'

After the bombing, he resumed his undercover work. In an undated transcript of a conversation from that period, Mr. Salem recounts a talk he had had earlier with an agent about an unnamed F.B.I. supervisor who, he said, "came and messed it up."

"He requested to meet me in the hotel," Mr. Salem says of the supervisor. "He requested to make me to testify and if he didn't push for that, we'll be going building the bomb with a phony powder and grabbing the people who was involved in it. But since you, we didn't do that."

The transcript quotes Mr. Salem as saying that he wanted to complain to F.B.I. headquarters in Washington about the bureau's failure to stop the bombing, but was dissuaded by an agent identified as John Anticev.

"He said, I don't think that the New York people would like the things out of the New York office to go to Washington, D.C.," Mr. Salem said Mr. Anticev had told him.

Another agent, identified as Nancy Floyd, does not dispute Mr. Salem's account, but rather, appears to agree with it, saying of the New York people: "Well, of course not, because they don't want to get their butts chewed."

Mary Jo White, who, as the United States Attorney for the Southern District of New York is prosecuting defendants in two related bombing cases, declined yesterday to comment on the Salem allegations or any other aspect of the cases. An investigator close to the case who refused to be identified further said, "We wish he would have saved the world," but called Mr. Salem's claims "figments of his imagination."

The transcripts, which are stamped "draft" and compiled from 70 tapes recorded secretly during the last two years by Mr. Salem, were turned over to defense lawyers in the second bombing case by the Government on Tuesday under a judge's order barring lawyers from disseminating them. A large portion of the material was made available to The New York Times.

In a letter to Federal Judge Michael B. Mukasey, Andrew C. McCarthy, an assistant United States attorney, said that he had learned of the tapes while debriefing Mr. Salem and that the informer had then voluntarily turned them over. Other Salem tapes and transcripts were being withheld pending Government review, of "security and other issues," Mr. McCarthy said.

William M. Kunstler, a defense lawyer in the case, accused the Government this week of improper delay in handing over all the material. The transcripts he had seen, he said, "were filled with all sorts of Government misconduct." But citing the judge's order, he said he could not provide any details.

The transcripts do not make clear the extent to which Federal authorities knew that there was a plan to bomb the World Trade Center, merely that they knew that a bombing of some sort was being discussed. But Mr. Salem's evident anguish at not being able to thwart the trade center blast is a recurrent theme in the transcripts. In one of the first numbered tapes, Mr. Salem is quoted as telling agent Floyd: "Since the bomb went off I feel terrible. I feel bad. I feel here is people who don't listen."

Ms. Floyd seems to commiserate, saying, "hey, I mean it wasn't like you didn't try and I didn't try."

In an apparent reference to Mr. Salem's complaints about the supervisor, Agent Floyd adds, "You can't force people to do the right thing."

The investigator involved in the case who would not be quoted by name said that Mr. Salem may have been led to believe by the agents that they were blameless for any mistakes. It was a classic agent's tactic, he said, to "blame the boss for all that's bad and take credit for all the good things."

In another point in the transcripts, Mr. Salem recounts a conversation he said he had with Mr. Anticev, saying, "I said, 'Guys, now you saw this bomb went off and you both know that we could avoid that.' " At another point, Mr. Salem says, "You get paid, guys, to prevent problems like this from happening."

Mr. Salem talks of the plan to substitute harmless powder for explosives during another conversation with agent Floyd. In that conversation, he recalls a previous discussion with Mr. Anticev.

"Do you deny," Mr. Salem says he told the other agent, "your supervisor is the main reason of bombing the World Trade Center?" Mr. Salem said Mr. Anticev did not deny it. "We was handling the case perfectly well until the supervisor came and messed it up, upside down."

The transcripts reflect an effort to keep Mr. Salem as an intelligence asset who would not have to go public or testify.

A police detective working with the F.B.I., Louis Napoli, assures Mr. Salem in one conversation, "We can give you total immunity towards prosecution, towards, ah, ah, testifying." But he adds: "I still have to tell you that if you're the only game in town in regards to the information," then, he says, "you'll have to testify." Studied for Signs of Illegality

The transcripts are being closely studied by lawyers looking for signs that Mr. Salem and the law enforcement officials, in their zeal to gather evidence, may have crossed the legal line into entrapment, a charge that defense counsel have already raised.

But the transcripts show that the officials were concerned that by associating with bombing defendants awaiting trial in the Metropolitan Correctional Center, Mr. Salem might have been accused of spying on the defense.

In an undated conversation, Mr. Anticev tries to explain the perils.

"We're not allowed to have any information regarding that," he tells Mr. Salem. "That could jeopardize, you know, if you go see a lawyer, ah, you know, with the defendant's friend or whatever like that, and you're talking about things we're not suppose to, ah, condone that. We're not supposed to make people do that for us. That's like sacred ground. You can't be privileged, ah, you can't know what's being talked about at all."

Mr. Salem seems to bridle. "I, I, I don't think that's right," he says.

The agent insists: "Yeah, but that's just a guideline. If that ever happened, ah, you can back and reported on the meeting between, ah, you know, Kunstler and Mohammad A. Elgabrown. Forget about it. I mean a lot of people ah the case can get thrown out. You understand?" The references were to the defense lawyer, Mr. Kunstler, and his client in the second bomb case, Ibrahim A. Elgabrowny.

Mr. Salem seems to reluctantly agree.

"They want you to have a hand in it," Mr. Anticev goes on, "but they're afraid that when you get that kind of, ah, too deep, like me, it's almost like, especially with all this legal stuff going on right now."

If it were just intelligence gathering, the agent says, "You can do anything you want. You could go crazy over there and have a good time. Do you know what I mean?"

The agent goes on: "But now that everything is going to court and there is legal stuff and it's just, it's just too hard. It's just too tricky, if, this, you know. And then there's the fact if you come by with the big information, he did this, ah, let me talk about this with the other people again."

"O.K.," Mr. Salem says. "All right. O.K."

*Correction: October 29, 1993, Friday An article yesterday about accounts of a plot to build a bomb that was eventually exploded at the World Trade Center referred imprecisely in some copies to what Federal officials knew about the plan before the blast. Transcripts of tapes made secretly by an informant, Emad A. Salem, quote him as saying he warned the Government that a bomb was being built. But the transcripts do not make clear the extent to which the Federal authorities knew that the target was the World Trade Center.*

Home | Times Topics | Member Center | Copyright 2011

The New York Times Company | Privacy Policy | Help | Contact Us | Work for Us | Site Map | Index by Keyword

# EXHIBIT 9

**The New York Times**            **Archives**

## A Stray Bullet Kills a Woman In Queens Home

By DON TERRY
Published: October 24, 1988

A woman standing in the foyer of her house in Queens was killed yesterday when a bullet from a high-powered rifle smashed through the front door, striking her in the abdomen, the police said.

The bullet was fired during a traffic dispute involving an off-duty New York City police officer who was driving his own car, and two men with a rifle in another car in Elmhurst.

The officer, William Diaz, 29 years old, told detectives that he fired his off-duty revolver at the suspects after they opened fire on him, said Sgt. Raymond O'Donnell, a police spokesman. He said Officer Diaz, a four-year veteran assigned to the 90th Precinct in Brooklyn, was placed on modified duty pending an investigation of the incident.

Investigators found seven shell casings, which they thought had come from a single rifle, in three separate spots in the area.

The two men apparently got away in their car. The officer involved was not hurt, and there were no arrests. Fatal Walk to Window

The dead woman, Caroline Connelly, 61, had been drawn to a foyer window of her two-story house at 102-20 Martense Avenue about 2:25 A.M., by the sound of screeching tires outside, said her son, Bernard Connelly.

"She never goes to the window," said Mr. Connelly, 27, who lives in the house with his mother, grandmother and sister. "She minds her own business. I don't know what made her go to the window like that."

Sergeant O'Donnell said Officer Diaz told investigators that he was driving home on Martense Avenue, a one-way street, when a white Pontiac Camaro came down the street the wrong way.

The two cars stopped and the occupants of the Camaro suddenly fired at the officer, Sergeant O'Donnell said. He could not explain why. Mrs. Connelly, whose bedroom was on the first floor, told her mother that she thought there had been a car accident, Mr. Connelly said. From his second-floor bedroom window, he saw two cars stopped in the middle of the street, their lights on and motors running.

Mr. Connelly said his mother walked to a foyer window near the front door and peered outside. Suddenly, a bullet came through the two-inch-thick wooden door, striking her in the abdomen and passing out her back.

Mr. Connelly said he was on the telephone with a 911 operator to report the shots being fired when he heard his 79-year-old grandmother scream, "Mommy's been shot."

Home | Times topics | Member Center

Copyright 2011 The New York Times Company | Privacy Policy | Help | Contact Us | Work for Us | Site Map | Index by Keyword

# EXHIBIT 10

(1)

W 2-14-96 01, 02, 05, 04                    CI-96-0076

POST   ARREST

ASFAND  GHAZI
_____

917-422-2130

YOUNES                    21  w/m

MORACCAN
_____

WOODHAVEN BLVD.
_____

WILL MT  IN  FRONT OF HIS HOUSE. GIVE TO

YOUNES
_____

BORROWED MONEY FROM 2 FRIENDS +

YOUNES - YOUNES GAVE HIM $1,000
_____

(1) FRIEND - LENT HIM $3,000 - DID NOT KNOW

(1) FR. APT - LENT HIM $2,000 - DID NOT KNOW

(2)

WHILE INCARCERATED MET ON RYKERS ISL.
    ALI ABBAS
    SALEEM KHAN

CAN MAKE LOTS OF MONEY
SALEEM CALLED ASKAND
1ST TIME WAS EMPTY BAG / W SALEEM'S WIFE
WANTED $10,000 UP FRONT
CALLED IN DEC. AGAIN

MAIN MAN - SALEEM
OTHER MAN - IRFAN
IRFAN GAVE # TO CALL

YOUNES USED TO WORK FOR DEA
TOOK A COURSE HERE

CODE # 59
1 X W/ HIM - YOUES

(3)

YOUNES HAS FRIENDS — DOMINICANS

PR's

ITALIANS

ECUDORIANS

GHAZI KNEW HE WAS BUYING HEROIN.

# EXHIBIT 11

**The New York Times**                    **Archives**

## Sheik, Calling Imprisonment Humiliating, Seeks Support

By The Associated Press
Published: April 15, 1996

Sheik Omar Abdel Rahman, the militant Egyptian cleric convicted in a plot to bomb the United Nations and other New York City landmarks, has appealed to his followers to help end what he called his humiliating treatment in a United States prison.

A letter from Mr. Abdel Rahman, published yesterday in a London newspaper, called on his supporters to "make your voice heard" to improve his living conditions.

But the appeal from Mr. Abdel Rahman, the spiritual leader of Islamic Group, the most powerful group of Muslim militants in Egypt, fell short of urging violence.

Mr. Abdel Rahman, 57, was sentenced to life in prison by a Federal judge in January for plotting terrorist attacks in New York City and conspiring to kill political leaders including President Hosni Mubarak of Egypt.

The cleric, who is blind and suffers from diabetes and high blood pressure, has been sent to the United States Medical Center for Federal Prisoners in Springfield, Mo.

"Our response is that we do not discuss an individual inmate's case," Todd Craig, a spokesman for the Federal Bureau of Prisons, said in Washington. "But if any inmate has concerns about their treatment, we will investigate them and take appropriate action."

In the letter, believed to be the first since his conviction in October, Mr. Abdel Rahman accused prison guards of racial discrimination and religious prejudice.

The cleric said the guards strip-searched him after he had visitors, apparently to check for contraband. He said that he was not allowed to pray with other Muslims in the prison and did not have proper washing facilities. A devout Muslim is required to wash and purify himself before praying, five times a day.

"Every time I have a visitor, they take my clothes off and force me to stand nude, as when I was born," he wrote. "Do Muslims and the defenders of faith accept this humiliation?"

His requests for a haircut have been ignored, said Mohammed Elmasrey, a paralegal who works with Mr. Abdel Rahman's lawyer, Ramsey Clark. "Muslim scholars recommend that we do not go beyond 40 days without trimming our hair," Mr. Elmasrey said.

Mr. Abdel Rahman was also denied a request for a shortwave radio that would let him listen to programs in Arabic, Mr. Elmasry said.

"He can't read or watch television," the paralegal said. "He's very isolated."

The letter from Mr. Abdel Rahman was reported in Al Hayat, an Arabic daily in London. A copy was obtained by The Associated Press.

"People of manhood, support, sacrifice and dignity: Rise up from your deep slumber and make your voice heard," the letter said. "Rise up and see justice done."

In February, Springfield prison officials said that security had been increased since the cleric's arrival, and that he was being kept isolated for security reasons.

"He's getting equal treatment, the same as any other Federal prisoner," the warden, Pat Keohane, said in Missouri yesterday.

"I'm aware that periodically it comes up that he wants to do certain things that go against the grain for security at the institution," Mr. Keohane said. He would not elaborate.

Copyright 2011 The New York Times Company | Privacy Policy | Help | Contact Us | Work for Us | Site Map | Index by Keyword

# EXHIBIT 12

~~TOP SECRET SPECIAL HANDLING NOFORN~~



THE JOINT CHIEFS OF STAFF

WASHINGTON 25, D.C.

**UNCLASSIFIED**

13 March 1962

MEMORANDUM FOR THE SECRETARY OF DEFENSE

Subject: Justification for US Military Intervention in Cuba (TS)

1. The Joint Chiefs of Staff have considered the attached Memorandum for the Chief of Operations, Cuba Project, which responds to a request of that office for brief but precise description of pretexts which would provide justification for US military intervention in Cuba.

2. The Joint Chiefs of Staff recommend that the proposed memorandum be forwarded as a preliminary submission suitable for planning purposes. It is assumed that there will be similar submissions from other agencies and that these inputs will be used as a basis for developing a time-phased plan. Individual projects can then be considered on a case-by-case basis.

3. Further, it is assumed that a single agency will be given the primary responsibility for developing military and para-military aspects of the basic plan. It is recommended that this responsibility for both overt and covert military operations be assigned the Joint Chiefs of Staff.

For the Joint Chiefs of Staff:

*L. L. Lemnitzer*

L. L. LEMNITZER
Chairman
Joint Chiefs of Staff

SYSTEMATICALLY REVIEWED
BY JCS ON _21 May 84_
CLASSIFICATION CONTINUED

1 Enclosure
Memo for Chief of Operations, Cuba Project

EXCLUDED FROM GDS

EXCLUDED FROM AUTOMATIC
REGRADING; DOD DIR 5200.10
DOES NOT APPLY

~~TOP SECRET SPECIAL HANDLING NOFORN~~

UNCLASSIFIED

TOP SECRET

JCS 1969/321

12 March 1962

Page 2165

COPY NO. ___1___

SPECIAL DISTRIBUTION

NOTE BY THE SECRETARIES

to the

JOINT CHIEFS OF STAFF

on

NORTHWOODS (S)

A report* on the above subject is submitted for consideration by the Joint Chiefs of Staff.

F. J. BLOUIN

M. J. INGELIDO

Joint Secretariat

* Not reproduced herewith; on file in Joint Secretariat

EXCLUDED FROM GDS
EXCLUDED FROM AUTOMATIC
REGRADING; DOD DIRECTIVE
5200.10 DOES NOT APPLY

TOP SECRET
JCS 1969/321

2165




JCS 1989/32

15 March 1952

JOINT CHIEFS OF STAFF

DECISION ON JCS 1989/32

A Note by the Secretaries

on

NOR-0-CODS (U)

Note by the Secretaries

1. At their meeting on 13 March 1952, the Joint Chiefs of Staff approved the recommendations in paragraph 8 of JCS 1989/32.

2. Herewith the Commandant had expressed his view concern of the Marine Corps that thereby the provisions of Title 10, US Code 4-17 (c), applied and were followed.

3. This action now becomes a part of and attachment is attached to and top sheet of JCS 1989/32.

S. J. BROWN

M. J. INGENITO

Joint Secretaries

EXCLUDED FROM GDS

EXCLUDED FROM AUTOMATIC REGRADING; DOD DIRECTIVE 5200.10 DOES NOT APPLY.

9 March 1962

COPY   OF   COPIES
SPECIAL DISTRIBUTION

UNCLASSIFIED

REPORT BY THE DEPARTMENT OF DEFENSE AND
JOINT CHIEFS OF STAFF REPRESENTATIVE ON THE
CARIBBEAN SURVEY GROUP

to the

JOINT CHIEFS OF STAFF

on

CUBA PROJECT (TS)

The Chief of Operations, Cuba Project, has requested
that he be furnished the views of the Joint Chiefs of Staff
on this matter by 13 March 1962.

EXCLUDED FROM GDS

UNCLASSIFIED

TOP SECRET   SPECIAL HANDLING   NOFORN

UNCLASSIFIED

JUSTIFICATION FOR US MILITARY INTERVENTION IN CUBA (TS)

### THE PROBLEM

1. As requested* by Chief of Operations, Cuba Project, the
Joint Chiefs of Staff are to indicate brief  but precise
description  of pretexts which they consider would provide
justification for US military intervention in Cuba.

### FACTS BEARING ON THE PROBLEM

2. It is recognized that any action which becomes pretext
for US military intervention in Cuba will lead to a political
decision which then would lead to military action.

3. Cognizance has been taken of a suggested course of
action proposed** by the US Navy relating to generated
instances in the Guantanamo area.

4. For additional facts see Enclosure B.

### DISCUSSION

5. The suggested courses of action appended to Enclosure A
are based on the premise that US military intervention will
result from a period of heightened US-Cuban tensions which
place the United States in the position of suffering justif-
iable grievances.  World opinion, and the United Nations
forum  should be favorably affected by developing the inter-
national image of the Cuban government as rash and irresponsible,
and as an alarming and unpredictable threat to the peace of
the Western Hemisphere.

6. While the foregoing premise can be utilized at the
present time it will continue to hold good only as long as
there can be reasonable certainty that US military intervention
in Cuba would not directly involve the Soviet Union.  There is

---

\* Memorandum for General Craig from Chief of Operations,
Cuba Project, subject: "Operation MONGOOSE", dated
5 March 1962, on file in General Craig's office.
\*\* Memorandum for the Chairman, Joint Chiefs of Staff, from
Chief of Naval Operations, subject: "Instances to
Provoke Military Actions in Cuba (TS)", dated 8 March 1962,
on file in General Craig's office.

2

UNCLASSIFIED

TOP SECRET  SPECIAL HANDLING  NOFORN

UNCLASSIFIED

as yet no bilateral mutual support agreement binding the USSR
to the defense of Cuba, Cuba has not yet become a member of the
Warsaw Pact, nor have the Soviets established Soviet bases
in Cuba in the pattern of US bases in Western Europe.  Therefore,
since time appears to be an important factor in resolution of
the Cuba problem, all projects are suggested within the time
frame of the next few months.

### CONCLUSION

7. The suggested courses of action appended to Enclosure A
satisfactorily respond to the statement of the problem.  However,
these suggestions should be forwarded as a preliminary submission
suitable for planning purposes, and together with similar inputs
from other agencies, provide a basis for development of a single,
integrated, time-phased plan to focus all efforts on the
objective of justification for US military intervention in Cuba.

### RECOMMENDATIONS

8. It is recommended that:

   a. Enclosure A together with its attachments should be
forwarded to the Secretary of Defense for approval and
transmittal to the Chief of Operations, Cuba Project.

   b. This paper NOT be forwarded to commanders of unified
or specified commands.

   c. This paper NOT be forwarded to US officers assigned
to NATO activities.

   d. This paper NOT be forwarded to the Chairman, US
Delegation, United Nations Military Staff Committee.

3

UNCLASSIFIED

TOP SECRET   SPECIAL HANDLING   NOFORN

UNCLASSIFIED

MEMORANDUM FOR THE SECRETARY OF DEFENSE

Subject:  Justification for US Military Intervention in Cuba (TS)

1. The Joint Chiefs of Staff have considered the attached Memorandum for the Chief of Operations, Cuba Project, which responds to a request* of that office for brief but precise description of pretexts which would provide justification for US military intervention in Cuba.

2. The Joint Chiefs of Staff recommend that the proposed memorandum be forwarded as a preliminary submission suitable for planning purposes.  It is assumed that there will be similar submissions from other agencies and that these inputs will be used as a basis for developing a time-phased plan. Individual projects can then be considered on a case-by-case basis.

3. Further, it is assumed that a single agency will be given the primary responsibility for developing military and para-military aspects of the basic plan.  It is recommended that this responsibility for both overt and covert military operations be assigned the Joint Chiefs of Staff.

---

* Memorandum for Gen Craig from Chief of Operations, Cuba Project, subject, "Operation MONGOOSE", dated 5 March 1962, on file in Gen Craig's office

4                          Enclosure A



UNCLASSIFIED

TOP SECRET    SPECIAL HANDLING    NOFORN

TOP SECRET SPECIAL HANDLING NOFORN

APPENDIX TO ENCLOSURE A

DRAFT

 UNCLASSIFIED

MEMORANDUM FOR CHIEF OF OPERATIONS, CUBA PROJECT

Subject: Justification for US Military Intervention
in Cuba (TS)

1. Reference is made to memorandum from Chief of Operations,
Cuba Project, for General Craig, subject: "Operation MONGOOSE",
dated 5 March 1962, which requested brief but precise
description of pretexts which the Joint Chiefs of Staff
consider would provide justification for US military inter-
vention in Cuba.

2. The projects listed in the enclosure hereto are forwarded
as a preliminary submission suitable for planning purposes.
It is assumed that there will be similar submissions from
other agencies and that these inputs will be used as a basis
for developing a time-phased plan. The individual projects
can then be considered on a case-by-case basis.

3. This plan, incorporating projects selected from the
attached suggestions, or from other sources, should be
developed to focus all efforts on a specific ultimate
objective which would provide adequate justification for
US military intervention. Such a plan would enable a logical
build-up of incidents to be combined with other seemingly
unrelated events to camouflage the ultimate objective and
create the necessary impression of Cuban rashness and
irresponsibility on a large scale, directed at other
countries as well as the United States. The plan would also
properly integrate and time phase the courses of action to
be pursued. The desired resultant from the execution of
this plan would be to place the United States in the apparent
position of suffering defensible grievances from a rash and
irresponsible government of Cuba and to develop an inter-
national image of a Cuban threat to peace in the Western
Hemisphere.

 UNCLASSIFIED          5          Appendix to
Enclosure A

TOP SECRET SPECIAL HANDLING NOFORN

UNCLASSIFIED

4. Time is an important factor in resolution of the Cuban problem. Therefore, the plan should be so time-phased that projects would be operable within the next few months.

5. Inasmuch as the ultimate objective is overt military intervention, it is recommended that primary responsibility for developing military and para-military aspects of the plan for both overt and covert military operations be assigned the Joint Chiefs of Staff.

6

Appendix to
Enclosure A

UNCLASSIFIED

TOP SECRET   SPECIAL HANDLING   NOFORN

TOP SECRET SPECIAL HANDLING NOFORN

UNCLASSIFIED

ANNEX TO APPENDIX TO ENCLOSURE A

PRETEXTS TO JUSTIFY US MILITARY INTERVENTION IN CUBA

(Note: The courses of action which follow are a preliminary submission suitable only for planning purposes. They are arranged neither chronologically nor in ascending order. Together with similar inputs from other agencies, they are intended to provide a point of departure for the development of a single, integrated, time-phased plan. Such a plan would permit the evaluation of individual projects within the context of cumulative, correlated actions designed to lead inexorably to the objective of adequate justification for US military intervention in Cuba).

1. Since it would seem desirable to use legitimate provocation as the basis for US military intervention in Cuba a cover and deception plan, to include requisite preliminary actions such as has been developed in response to Task 33 c, could be executed as an initial effort to provoke Cuban reactions. Harassment plus deceptive actions to convince the Cubans of imminent invasion would be emphasized. Our military posture throughout execution of the plan will allow a rapid change from exercise to intervention if Cuban response justifies.

2. A series of well coordinated incidents will be planned to take place in and around Guantanamo to give genuine appearance of being done by hostile Cuban forces.

   a. Incidents to establish a credible attack (not in chronological order):

      (1) Start rumors (many). Use clandestine radio.

      (2) Land friendly Cubans in uniform "over-the-fence" to stage attack on base.

      (3) Capture Cuban (friendly) saboteurs inside the base.

      (4) Start riots near the base main gate (friendly Cubans).

7

Annex to Appendix
to Enclosure A



UNCLASSIFIED

TOP SECRET SPECIAL HANDLING NOFORN

UNCLASSIFIED

(5) Blow up ammunition inside the base; start fires.

(6) Burn aircraft on air base (sabotage).

(7) Lob mortar shells from outside of base into base. Some damage to installations.

(8) Capture assault teams approaching from the sea or vicinity of Guantanamo City.

(9) Capture militia group which storms the base.

(10) Sabotage ship in harbor; large fires -- napthalene.

(11) Sink ship near harbor entrance.  Conduct funerals for mock-victims (may be lieu of (10)).

b. United States would respond by executing offensive operations to secure water and power supplies, destroying artillery and mortar emplacements which threaten the base.

c. Commence large scale United States military operations.

3. A "Remember the Maine" incident could be arranged in several forms:

a. We could blow up a US ship in Guantanamo Bay and blame Cuba.

b. We could blow up a drone (unmanned) vessel anywhere in the Cuban waters.  We could arrange to cause such incident in the vicinity of Havana or Santiago as a spectacular result of Cuban attack from the air or sea, or both.  The presence of Cuban planes or ships merely investigating the intent of the vessel could be fairly compelling evidence that the ship was taken under attack.  The nearness to Havana or Santiago would add credibility especially to those people that might have heard the blast or have seen the fire.  The US could follow up with an air/sea rescue operation covered by US fighters to "evacuate" remaining members of the non-existent crew.  Casualty lists in US newspapers would cause a helpful wave of national indignation.

4. We could develop a Communist Cuban terror campaign in the Miami area, in other Florida cities and even in Washington.

8

Annex to Appendix
to Enclosure A



UNCLASSIFIED

TOP SECRET  SPECIAL HANDLING  NOFORN

TOP SECRET SPECIAL HANDLING NOFORN

UNCLASSIFIED

The terror campaign could be pointed at Cuban refugees seeking haven in the United States. We could sink a boatload of Cubans enroute to Florida (real or simulated). We could foster attempts on lives of Cuban refugees in the United States even to the extent of wounding in instances to be widely publicized. Exploding a few plastic bombs in carefully chosen spots, the arrest of Cuban agents and the release of prepared documents substantiating Cuban involvement also would be helpful in projecting the idea of an irresponsible government.

5. A "Cuban-based, Castro-supported" filibuster could be simulated against a neighboring Caribbean nation (in the vein of the 14th of June invasion of the Dominican Republic). We know that Castro is backing subversive efforts clandestinely against Haiti, Dominican Republic, Guatemala, and Nicaragua at present and possible others. These efforts can be magnified and additional ones contrived for exposure. For example, advantage can be taken of the sensitivity of the Dominican Air Force to intrusions within their national air space. "Cuban" B-26 or C-46 type aircraft could make cane-burning raids at night. Soviet Bloc incendiaries could be found. This could be coupled with "Cuban" messages to the Communist underground in the Dominican Republic and "Cuban" shipments of arms which would be found, or intercepted, on the beach.

6. Use of MIG type aircraft by US pilots could provide additional provocation. Harassment of civil air, attacks on surface shipping and destruction of US military drone aircraft by MIG type planes would be useful as complementary actions. An F-86 properly painted would convince air passengers that they saw a Cuban MIG, especially if the pilot of the transport were to announce such fact. The primary drawback to this suggestion appears to be the security risk inherent in obtaining or modify-ing an aircraft. However, reasonable copies of the MIG could be produced from US resources in about three months.


UNCLASSIFIED

TOP SECRET SPECIAL HANDLING NOFORN

UNCLASSIFIED

7. Hijacking attempts against civil air and surface craft should appear to continue as harassing measures condoned by the government of Cuba. Concurrently, genuine defections of Cuban civil and military air and surface craft should be encouraged.

8. It is possible to create an incident which will demonstrate convincingly that a Cuban aircraft has attacked and shot down a chartered civil airliner enroute from the United States to Jamaica, Guatemala, Panama or Venezuela. The destination would be chosen only to cause the flight plan route to cross Cuba. The passengers could be a group of college students off on a holiday or any grouping of persons with a common interest to support chartering a non-scheduled flight.

    a. An aircraft at Eglin AFB would be painted and numbered as an exact duplicate for a civil registered aircraft belonging to a CIA proprietary organization in the Miami area. At a designated time the duplicate would be substituted for the actual civil aircraft and would be loaded with the selected passengers, all boarded under carefully prepared aliases. The actual registered aircraft would be converted to a drone.

    b. Take off times of the drone aircraft and the actual aircraft will be scheduled to allow a rendezvous south of Florida. From the rendezvous point the passenger-carrying aircraft will descend to minimum altitude and go directly into an auxiliary field at Eglin AFB where arrangements will have been made to evacuate the passengers and return the aircraft to its original status. The drone aircraft meanwhile will continue to fly the filed flight plan. When over Cuba the drone will being transmitting on the international distress frequency a "MAY DAY" message stating he is under attack by Cuban MIG aircraft. The transmission will be interrupted by destruction of the aircraft which will be triggered by radio signal. This will allow ICAO radio

10

Annex to Appendix
to Enclosure A



UNCLASSIFIED

TOP SECRET   SPECIAL HANDLING   NOFORN

UNCLASSIFIED

stations in the Western Hemisphere to tell the US what
has happened to the aircraft instead of the US trying to
"sell" the incident.

9. It is possible to create an incident which will make it
appear that Communist Cuban MIGs have destroyed a USAF aircraft
over international waters in an unprovoked attack.

a. Approximately 4 or 5 F-101 aircraft will be dispatched
in trail from Homestead AFB, Florida, to the vicinity of Cuba.
Their mission will be to reverse course and simulate fakir
aircraft for an air defense exercise in southern Florida.
These aircraft would conduct variations of these flights at
frequent intervals.  Crews would be briefed to remain at
least 12 miles off the Cuban coast; however, they would be
required to carry live ammunition in the event that hostile
actions were taken by the Cuban MIGs.

b. On one such flight, a pre-briefed pilot would fly
tail-end Charley at considerable interval between aircraft.
While near the Cuban Island this pilot would broadcast that
he had been jumped by MIGs and was going down.  No other
calls would be made.  The pilot would then fly directly
west at extremely low altitude and land at a secure base, an
Eglin auxiliary.  The aircraft would be met by the proper
people, quickly stored and given a new tail number.  The
pilot who had performed the mission under an alias, would
resume his proper identity and return to his normal place
of business.  The pilot and aircraft would then have
disappeared.

c. At precisely the same time that the aircraft was
presumably shot down a submarine or small surface craft
would disburse F-101 parts, parachute, etc., at approximately
15 to 20 miles off the Cuban coast and depart.  The pilots
returning to Homestead would have a true story as far as
they knew.  Search ships and aircraft could be dispatched
and parts of aircraft found.

11

Annex to Appendix
to Enclosure A


UNCLASSIFIED



ENCLOSURE B

## FACTS BEARING ON THE PROBLEM

1. The Joint Chiefs of Staff have previously stated*
that US unilateral military intervention in Cuba can be
undertaken in the event that the Cuban regime commits hostile
acts against US forces or property which would serve as an
incident upon which to base overt intervention.

2. The need for positive action in the event that current
covert efforts to foster an internal Cuban rebellion are
unsuccessful was indicated** by the Joint Chiefs of Staff
on 7 March 1962, as follows:

"- - - determination that a credible internal
revolt is impossible of attainment during the next
9-10 months will require a decision by the United States
to develop a Cuban "provocation" as justification for
positive US military action."

3. It is understood that the Department of State also is
preparing suggested courses of action to develop justification
for US military intervention in Cuba.

_____
* JCS 1969/303
** JCS 1969/313

UNCLASSIFIED

# EXHIBIT 13


NYDailyNews.com
# DAILY•NEWS

## Judge Blasts Da's Tactics

BY PETE DONOHUE

Friday, April 10, 1998

In a scathing decision, a Queens judge this week blasted prosecutors for the heavy-handed tactics they allegedly used to gather evidence in a murder case involving a Gotti family crony.

Justice Randall Eng said prosecutors wrongly directed cops to seize a taped conversation from a defense investigator working for four men charged with gunning down Scott Schulman in Rego Park in February 1997.

Schulman, an ex-con, was a pal of Peter Gotti Jr., nephew of imprisoned Mafia boss John Gotti, law enforcement sources said.

"The district attorney's office was guilty of misconduct," Eng wrote in his Wednesday decision. "The interference with the legitimate activities of an investigator is to be abhorred."

The audio tape contained a December 1997 conversation between a prosecution witness and investigator John Dabrowski. The sleuth was secretly taping the conversation until the woman became alarmed and called cops.

Eng said Dabrowski properly identified himself and did not intimidate the woman.

Nevertheless, the judge declined to dismiss the murder case. But defense attorney Marvyn Kornberg said he would make another dismissal request based on a "pattern of misconduct" by prosecutors.

Schulman, 29, was shot 20 times outside his 98th St. apartment building. Police charged four Queens men Salvatore Pasquetti, 25; Joseph DeStefano, 24; his cousin, Gennaro DeStefano, 21; and Nicholas Varuzzi, 22. with the slaying. Prosecutors have not offered a motive.

Mary de Bourbon, spokeswoman for District Attorney Richard Brown, said prosecutors are "distressed by the personal invective" of the decision, in which Eng sharply criticizes Assistant District Attorney Andrew Cohen.

"We believe that [Cohen] was correct in having the recording seized, given the fact that the witness alleged she had been threatened," and prosecutors thought the tape could be evidence of possible witness-tampering by the investigator, de Bourbon said.