# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

**YOUNES KABBAJ,**
Plaintiff

V.

**UNITED STATES OF AMERICA,**
**DEPARTMENT OF JUSTICE,**
**DEPARTMENT OF STATE,**
**FEDERAL BUREAU OF INVESTIGATION,**
all U.S. government entities; and,
**PERRY CUOCCI, MATTHEW FOSTER,**
**THOMAS T. RILEY, ROBERT P. JACKSON,**
**DONALD E. GONNEVILLE, JOSE MARTIN,**
**DAVID FORTEZA, AMANDA CURET,**
**DONALD BAILY, JIMMY ARROYO,**
**KEN BRADLEY, JIM BRUINSMA,**
**ANTHONY SCALIA, STEVEN BERGER,**
**SHAMUS SKELLY, SCOTT MCLELLUN,**
**LANNY A. BREUER, MICHAEL REIGLE,**
in their individual and official capacities;
and,
**JOHN DOES 1-8,** and,
**AN UNKNOWN NUMBER OF UNKNOWN**
**EMPLOYEES OF THE US GOVERNMENT**
in their individual and official capacities,
Defendants.

**CASE NO: 11-cv-23492-MGC**

## THIRD AMENDED COMPLAINT AND JURY DEMAND

Younes Kabbaj ("Plaintiff") hereby brings this Complaint against the above-named

Defendants for their participation in an unlawful conspiracy to obstruct the course of justice as

part of an unlawful and discriminatory attempt to promote self-serving foreign policy agendas in

the Middle East. The conspiracy, as it relates to the Plaintiff, commenced in 1996 when several

Defendants agreed to obstruct a single homicide investigation.  Since that time, the conspiracy continued to expand for over 15 years to encompass dozens of Defendants engaged in a wide-ranging plot to obstruct numerous criminal investigations including those relating to the 911 attacks and other major acts of terrorism.

The last known set of overt actions taken by named Defendants in furtherance of this unlawful conspiracy were committed by individuals located at FBI headquarters in Miami and elsewhere starting approximately March 8th, 2011 after Plaintiff travelled to that location to alert law enforcement officials regarding, among other things, the existence of an imminent terrorist threat affecting tourists and citizens located in Morocco, to wit, a plot by individuals located in Morocco and elsewhere to bomb a specific tourist location in Marrakesh, Morocco in the following month of April, 2011.

After Plaintiff met with unidentified individuals at FBI headquarters on March 8th, 2011 to inform them about an imminent terrorist threat affecting Morocco, the location of Osama Bin Laden in Pakistan, the identities of Islamic militants armed with anti-aircraft missiles and other relevant time-sensitive terrorism-related information, named Defendants simply responded in the same unlawful manner which they had done for over 15 years since the unlawful conspiracy first commenced.  Instead of debriefing Plaintiff in a lawful manner so as to acquire this information, named Defendants refused to interview Plaintiff and instead accused him of being a terrorist and sent him home.

After refusing to receive this information from Plaintiff, named Defendants then responded to his most recent offer to provide information by instituting aggressive surveillance against him in an effort to obtain the information he sought to provide without actually interviewing him, in what is a clear violation of his constitutional rights.  You cannot refuse to

2

receive information through a proper law enforcement debriefing that would not violate Plaintiff's privacy, in exchange for an attempt to acquire that same information through other means that violate Plaintiff's privacy in what is a clear effort by named Defendants to manufacture the ability to deny receiving such information should they chose not to act upon it and it later proves to be relevant.  This surveillance methodology instituted against Plaintiff by the Defendants merely complemented the over 10 years of unlawful surveillance that Plaintiff was subjected to starting immediately following the 911 attacks when Plaintiff first offered to assist named Defendants with the capture of Osama Bin Laden and was similarly denied a proper debriefing by Defendants, in anticipation that Plaintiff acquired information they would seek to deny in an effort to obstruct the 911 investigation (such information likely to prove US government misconduct leading up to the attacks).

Upon information and belief, named Defendants additionally obstructed Plaintiff's attempts to provide this time-sensitive terrorism-related information directly to foreign law enforcement in the days and weeks following Defendant FBI's refusal to interview Plaintiff on March 8th, 2011.  This deliberate obstruction by named Defendants resulted in their obstructing the ability of alternate governments to investigate this information, which had the direct effect of allowing the terrorist plot in Morocco to proceed unchallenged with the bombing of a tourist café in Marrakesh, Morocco on April 28th, 2011, which resulted in another 17 preventable deaths directly attributable to the unlawful conspiracy described herein.

When the Defendants learned (through illegal surveillance) that Plaintiff was planning to retaliate against the Defendants for their refusal to prevent the Marrakesh bombing by publishing the location of Osama Bin Laden to the media and various foreign Embassies, Named Defendants then rushed to immediately assassinate Bin Laden before the Plaintiff could secure

his arrest, and this assassination was committed with the deliberate intent to continue to obstruct a proper investigation into the 911 attacks.

The unlawful conspiracy described in this Complaint as it relates to the Plaintiff, was commenced on February 14th, 1996, with overt actions in furtherance of the conspiracy being committed by named Defendants at least every year since that date. In addition to the refusal by named Defendants to prevent the Marrakesh bombing, there is at least one additional mass-casualty terrorist attack which took place in Mumbai, India on November 26th, 2008 (the "Mumbai attacks") that Plaintiff is informed and believes was also preventable as a result of information he could have provided the Defendants. Information acquired by Plaintiff during the course of 15 years investigating these matters also indicates that Defendants knew about the impending 911 attacks, yet had deliberately refused to prevent them so as to utilize the attacks as a pretext to launch discriminatory wars in the Middle East.

As part of this conspiracy, Named Defendants additionally conspired to obstruct the investigation into several other non-terrorism related homicides that Plaintiff witnessed or acquired privileged information about during his infiltration of numerous criminal conspiracies based out of New York City, such information not previously known to police or the public. Named Defendants engaged the obstruction of these homicide investigations so as to prevent Plaintiff his ability to establish his credibility regarding other more serious terrorism-related investigations which, if conducted in a lawful manner, would likely confirm facts that they would seek to keep from the public in an effort to utilize the attacks as a pretext to launch wars in the Middle East to promote political ideologies.

As a result of the confirmed preventable deaths in Marrakesh that are directly attributable to this prolonged conspiracy to obstruct the course of justice, Plaintiff was therefore left with no

other choice but to consider all administrative and law enforcement remedies to have been fully

exhausted, leaving this Complaint as the last remaining option to try and terminate the

conspiracy. Even after the Marrakesh bombing had already occurred, and despite the fact that

Plaintiff had offered to drop this lawsuit in exchange for a proper investigation, the named

Defendants still refuse to debrief Plaintiff regarding the Marrakesh investigation and additional

terrorist plots that he believes to be viable and pending. This behavior by the Federal Defendants

represents nothing less than a callous disregard for the safety and security of innocent civilians

around the world.

## PARTIES

1. Plaintiff Younes Kabbaj is a natural-born U.S. citizen of Moroccan, Tunisian and

Spanish (Sephardic) descent, born in Manhattan, New York City. Plaintiff is a graduate of

Queens College, C.U.N.Y., with a Bachelors degree in Psychology and Media Studies. Plaintiff

renounced his citizenship to Morocco on March 8th, 2011, and is currently only a citizen of his

birth country, the United States.

2. The United States of America ("USA" or "US") is a federal constitutional republic

comprising fifty states and a federal district (which is the capital) located in Washington, D.C.

3. Department of Justice ("DOJ") is the United States federal executive department

responsible for the enforcement of the law and administration of justice, equivalent to the justice

or interior ministries of other countries. Divisions within the DOJ that are relevant to this

complaint are the Drug Enforcement Administration ("DEA") and the Federal Bureau of

Investigations ("FBI"). The DOJ's headquarters is located at 950 Pennsylvania Avenue, N.W.,

Washington, DC 20530.

4. Department of State ("DOS") is the United States federal executive department responsible for international relations of the United States, equivalent to the foreign ministries of other countries. Divisions within the DOS that are the United States Embassy in Rabat, Morocco ("US Embassy in Rabat"), and the Rewards for Justice Program ("RFJ"). The DOS's headquarters is located at 2201 C Street NW, Washington, DC 20520.

5. The Federal Bureau of Investigation ("FBI") is a governmental agency belonging to the United States Department of Justice that serves as both a federal criminal investigative body and an internal intelligence agency (counterintelligence). It is the primary law enforcement entity in the United States tasked with investigating and prosecuting international and domestic terrorism-related crimes.

6. Lanny A. Breuer is the Assistant United States Attorney General for the Criminal Division, a component of the DOJ.

7. Perry Cuocci, Matthew Foster and Michael Reigle are Special Agents assigned to FBI.

8. Jimmy Arroyo, Donald Baily and Ken Bradley are Special Agents assigned to DEA.

9. Thomas T. Riley, Robert P. Jackson, Donald E. Gonneville, at all times relevant herein, were employees of the DOS assigned to the US Embassy in Rabat, Morocco.

10. Shamus Skelly and Scott McClellan are employees assigned to the Secret Service.

11. Anthony Scalia, Jim Bruinsma and Steven Berger, at all times relevant herein, are law enforcement officer assigned to the NYPD's Cold Case Squad.

12. Jose Martin, David Forteza and Amanda Curet are law enforcement officers employed with the Sunrise PD.

13. The true identities of Defendants DOES 1 to 8, inclusive, are presently unknown, therefore said Defendants are sued herein pursuant to the Federal Rules of Civil Procedure as

6

fictitious persons. Plaintiff is informed and believes that DOES 1 to 10, inclusive, are agents and/or assigns of each other and the named Defendants, and each of them, and have committed such wrongful acts and/or conspired to commit such wrongful acts and are directly and vicariously liable for such acts which caused damages to Plaintiff as alleged in this Complaint. After ascertaining the true identity of a fictitiously named Defendant sued herein as 'John Doe,' Plaintiff will amend this Complaint accordingly.

14. John Doe 1 is an unidentified U.S. Government employee (of Asian descent) that accompanied Defendant Jimmy Arroyo during an interview with the Plaintiff at DEA headquarters in New York immediately following the September 11th, 2001 terrorist attacks.

15. John Does 2 and 3 are unidentified U.S. Government employees that interviewed Plaintiff in October of 2001, where they subsequently accused Plaintiff of involvement with participation in a well known terrorism conspiracy dubbed the "Anthrax attacks," as well as accusing Plaintiff of orchestrating the mailing of an Anthrax hoax letter to a Federal Prison in Rochester, Minnesota.

16. John Doe 4 is an unidentified U.S. Government employee that accompanied Special Agent Shamus Skelly when he went to Plaintiff's job in December of 2004 to interview the Plaintiff regarding an "anonymous" terrorism tip submitted to the South Florida Anti-Terrorism Taskforce accusing Plaintiff of involvement with terrorism.

17. John Doe 5 is an alleged Central Intelligence Agency employee who claimed his name was "Richard" when he visited the Plaintiff at his job in 2005, causing Plaintiff to file a complaint against him with Defendant Skelly at the same FBI headquarters in Miami where Plaintiff went to report the imminent Marrakesh bombing on March 8th, 2011.

18.  John Doe 6 is a male individual named "David," who called the Plaintiff on his cell phone on January 22nd, 2010, at 2:05pm (Casablanca, Morocco GMT), from a phone number originating within the United States Embassy in Rabat.  David claimed to be a "legal attaché" at the US Embassy that was investigating emails sent by Plaintiff to various law enforcement entities.

19.  John Does 7 and 8 are two unidentified individuals that interviewed Plaintiff at FBI headquarters in Miami on March 8th, 2011 before denying him access to speak to an FBI agent and directing him to retain an attorney if he wished to speak to an agent.

20.  The true identities of an unknown number of unknown employees of the US government named as Defendants, are not ascertainable to Plaintiff at this time, but such individuals are named as Defendants in this lawsuit in anticipation that discovery in this matter will eventually identify them.

## JURISDICTION AND VENUE

21.  The purpose of this action is to redress and restrain acts or practices by Defendants that federal law deems unlawful.  This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's Jurisdiction under Article III of the Constitution and 28 U.S.C. §§ 1331 & 1343(a)(3) and 5 U.S.C. § 552a(g)(1)(D) & (g)(4).

22.  Plaintiff seeks monetary damages against federal and state employees acting under color of legal authority, in their individual and official capacities, under *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 28 L.Ed.2d 619 (1971), under *Boling v. Sharpe* 347 U.S. 497 (1956), under 42 U.S.C. §§1981, §§1983, §§1985, §§1986,

§§1988, and under the First, Fourth, Fifth, Eight and Fourteenth Amendments to the United States Constitution

23.   Plaintiff seeks actual damages as well as fees and costs against the DOJ and the FBI for the intentional and willful violation of the Privacy Act, 5 U.S.C. § 552a(g)(5). The Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* The Court has authority to grant injunctive relief under the federal courts' inherent equitable powers.

24.   Venue for this action properly lies in the Southern District of Florida pursuant to 28 U.S.C. §§1391(b).

## NATURE OF THIS ACTION

25.   This is a case in which Defendants, individually and together, conspired and acted in concert and did violate the constitutional rights of the Plaintiff by denying him access to due process and equal protections under the Fifth and Fourteenth Amendments.

26.   Defendants additionally conspired to deny Plaintiff the right to be free from religious persecution, unlawful search and seizure and invasion of privacy, deprivation of liberty and property, and cruel and unusual punishments under the First, Fourth and Eighth Amendments.

27.   Defendants refused to investigate and prosecute, or otherwise hindered and obstructed the investigation and prosecution of criminal/terrorism conspiracies based upon discriminatory and other unlawful motivations.

28.   Defendants conspired to deny Plaintiff equal access to reward money and other tangible benefits that are made available to individuals that assist with the prosecution of crimes.

29.  Defendants conspired to maintain the unlawful threat of prosecution against Plaintiff by refusing him his legal right to establish his withdrawal and/or non-conformance with criminal conspiracies he infiltrated solely for the purpose of disrupting them.

30.  Defendants conspired to release false information about Plaintiff in an effort to provoke others to violate Plaintiff's constitutional rights, such as causing his unlawful imprisonment in psychiatric facilities, causing his unlawful incarceration and detention incommunicado in prison facilities, and causing his indictment and detention on terrorism-related charges in a foreign country, all in an effort to continue to deny Plaintiff the ability to obtain assistance in terminating the unlawful conspiracy engaged against him since the 911 attacks.

*Violation of Due Process and Equal Protections - Withdrawal from Conspiracies*

31.  State and Federal conspiracy laws make it unlawful for two or more people to conspire to commit a crime.  Once an individual agrees to participate in a criminal conspiracy, he becomes liable for all the actions of his coconspirators in furtherance of such a conspiracy.  An individual that makes the unlawful decision to join a criminal conspiracy can only limit his legal liability by subsequently establishing his withdraw from the conspiratorial agreement prior to the commission of an overt act in furtherance of the conspiracy, or by establishing withdrawal from the conspiracy at some point after an overt act in furtherance of it has already been committed so as to nullify additional criminal liability that might otherwise be applicable for additional overt actions committed by co-conspirators in furtherance of the conspiracy once withdrawal has been established.

32.  According to all available case law that describe the procedure by which individuals can successfully establish their withdrawal from a conspiracy, the only indisputable and unequivocal method of withdrawal that is considered impervious to any legal assault or

10

invalidation whatsoever, is to simply alert law enforcement authorities directly to the existence

of a criminal conspiracy and the inner workings thereof.  Once such a disclosure is made directly

to the police and subsequently documented by them, only at that point can an individual limit his

liability to an ongoing criminal conspiracy.

    33.  Starting February 14, 1996 and continuing until present, Plaintiff made numerous

attempts to inform federal officials regarding the existence of numerous criminal conspiracies he

either penetrated and/or participated in during a time period spanning approximately 1991 to

1996, so as to establish his withdrawal and repudiation from such conspiracies by informing law

enforcement to their existence.  Defendants refused to allow Plaintiff the ability to inform upon

numerous criminal conspiracies starting approximately February of 1996 and continuing until

today, thereby denying Plaintiff the ability to establish his withdrawal from such conspiracies

according to the manner prescribed by law and in violation of his rights to due process and equal

protections under the Fifth and Fourteenth Amendment.

    34.  Named Defendants, by refusing to engage their job duties to investigate the various

conspiracies that Plaintiff attempted to inform them about, thereby allowed criminal conspiracies

to remain ongoing for over a decade after they should have first been disrupted.  Named

Defendants thereby caused incalculable harm, either through extreme negligence or deliberate

design, by allowing the subsequent distribution of tons of cocaine, heroin and the commission of

homicides and acts of terrorism in furtherance of these various narco-terrorism conspiracies

which Plaintiff attempted to inform about and impede as early as February 14th, 1996.

    35.  Starting on February 14th, 1996, named Defendants denied Plaintiff the right to bear

witness and provide evidence to law enforcement regarding the narco-terrorism conspiracies he

infiltrated starting approximately 1991.  By denying Plaintiff the right to inform law enforcement

regarding his associations with members of these criminal conspiracies (even if such associations did not pass the threshold of invoking criminal liability upon Plaintiff for involvement with a particular conspiracy), the named Defendants thereby sought to impose a loophole in the conspiracy law upon Plaintiff by refusing to allow him the ability to properly establish his withdrawal, or non-conformance with, a criminal conspiracy to which he was a direct witness. By refusing to allow Plaintiff to inform upon, and establish withdrawal from a conspiracy, named Defendants sought to maintain the threat of a malicious prosecution against Plaintiff long after the statute of limitations applicable to his possible qualifying conduct.  Defendants also conspired to prevent Plaintiff the ability to legally dispense with the threat of such a malicious prosecution for over 15 years.

36.  Plaintiff is requesting a declaration from this court that he has complied with the requirements necessary to establish his withdrawal from any criminal conspiracies that he may have infiltrated since approximately 1991, after Plaintiff made numerous attempts, starting on February 14th, 1996 and continuing until this day, to inform Federal authorities regarding the existence of such conspiracies and the inner workings thereof.  Clearly, when these precedents regarding withdrawal from conspiracies were established by the courts, they did not anticipate a situation where Federal law enforcement would refuse to allow an individual to establish his withdrawal from a conspiracy through a proper debriefing.  Plaintiff spent 15 years attempting to engage this debriefing after becoming aware of this provision of the conspiracy laws, to no avail. Plaintiff is therefore seeking a declaration from the courts that can remedy this deficiency so as to remove from Plaintiff the constant threat of malicious prosecution at the hands of Federal Defendants, which they are seeking to impose upon Plaintiff for an indefinite amount of time.

12

*Violation of Due Process and Equal Protections – Equal Access to Reward Money*

37.   The United States government established a "Rewards for Justice" program through the 1984 Act to Combat International Terrorism, Public Law 98-533.  This Program is administered by the U.S. Department of State's Bureau of Diplomatic Security, and offers a reward of up to $25,000,000 for information that leads to the arrest or conviction of anyone who plans, commits, or attempts international terrorist acts against U.S. persons or property, that prevents such acts from occurring in the first place, that leads to the location of a key terrorist leader, or that disrupts terrorism financing.  The Secretary of State is authorized to pay a reward greater than $25 million if he/she determines that a greater amount is necessary to combat terrorism or to defend the United States against terrorist acts.

38.   In September of 2001, Plaintiff informed named Defendants regarding an opportunity to capture Osama Bin Laden.  Named Defendants deliberately obstructed Plaintiff's ability help secure Osama Bin Laden's capture at that time, thereby ensuring that Bin Laden would continue to escape apprehension for almost a decade.  Named Defendants refused to take Osama Bin Laden into custody despite the fact that they were offering a $25,000,000 reward for information leading to his arrest.  Named Defendants not only endangered the safety and security of innocent people by refusing to take Osama Bin Laden into custody immediately following the 911 attacks, but they also deliberately denied Plaintiff access to the reward money being offered for Osama Bin Laden's capture.

39.   After Osama Bin Laden went into hiding at the end of 2001, Plaintiff was not able to obtain any information regarding his whereabouts from that time until 2009 when Plaintiff also obtained additional evidence regarding an unrelated terrorism conspiracy in Marrakesh while he resided in Morocco from 2006 to 2010.

13

40.  Shortly after the Marrakesh bombing, named Defendants utilized unlawful surveillance to confirm Plaintiff was aware Osama Bin Laden was living in Abbottabad, Pakistan, which they already knew to be accurate information based upon their own investigations.  After they learned that Plaintiff was making plans to publish this information to the public, the named Defendants immediately engaged an operation to assassinate Osama Bin Laden in order to prevent Plaintiff from securing his arrest.

41.  Named Defendants thereby engaged an unlawful conspiracy to deny, or otherwise deprive Plaintiff of access to substantial reward money he was otherwise eligible to collect and distribute to others that had assisted Plaintiff with the information at great peril to the safety and security of numerous individuals, including Plaintiff.  In at least one instance Plaintiff has been able to confirm that an individual who assisted him in confirming Bin Laden's whereabouts in Pakistan was subsequently assassinated.

42.  Plaintiff did not pursue information regarding the whereabouts of Osama Bin Laden for financial gain, but rather to secure Bin Laden's arrest and prevent additional acts of terrorism. Nevertheless, Plaintiff incurred debts and expenses along the way.  The expenses Plaintiff incurred to acquire the location of Osama Bin Laden on two separate occasions since the 911 attacks were less than $100,000, and Plaintiff was dependent upon the reward being offered by named Defendants for the capture of Bin Laden as a means by which to recuperate the debts he incurred to locate him.

43.  Named Defendants also acted with malice and discrimination against Plaintiff and all Arabs/Muslims by refusing to allow an individual of Arab or Muslim descent the right to claim responsibility for the prevention of a major act of terrorism or the capture of such high-value terrorism suspects.  Part of the unlawful conspiracy described herein is an effort by named

Defendants to cast suspicion upon all Arabs and Muslims as being a population that is entirely supportive of terrorism due to the false assertion that the goal of the entire Islamic religion is the commission of violence and oppression of all mankind.  The refusal by named Defendants to allow a Muslim of Arabic descent to claim responsibility for assistance in the prevention of terrorism is consistent with the discriminatory goals of the conspiracy described herein.

*Violation of Due Process and Equal Protections – Equal Access to State Funds*

44.  The New York City Police Department administers a program called "Crimestoppers" which offers financial rewards up to $2,000 for tips that lead to the arrest and conviction of criminals.  Defendants Scalia, Bruinsma and Berger of the NYPD's Cold Case Squad additionally violated Plaintiff's constitutional right to due process and equal protections by denying Plaintiff access to reward money he was eligible to collect for providing information and evidence regarding numerous unsolved homicides in New York and elsewhere.  The refusal by these NYPD officers to investigate crimes to which Plaintiff was a witness thereby deprived him of access to financial awards offered for such information based upon discriminatory and other unlawful principles.

## FACTUAL ALLEGATIONS

*Background*

45.  At approximately 13 years of age, Plaintiff joined "Post 9910," a Federal Law Enforcement Explorer Program ("Explorer Program") comprised of children 13-18 years old and chartered to the Drug Enforcement Administration's New York Headquarters at 99 Tenth Ave in Manhattan, New York.  This program was originally designed to induce children to explore a possible career with the DEA upon successful graduation from college.  Plaintiff was never asked to obtain permission from his parents before enrolling in this program, and Plaintiff's

parents did not know that they could veto his involvement with the program by simply asking the DEA not to allow the Plaintiff to participate.

46. The Explorer Program was administered by Special Agent in Charge ("SAC") of the DEA in New York at that time, Carlo Boccia, as well as the second in command in the DEA, Assistant Special Agent in Charge ("ASAC") Ken McCreary.  Other Special Agents that administered the program were Bob Busky (the DEA's head recruiter in New York), Jim Mokwa and Debbie Gibson (both of which were also decorated and accomplished Special Agents from that New York Field Division of the DEA), and John Hannah III.

47. While participating in this program, Plaintiff was enticed by Agents from the program into investigating criminal activity in his own neighborhood through various forms of encouragement provided by the Agents.  For example, while describing various criminal investigations, Agents from the Explorer program informed Plaintiff that DEA agents were sometimes placed into situations where they would have to actually deal drugs just to infiltrate criminal organizations and capture their leaders.  After acquiring this information from Agents, Plaintiff thereby assumed that it was a lawful practice to deal drugs as part of an effort to infiltrate criminal organizations, as long as the ultimate intention was to help assist with the capture of major criminals.  This same strategy of law enforcement is an already established methodology by Federal Agencies, and a recent article about such strategies can be found at: www.foxnews.com/politics/2011/12/06/issa-launches-probe-alleged-dea-laundering-operation-in-mexico/

48. Defendants continued to subject Plaintiff to unlawful behavior by the supervising Special Agents of the Explorer Program, behavior that was clearly and unequivocally inappropriate for children.  For example, Plaintiff and numerous other Explorers were taken to

Camp Smith, a military camp located in upstate New York, and trained in the use of semi-automatic handguns, fully automatic machine guns and even a vehicle-mounted .50 Caliber fully automatic machinegun. This firearms training, conducted with live ammunition, also occurred periodically using the Explorer Agents' semi-automatic service pistols at an indoor shooting range located within DEA headquarters at 99 Tenth Ave in Manhattan. Plaintiff, at approximately 13 years of age, was rendered proficient in the use of firearms by the DEA as a result of the training provided to him by the top Special Agents in the New York Field Division, and subsequently began to take on a fascination with firearms which eventually led Plaintiff to acquire his own firearms through illegal arms dealers in New York and elsewhere.

49. As part of his participation with the DEA Explorer program, Plaintiff was also subjected to other unlawful behavior by Special Agents that were administering the program. One such unlawful act occurred when Special Agents administering the program had taught the Plaintiff how to make a silencer for a firearm. In another lesson at DEA headquarters, SAC Carlo Boccia had commenced to showing the entire class of underage Explorers, a slide show containing numerous graphic crime scene photos from various murder investigations, including a photograph of one of the murder victims from the 1993 World Trade Center bombing, as well as several other graphic photos of murders that involved sexual mutilations. All the images that were presented during that lesson were completely inappropriate for display to children. At no time were Plaintiff's parents ever informed about all these activities that the DEA was engaging in with their child.

50. DEA Agents also provided Explorers access to numerous sensitive areas within the DEA and trained them on confidential law enforcement investigative procedures and counter-surveillance techniques, thereby providing secret information to children not authorized to

receive such information.  The "toys for tots" being offered by the DEA to all these children turned out to be life-altering for many of them as at least seven child participants in the program eventually fell into experimenting with criminal activity, including some who, like the Plaintiff, went on to associate with large-scale drug organizations after first being introduced to the lifestyle by the DEA through the Explorer Program.

51.  Shortly after enrolling in the Explorer Program, Plaintiff noticed the unlawful activity of other Explorers and the reaction by Special Agents whereby they did not seem too terribly concerned that Explorers were consistently being caught committing 'low-level' crimes. Plaintiff, feeling emboldened by the false sense of security that the Explorer program gave him, thereby took it upon himself to attempt to infiltrate drug organizations that infested his neighborhood in Lefrak City, Queens, primarily out of childish curiosity and a desire to impress Agents from the DEA's explorer program that age was not a limiting factor in Plaintiff's ability to perform successful undercover work that yielded valuable information about unsolved crimes.

52.  Even as Plaintiff was an active participant of the Explorer program at the same time he was directly associating with high-level targets of their investigations, Plaintiff still obtained support from the Agents at the Explorer program who helped terminate at least one State criminal investigation against the Plaintiff.  This ability by Plaintiff to use his DEA connections to terminate a State investigation that was engaged against him only further emboldened Plaintiff to continue to experiment with his attempts to infiltrate drug organizations with the assumption that he continued to have the tacit support of the DEA in his actions.

53.  Plaintiff, starting at the approximate age of 15, subsequently infiltrated several international drug distribution networks in an effort to acquire information that he intended to provide to the federal agents at the Explorer program.  After many years of research, Plaintiff

18

was able to identify various law enforcement investigations targeting organizations that he infiltrated. The following is a list of known organizations that Plaintiff infiltrated, ordered according to the approximate date of their indictment and prosecution:

1. USA v. Millan et al. ("Millan Conspiracy"), 1:91-cr-00685-SWK (NYSD 1991)
2. USA v. Haq et al. ("New Jersey Haq Conspiracy"), 2:93-cr-00145-WGB (NJD 1993)
3. NYPD's "Operation Big Shot" ("Barbe Conspiracy"), (NYPD 1993)
4. USA v. Martinez et al. ("Martinez Conspiracy"), 1:94-cr-00219-RPP (NYSD 1994)
5. USA v Ghazi et al. ("Ghazi Conspiracy"), 1:96-cr-00205-ERK (NYED 1996)
6. USA v. Paan et al. ("Paan Conspiracy"), 1:96-cr-00035-JAL (FLSD 1996)
7. USA v. Corwise et al. ("Corwise Conspiracy"), 1:96-cr-01094-RR (NYED 1996)
8. USA v. Sethi et al. ("Sethi Conspiracy"), 1:97-cr-00106-JG (NYED 1997)
9. NYPD's "Operation Lefrak City I & II" ("Lefrak Conspiracy") NYPD 1997 & 2003
10. USA v. Maisonet et al. ("Maisonet Conspiracy"), 1:97-cr-00817-DC (NYSD 1997)
11. USA v. Camacho et al. ("Camacho Conspiracy"), 1:97-cr-01111-SJ (NYED 1997)
12. USA v. Haq et al. ("New York Haq Conspiracy"), 1:97-cr-00762-RJD (NYED 1997)
13. USA v. Max Madrigal et al. ("Max Conspiracy") 1:98-cr-00100-LMM (NYSD 1998)
14. USA v. Jose Madrigal et al. ("Keno Conspiracy") 1:98-cr-00654-NG (NYSD 1998)
15. USA v. Ahmed et al. ("Ahmed Conspiracy") 1:99-cr-00395-TPG (NYSD 1999)
16. USA v. Chaudhry et al.("Chaudhry Conspiracy")1:00-cr-01184-JSR-1 (NYED 2001)
17. NYPD's Operation Byte Size Bust Out ("Khan Conspiracy"), NYPD 2002
18. USA v. Rahimi et al. ("Rahimi Conspiracy") 1:03-cr-00486-DC-3 (NYSD 2003)
19. USA v. Myles et al. ("Myles Conspiracy") 1:2003-cr-00536 (ILND 2003)
20. USA v. Noorzai et al. ("Noorzai Conspiracy") 1:05-cr-00019-DC-1 (NYSD 2005)
21. USA v. Mendez et al. ("Mendez Conspiracy") 1:07-cr-00107-ARR-1 (NYED 2007)

54.  The twenty-one conspiracies listed above share common acquaintances that link them through agreements between conspiracy members to further their own criminal activity, as well as the criminal activity of others and their respective overarching organized crime entities. They also relate to each other through the Plaintiff having infiltrated them all after first attending the DEA's Explorer Program.

55.  Two additional precursor and overarching conspiracies were allegedly semi-disrupted by Federal law enforcement, and whose prosecutions were concluded prior to time when Plaintiff infiltrated and discovered that they remained active. The first of these precursor cases is USA v Sindona, case number S75-cr-00948-TPG (NYSD), which Plaintiff infiltrated

after directly associating with one of the participants of the case, a Mr. Robert Venetucci. Plaintiff discovered this conspiracy is still active and has evolved to include potential terrorism related activity.   The second precursor conspiracy is the case is USA v. Rivera ("Rivera Conspiracy"), case number 1:89-cr-00346-LAP-1 (NYSD 1989), which Plaintiff infiltrated after directly associating with a former member of the conspiracy that escaped apprehension.

56.  Due to the ongoing nature of this unlawful conspiracy by the Federal defendants, Plaintiff will exercise personal discretion throughout this Complaint regarding whether to publically disclose the existence of certain events or recordings made during the course of his attempts to document the matters described in this Complaint.  Lack of notification or omission regarding the existence of certain events, or audio or video recordings documenting an event described in this complaint, is not to be misconstrued as a denial that such evidence exists.

*Partial listing of relevant events – in chronological order*

57.  Between 1991 and 1996, Plaintiff witnessed several murders committed by the organizations he infiltrated.  Plaintiff also infiltrated various terrorism-related conspiracies during this time period, although he did not know the true nature of these conspiracies or their potential lethality until after the 911 attacks.

58.  After several years of living a dual life whereby Plaintiff was an active participation of the DEA Explorer Program while witnessing multiple murders as he infiltrated various organized crime syndicates, Plaintiff was eventually arrested on February 14th, 1996, during a DEA drug sting operation (the Ghazi Conspiracy) conducted by Special Agents operating out of the same New York headquarters of the DEA that was frequented by the Plaintiff on a bi-weekly basis while attending the Explorer Post meetings.  At the time of his arrest in 1996 (after approximately five years of infiltrating drug organizations), Plaintiff had acquired substantial

information regarding numerous unsolved homicides, shootings, rapes, potential terrorism related activity including arms trafficking in large shipments of automatic and semi-automatic firearms, silencers, grenades, C4 explosives, anti-aircraft missiles and an alleged explosive called "Mercury Red," as well as information related to money laundering and drug dealing on a fairly massive scale.  Plaintiff had additionally accumulated numerous audio and video recordings documenting and corroborating various events.

59.  The group of DEA Special Agents that arrested Plaintiff on February 14th, 1996, did not know that Plaintiff was also a DEA Explorer who had associated directly with the top Agents in charge of that same New York Field Division that employed them.  Plaintiff decided that he would conceal his involvement in the Explorer program from arresting Agents, while also concealing his arrest from the Explorer Post Agents until after he could first resolve the instant case and work out a peace treaty with the unknown group of hostile DEA Special Agents that arrested him, which he believed he could easily accomplish by cooperating and dismantling the organizations he had successfully penetrated.  Plaintiff surmised that if he could first overcome the wrath of the Special Agents that had arrested him, that he would thereby be able to attain the forgiveness of the other Agents from the Explorer program that had mentored him for so many years after their becoming aware that he had only associated with these criminals for purposes of obtaining their arrest.

60.  Upon Plaintiff's arrest in the Ghazi Conspiracy, Plaintiff withdrew from participation with all criminal conspiracies by immediately attempting to cooperate with the group of DEA Special Agents that had arrested him, as is the procedure required for an individual to properly establish withdraw from a conspiracy.  Although Plaintiff was technically, as a matter of law, innocent of the instant charges for which he was arrested, Plaintiff admits that he periodically

21

engaged in assisting with some limited drug distribution in the previous years in order to maintain the trust of these violent mafia figures so as to continue to acquire information regarding violent crimes. In Plaintiff's mind, the homicides he obtained information about far outweighed the sporadic drug distribution he engaged in to acquire such information.

61. Plaintiff would soon learn that the DEA Agents that arrested him in February 1996, were not nearly as 'honest' and 'respectable' as the Agents he associated with in the Explorer Program. Plaintiff would learn this almost immediately after his arrest, and throughout the entire prosecution on that case.

62. Immediately after Plaintiff was arrested, he attempted to provide Defendant Donald Baily, the DEA Special Agent that arrested him, with information about a homicide Plaintiff witnessed in 1994. When Defendant Baily learned that Plaintiff had information about a homicide, rather than interview Plaintiff regarding this information, Defendant Baily terminated the interview and refused to continue the debriefings so as to obtain additional information about the homicide, and had instead sought to force Plaintiff to plead guilty to a drug charge for which he was innocent as a prerequisite to any additional interviews. Plaintiff refused to plead guilty to the inflated drug charge, and Defendant Baily then refused to receive information from the Plaintiff regarding the homicide he witnessed. Plaintiff did not disclose that he had information about additional homicides since he was still waiting for Defendant Baily to respond to the information that he already provided.

63. Plaintiff continued to acquire evidence regarding unsolved homicides even as he was released on bail and continuing to fight the malicious prosecution instituted against him by Defendant Baily. In November of 1996, Plaintiff made additional audio recordings with one of the murderers involved in the 1994 homicide for which Plaintiff attempted to inform upon to

Defendant Baily, and again offered this evidence to the prosecutor on his drug case, AUSA Dorksky, who also refused to review any recordings made by Plaintiff unless he first pled guilty to false charges. Plaintiff refused to plead guilty, and was subsequently acquitted of the charges they sought to institute against Plaintiff by the judge.

64. Even after Plaintiff was acquitted by the Judge of the false charges filed against him by the DEA, Defendant Baily still refused to follow up with Plaintiff to acquire the evidence and information regarding that homicide investigation from 1994. At this time, Plaintiff still did not know the identity of the victim, but was also able to determine that Defendant Baily had somehow acquired the identity of the victim and was actively attempting to obstruct Plaintiff's ability to solve this crime in what was a form of retaliation against Plaintiff for his refusal to plead guilty to an unrelated drug crime that he did not commit.

65. Plaintiff was eventually convicted by the judge on lessor charge than the one instituted against him by Defendant Baily, and was subsequently allowed to self-surrender to a Federal prison facility in Rochester, Minnesota to serve his sentence for that conviction. Shortly before his release from that facility, a Sheikh Omar Abdel Rahman (the alleged spiritual leader of an Egyptian terrorist organization) was sent to that same facility. While serving time with Sheikh Rahman at this facility over the course of approximately five months, Plaintiff witnessed various prison officials commit unlawful actions against Sheikh Rahman, including assaulting him during a prayer service that was witnessed by numerous other inmates, as well as on other occasions.

66. Upon Plaintiff's release from prison, he continued to investigate the criminal organizations he infiltrated, especially in light of the fact that Defendant Baily's refusal to investigate the 1994 homicide for which Plaintiff acquired information had eventually led to one

of the murder suspects being killed before he could be apprehended. Plaintiff took Defendant Baily's refusal to investigate the homicides that Plaintiff witnessed between 1991 and 1996, to be an indication that these crimes were not important enough to command an investigation. As a result, Plaintiff then shifted his focus to trying to acquire information about investigations that were already gaining considerable media attention, such as the investigation into Osama Bin Laden. Plaintiff had already infiltrated potential terrorism conspiracies directly related to the Al-Qaeda organization through the connections he established while infiltrating large-scale drug networks and criminal organization based out of Pakistan and Afghanistan.

67. Plaintiff used the fact that he had numerous contacts with Sheikh Rahman at the prison to penetrate Al-Qaeda through his connections in various Afghani and Pakistani drug organizations. After Plaintiff penetrated Al-Qaeda and was asked to participate in a terrorist plot to break Sheikh Rahman out of the prison, Plaintiff attempted to again solicit a debriefing by the DEA regarding these potential terrorism-related conspiracies by sending Defendant Baily postal mail at his headquarters in Manhattan, without any response. Plaintiff also attempted to use different methods of informing upon terrorism suspects, such as convincing others to submit tips on these individuals (since Plaintiff was not being allowed to cooperate). At least one of the tips that Plaintiff helped provide to the DEA through others, eventually resulted in a major bust by the DEA, although they were not aware that Plaintiff was behind the tip.

68. Plaintiff eventually obtained assistance from intermediaries in arranging an interview with Osama Bin Laden in Afghanistan. Plaintiff was set to take this trip prior to September 11th, 2001, but was delayed from taking this trip due to unforeseen circumstances. Plaintiff then rescheduled this trip to tape place in October of 2001, not aware that the 911 attacks were imminent.

69.  After the 911 attacks, Plaintiff discovered that the information he acquired between 1991 and 2001 regarding potential terrorism-related activity, was proven to be relevant to the ongoing 911 investigation.

70.  Plaintiff then contacted Special Agent John Hannah III from the DEA's explorer program, and informed him that he had information relevant to the 911 attacks.  Agent Hannah then arranged an interview between Plaintiff and Defendant Jimmy Arroyo at DEA Headquarters in Manhattan.

71.  After attending the interview at DEA Headquarters, Plaintiff informed Defendant Arroyo and Defendant John Doe 1 that he had information regarding an offer by individuals located oversees who had indicated a willingness to assist with the capture of Osama Bin Laden. Plaintiff also informed Defendants Arroyo and Doe 1 that he had information regarding a possible surface-to-air missile plot and other matters, including numerous unsolved homicides. The interview was terminated immediately without Plaintiff being allowed to provide any relevant information, such as the identities of the individuals Plaintiff suspected to be part of the 911 plot.  Defendant Arroyo stated that he first needed to corroborate that Plaintiff was incarcerated with Sheikh Rahman before the interview could continue.  The Defendants immediately placed the Plaintiff under unlawful surveillance and thereby refused to allow him the opportunity to provide his information, or to assist with the capture of Bin Laden, and this behavior then continued for over ten years.

72.  Shortly after the meeting with Defendant Arroyo, Plaintiff began to receive death threats from unknown individuals, while at the same time being placed on very obvious and flagrant surveillance that did not have any investigative value other than to harass Plaintiff. Although Defendant Arroyo stated to Plaintiff that he would contact him immediately the

following day, no such contact occurred, and as days continued to pass without any contact, Plaintiff was instead confronted with various death threats and intense surveillance.

73. On September 26th, 2001, Plaintiff was then subjected to a physical assault by an unknown assailant from a surveillance vehicle that was following him at the time. Plaintiff left his vehicle to confront the surveillance vehicle, and was struck by the car as it attempted to flee the scene before Plaintiff could confront them. After this assault, Plaintiff travelled to a hospital to get treatment for a small injury he sustained from the assault. When the hospital staff asked Plaintiff to explain how he sustained the injury, Plaintiff told them that he was nearly run over by a police surveillance vehicle, and subsequently gave the hospital authorities the phone number of Special Agent John Hannah to contact him and find out why he was being subjected to death threats and attacks by unknown individuals that were following Plaintiff, rather than simply being interviewed by the authorities.

74. The hospital authorities contacted Defendant Hannah, and returned to inform Plaintiff that he was denying that Plaintiff had contacted him, and denying that Plaintiff was interviewed by Defendant Jimmy Arroyo or that he was placed under any surveillance. Based upon these statements by Federal Authorities that were made to the hospital staff, Plaintiff was then committed to the psychiatric wing of the hospital against his will, based solely upon the hospital staff being deliberately misled into believing that Plaintiff was hallucinating. This would soon become the Modus Operendi of choice for the Federal Defendants in their continued attempts to prevent Plaintiff his ability to resolve any cases, be they related to terrorism or any other matters.

75. While being held in the hospital against his will, Plaintiff was again subjected to numerous death threats from unknown individuals, including being accused of involvement with

the Anthrax attacks.  Unknown individuals in the hospital were also threatening to cause harm to Plaintiff's family in Morocco, when it would be impossible for staff or other patients to have any information regarding the fact that Plaintiff's family worked directly with the King of Morocco.

76.  Upon Plaintiff's release from the hospital, the death threats and aggressive surveillance did not cease.  Unidentified individuals again confronted Plaintiff claiming to be Federal Agents, and had again threatened Plaintiff that he would be charged in the Anthrax investigation, despite the fact that Plaintiff did not have any knowledge or connection to the Anthrax mailings that were sent out shortly after the 911 attacks.  As a result of these continued provocations, Plaintiff began to retaliate against this aggression by responding with similar threats, such as passing false claims to the unidentified individuals that were harassing and conducting surveillance against him, that Plaintiff was part of a plot to detonate a nuclear weapon in New York City.

77.  Plaintiff then devised an elaborate hoax meant to force the defendants to either arrest him or debrief him regarding the information he wished to convey to Federal Authorities. Plaintiff then passed information to the Federal Defendants through the illegal surveillance, that he had successfully imported a nuclear weapon into New York using drug-trafficking routes that his associates previously exploited to bring drugs into the country, and that this nuclear weapon was on a timer to detonate at midnight on October 31st, 2001 if Sheikh Omar Abdel Rahman was not released from custody before then.

78.  The Defendants response to that event was to manufacture a second unlawful incarceration of Plaintiff prior to the designated detonation time of this fictitious nuclear attack. Approximately 8pm on the evening of October 31st, 2001 (about four hours before this fictitious nuclear weapon was set to explode), Plaintiff was at his home in the Bronx preparing to travel

into the 'blast zone' so as to commit suicide, when NYPD officers knocked on his door and dragged him against his will into their custody, without charge and without explanation. Shortly after midnight when it became clear that Plaintiff's retaliatory threats were nothing but a hoax, as no detonation of a nuclear weapon had occurred, Plaintiff was then taken against his will to a psychiatric facility in the Bronx and again subjected to an unlawful incarceration in a psychiatric facility without any judicial oversight. Federal Defendants, rather than arrest Plaintiff, had deliberately provoked Plaintiff to be detained through alternative means in a psychiatric hospital, in an effort to prevent Plaintiff the ability to commit suicide if his nuclear threat did indeed turn out to be true. Federal defendants preferred to detain Plaintiff in this matter, due to the certainty that he could not obtain judicial oversight of their actions as long as they refrain from making an arrest of Plaintiff directly.

79. Plaintiff has never suffered from any mental defect in his entire life. Prior to Plaintiff's attempts to cooperate in the 911 investigation, Plaintiff was never hospitalized or diagnosed by any doctor with any mental defect whatsoever. Plaintiff did not hallucinate having witnessed murders, or having met Sheikh Omar Abdel Rahman at the prison, or having infiltrated numerous criminal and terrorism investigations where he even once had the occasion of meeting Daood Gilani, the person who eventually went on to mastermind the Mumbai Terrorist Attacks in 2008. Plaintiff was simply being subjected to this unlawful activity as a means by which to deter him from the stated goal of his intent to cooperate from the start, which was to assist in the apprehension of Osama Bin Laden, as the Federal Defendants did not want to take him into custody alive for fear of the fact that he would eventually become a witness against them.

80. This behavior in 2001 became the normal course of conduct for the Defendants for over a decade since the 911 attacks. Plaintiff would attempt to cooperate regarding investigations, and instead of being interviewed, he would be subjected to intense surveillance, harassment and death threats from the Defendants to deter his attempt to cooperate. When Plaintiff began to respond against the Defendants, such as attempting to confront their surveillance vehicles, the Defendants would get violent and attempt to attack Plaintiff. When Plaintiff complained to State authorities, the Defendants would deny harassing Plaintiff and inform the authorities that Plaintiff has a mental disorder and is hallucinating, thereby causing Plaintiff to be committed to a psychiatric hospital, although he suffered from no mental defect.

81. After the two forced hospitalizations at the hands of the Defendants in September and October of 2001, and despite the fact that Defendant Arroyo never responded to continue the interview with Plaintiff to acquire the information regarding Osama Bin Laden, Plaintiff still demanded an interview with the FBI through his Probation Officer at the time, and she eventually arranged an interview at her office approximately November of 2001.

82. In November of 2001, Plaintiff was then interviewed by Defendant Perry Cuocci of the FBI at his probation office in Long Island, New York. In a very short interview with Defendant Cuocci that took no longer than about 10 minutes, Plaintiff informed Defendants Cuocci that he had attempted to cooperate with DEA and that they were not responding to the information he previously provided, but had instead responded by harassing Plaintiff, threatening him, attacking him and lying to State officials and hospital officials to cause his unlawful commitment to a hospital.

83. Defendant Cuocci responded to Plaintiff by informing him that he had not received any information from the DEA regarding his attempt to cooperate following the 911 attacks, and

that he would follow up with the DEA to try and find out what happened. The interview was then terminated with little if any information provided by Plaintiff because Defendant Cuocci was himself claiming that he needed to obtain more information from the DEA regarding why they had refused to interview him regarding the information Plaintiff already provided to Defendant Arroyo. Defendant Cuocci stated that he would then contact the Plaintiff after speaking with the DEA, but he never did.

84. Despite Plaintiff having been shunned by the FBI following the interview in November of 2001, Plaintiff was not deterred by what he had discovered, which was that the FBI did not want to capture Osama Bin Laden and were reacting violently to the mere suggestion of it by Plaintiff (despite the fact that they were offering reward money for his capture). Plaintiff continued to investigate his terrorism leads and again acquired a substantial lead regarding terrorism financing after he was again approached by Pakistani ISI affiliated militants that were requesting legal advice from Plaintiff after one of their couriers was "unexpectedly" arrested at Kennedy Airport with approximately $580,000 in undeclared United States currency concealed in his luggage while he was attempting to board a Pakistani International Airlines flight to Pakistan en route to the Swat Valley region of the North West Frontier Province of Pakistan.

85. Plaintiff was informed that at least part of this money was intended to finance terrorism operations overseas, and had previously attempted to inform Defendant Arroyo and the FBI regarding the existence of this suspected terrorist network prior to the time when over half a million dollars was put on a plane destined for the Swat Valley region of the North West Frontier Province of Pakistan, part of which was destined for the clan harboring Bin Laden.

86. Shortly after the money seizure at Kennedy airport, the war against Iraq was announced by President Bush, whereby Plaintiff again felt compelled to attempt to cooperate

Case 1:11-cv-23492-MGC   Document 77   Entered on FLSD Docket 08/22/2012   Page 31 of 79

with Federal officials in order to try and prevent what Plaintiff knew to be the unlawful invasion

of Iraq, which was not justified at that time due to the unlawful actions of named Defendants in

the obstruction of the capture of Osama Bin Laden.

87.  Plaintiff again reached out to Defendant Cuocci after again attempting to secure a

proper investigation by sending yet another anonymous letter to FBI Headquarters in 2002 that

also went unanswered.  Plaintiff informed Defendant Cuocci that he wished to provide

information relevant to the 911 investigation, whereby Defendant Cuocci arranged for an

interview with Plaintiff at a FBI facility in Long Island, New York.

88.  Plaintiff arrived at the FBI facility in Long Island, New York and was subsequently

interviewed by Defendant Cuocci, whereby the Plaintiff again inquired as to the reason why

Plaintiff was threatened with physical harm to both himself and his family, attacked, accused of

involvement with the Anthrax attacks and unlawfully incarcerated in a hospital without any

justification for no other reason than his attempts to provide information relevant to the 911

attacks.  Defendant Cuocci then stated that the DEA was not providing them with any

information, he further stated "you have no idea how hard it is to get any information from the

DEA."  Plaintiff again informed Defendant Cuocci to investigate why the DEA was not

providing him with information regarding why they intentionally obstructed the 911

investigation after Plaintiff came forward with relevant information, whereby Defendant Cuocci

again informed Plaintiff that he would contact the DEA to try and discover why the DEA was

not responding.

89.  Again, Plaintiff waited for days without any response from Defendant Cuocci,

thereby causing Plaintiff to again call Defendant Cuocci and engage a telephone conversation

with him to try and determine why there was never any response regarding these matters.

31

During that telephone conversation with Defendant Cuocci, Plaintiff clearly informed him that along with information regarding terrorism, that he also had information regarding numerous homicides and other serious crimes that had occurred in New York and elsewhere.

90.  Defendant Cuocci, upon hearing for the first time that Plaintiff was offering information on unsolved homicides and covert terrorism-related money shipments to Pakistan, should have made more serious inquiries to the DEA regarding the status of their investigation of Plaintiff.  Instead, Defendant Cuocci continued to obstruct the investigations by refusing to interview Plaintiff regarding these matters.

91.  After having completely failed to deter named Defendants from continuing to obstruct these investigations, and due to the fact that Plaintiff had information regarding potential terrorist plots against New York that the named Defendants were refusing to investigate and disrupt, Plaintiff then left New York and moved to Florida in January of 2004.

*Plaintiff flees to Florida*

92.  After moving to a community in Sunrise, Florida in early 2004, Plaintiff was subsequently targeted for additional improprieties by named Defendants through their alliance with a local police Department, the Sunrise Police Department, and a Florida resident by the name of Marjorie E. Malone.

93.  Marjorie Malone, was a neighbor of the Plaintiff, and for unknown reasons had begun to file false police reports against Plaintiff stating that he was involved in terrorism.

94.  In one such event, Ms. Malone wrote a letter to the Board of Directors for the community where Plaintiff resided accusing Plaintiff of possibly engaging in criminal activity for nothing more than having New York license plates on his car, which she believed to be proof that Plaintiff was a terrorist.  Plaintiff confronted Ms. Malone about the letter after she sent him a

copy of it, at which point she then openly declared to Plaintiff that she was going to call the Department of Homeland Security to report Plaintiff for terrorism because he had not switched the New York license plate on his vehicle to a Florida license plate.

95. It is impossible for Ms. Malone to have known anything regarding the Plaintiff's past dispute with the Defendants, as this was not something Plaintiff discussed with anyone.

96. After Ms. Malone threatened to file a false report against Plaintiff with the DHS, Plaintiff immediately contacted the Sunrise Police Department and reported this threat. The Sunrise Police Department then dispatched Officer Karel Rosario to investigate Plaintiff's complaint, whereby Plaintiff informed Officer Rosario that Ms. Malone was threatening to call the Department of Homeland Security on him to falsely accuse Plaintiff of being a terrorist. Officer Rosario then went to Ms. Malone and cautioned her not to attempt to file any false reports against Plaintiff, whereby she denied having made any such threats.

97. Upon being cautioned not to file false complaints against the Plaintiff, Ms. Malone then secured the cooperation of another unidentified neighbor, and together they contacted the Department of Homeland security to falsely report the Plaintiff as being involved with terrorism-related activity. No attempt to interview Plaintiff was made by the Defendants at the time the tip was made by Ms. Malone in September of 2004, because the unidentified individuals that received the tip already knew it to be false. Nevertheless, events in October of 2004 eventually provoked the Defendants to take advantage of this false tip in an effort to continue to harass and threaten the Plaintiff into silence regarding these matters.

98. In October of 2004, Plaintiff was interviewed by Sheikh Rahman's former attorney, Lynne Steward and her defense team regarding a possibility that Plaintiff would be called as a

witness in her ongoing trial on terrorism charges related to her issuance of the press release in 2000 announcing Sheikh Rahman's withdrawal of support for a terrorist ceasefire.

99.   After Plaintiff divulged certain information regarding improprieties committed by named Defendants to Lynne Stewart's defense team approximately October and November of 2004, named Defendants then retaliated against Plaintiff the following month in December of 2004 by dispatching Defendant Shamus Skelly, a Secret Service Agent, and Defendant John Doe 4, a Department of Homeland Security Agent to Plaintiff's job for the express purpose of causing a scene at his place of employment with the intention to threaten Plaintiff's right to be gainfully employed.   Defendant Skelly and Defendant John Doe 4 subsequently traveled to Plaintiff's job, claiming to be investigating an 'anonymous' terrorism tip received by the Department of Homeland Security in September of 2004 alleging Plaintiff to be a terrorist.   Up until that time, Plaintiff still could not get anyone in the FBI to investigate the information he sought to provide immediately following the 911 attacks and for years since that event, yet for whatever the reason Defendant Skelly was now using government resources to investigate false tips against the Plaintiff.

100.   Defendant Shamus Skelly and Defendant John Doe 4 interviewed Plaintiff at his job yet again refused and denied any knowledge of why Plaintiff was never questioned following his attempts to cooperate after the 911 attacks.   Defendant Skelly claimed to have no information about Plaintiff's previous attempts to cooperate, and was simply there to investigate the false tip, and had denied that he was investigating this tip as a form of retaliation against Plaintiff for assisting the Lynne Stewart defense team.   Defendant Skelly thereby created a scene at Plaintiff's job that eventually causing Plaintiff to be terminated from his position.

101.  Since Plaintiff's loss of his job was not a significant enough form of retaliation against Plaintiff, Defendant Skelly then additionally caused Plaintiff to be unlawfully incarcerated on two subsequent occasions as a further form of retaliation against Plaintiff for his refusal to submit to their aggression, which at times included aggressive surveillance that had no investigative reason other than to harass Plaintiff.

102.  Shortly after Defendant Skelly approached Plaintiff at his job and subsequently returned on several occasions to be seen parked outside the job conducting surveillance against Plaintiff, Plaintiff was approached by Defendant John Doe 5, who claimed to be a CIA Agent and who thereby requested Plaintiff's assistance with a 'secret' ongoing investigation in Morocco.  Upon Defendant John Doe 5's refusal to provide Plaintiff with some form of identification that he could use to verify that he was actually a CIA Agent, Plaintiff subsequently contacted Defendant Skelly to report the visit by Defendant John Doe 5 as possibly being related to unlawful activity.

103.  Shortly after contacting Defendant Skelly regarding John Doe 5, where he received no response, Plaintiff was again subjected to aggressive surveillance which caused Plaintiff to once again become involved in yet another altercation with a surveillance vehicle that was following him during that time period, almost exactly like the previous altercations he had with surveillance vehicles in the past following the 911 attacks.  Plaintiff thereby went to the Sunrise Police Department to report the altercation with the surveillance vehicle, and the Sunrise Police subsequently contacted Defendant Skelly, who they have alleged that he subsequently lied to them and informed them that he never went to Plaintiff's job and had never attempted to investigate him for terrorism.  Sunrise Police then took Plaintiff to a hospital as a result of their allegedly being informed by Defendant Skelly that Plaintiff was hallucinating, whereby Plaintiff

35

then informed the Sunrise PD to contact the FBI due to the misinformation provided by Defendant Skelly.

104.  Defendant Matthew Foster of the FBI then responded to the hospital, along with Defendant Forteza of the Sunrise Police Department, where they subsequently interviewed Plaintiff.  Defendants Foster and Forteza additionally confirmed to Plaintiff that Defendant Skelly was denying having gone to Plaintiff's job, and denying having interviewed Plaintiff about an anonymous terrorism tip.  They admitted that Defendant Skelly had interviewed Plaintiff (without stating where this interview occurred), but they additionally stated that Defendant Skelly questioned Plaintiff regarding a drug case and no other topic related to terrorism was discussed.  Plaintiff was thereby unlawfully committed to the custody of the hospital once again by Defendants Skelly, Foster and Forteza, where they informed the doctors that the misconduct Plaintiff was complaining about was a complete hallucination.  Defendants Skelly, Foster and Forteza further informed the doctors at the hospital that Plaintiff was not a witness to murders or anything else related to terrorism (without having ever questioned Plaintiff about these topics), and they also informed the doctors at the hospital that Plaintiff was never incarcerated with Sheikh Rahman at FMC Rochestor and that this too was a hallucination.

105.  Defendants Skelly, Foster and Forteza thereby assisted an already ongoing unlawful conspiracy by Federal Defendants to attempt to continue to deter Plaintiff from assisting in a wide range of criminal investigations ranging from unsolved homicides to the 911 investigation, through the use of death threats, unlawful commitments to hospitals (based upon their providing false information to hospital officials), and other illegal means, and are therefore liable to Plaintiff for all causes of action arising from Plaintiff's unlawful imprisonments in hospitals on several occasions between September of 2001 and January of 2005, which was the last time they

36

would attempt such a ruse, as shortly after the 2005 hospital commitment, they then decided to expand their unlawful activity to the filing of false criminal charges against the Plaintiff since the hospital commitments were not serving as an effective deterrent against Plaintiff.

106. A subsequent report filed by Sunrise PD regarding this unlawful commitment of Plaintiff to a hospital in January of 2005 confirmed that Defendant DOJ, FBI, Foster and other Federal Defendants, had been intentionally violating Plaintiff's Privacy rights both before and after that commitment, by consistently providing false information (obviously contained in Plaintiff's confidential FBI file) to outside parties in an effort to force Plaintiff's unlawful commitment to hospitals, and in an effort to suggest that the information Plaintiff already provided to them on numerous occasions (regarding very specific unsolved murder investigations) was a hallucination and could not possibly be verified by any means available to them.

107. The Defendants engaged this unlawful strategy starting almost immediately after Plaintiff's attempts to cooperate in the 911 investigation in September of 2001, in a sustained effort to perpetuate the false impression of Plaintiff by others that he indeed suffered from a mental disorder so as to discredit him should he continue to divulge what the Defendants had done to deliberately obstruct the 911 investigation.  This has been the methodology employed against Plaintiff by the Defendants since the start of these events following Plaintiffs attempts to cooperate after the 911 attacks, despite the fact that Plaintiff never suffered from any mental disorder and has never hallucinated anything in his entire life, and despite the fact that Plaintiff could very easily prove that his information regarding homicides and terrorism is completely accurate and verifiable though physical evidence and other means, including recordings made by Plaintiff with actual individuals implicated in the crimes.

108.  Plaintiff was never treated for any psychiatric disorder prior to when the Defendants first lied to hospital officials in September of 2001 in an effort to get him unlawfully committed at that time as part of a conspiracy to obstruct the 911 investigation.  Defendants continued using that same strategy for years since 911, causing Plaintiff to be committed to a hospital on several occasions by simply providing false information to the hospitals.  Without direct Federal intervention through their providing false information to a hospital, there is no possibility that Plaintiff could be committed to a hospital based upon his own testimony to hospital officials, nor is there any possibility that Plaintiff could be committed to a hospital in any situation where there is judicial oversight governing any such commitment.  It is simply an abuse of authority by Federal officials in that they are trusted by hospital officials when they make statements to them that Plaintiff is hallucinating, and this is indeed a situation they exploited for many years against the Plaintiff.

109.  Shortly after being released from the hospital in 2005, Plaintiff finally made contact with Defendant Skelly and arranged to meet him at the same FBI Headquarters where Plaintiff went to report the imminent Marrakesh Bombing in 2011.

110.  Plaintiff again attempted to ascertain why Defendant Skelly had lied to get him incarcerated in a hospital, and Plaintiff again attempted to engage him regarding the events that took place between 1996 and 2001 where Plaintiff was consistently being targeted for illegal actions for nothing more than his attempts to provide information relevant to ongoing criminal investigations.  Defendant Skelly thereby stated the same information that was consistently stated to Plaintiff in every interview subsequent to his attempts to cooperate with Defendant Arroyo.  Defendant Skelly stated he would investigate Plaintiff's claims and respond, which he never did.

111.  When the Defendants saw that Plaintiff was not going to back down to their aggression, they finally decided to take their aggression against Plaintiff to a new level.  Shortly after the hospital incident and the follow-up interview with Defendant Skelly at FBI Headquarters, Plaintiff was again subjected to yet another retaliatory attack by named Defendants using yet another false pretext provided by their star informant, Ms. Malone.  In February of 2005, after Plaintiff left his home to get lunch at a nearby restaurant, Ms. Malone waited until Plaintiff had left his residence at which point she then called the Sunrise Police Department and reported to them that the Plaintiff had just broken into her home, attacked her inside her home, and then fled the scene.  While Plaintiff was getting food at a nearby McDonalds, Sunrise Police Officers arrived at Ms. Malone's residence to interview her, whereby they observed her crying and wailing that Plaintiff had broken into her home and attacked her in revenge for her having called the Federal Authorities to report his 'terrorism' activities.

112.  Sunrise Police had numerous interactions with Marjorie Malone, as she had fabricated numerous similar complaints against other residents.  Defendant Amanda Curet, the Sunrise Police officer that responded to the call, also acquired additional proof of Plaintiff's innocence after leaving Ms. Malone's resident and interviewing another neighbor, whereby Defendant Curet confirmed, via independent witness, that Plaintiff did not in any way attack Defendant Malone but had simply left his home without incident.  Despite the fact that an independent witness to the events completely contradicted Ms. Malone's allegations, as well as the Sunrise Police department having received numerous false complaints by Ms. Malone against other residents for years, the Sunrise Police Department chose to ignore these facts and proceeded to arrest the Plaintiff simply because one of the numerous Sunrise Police Officer that responded to the call (Officer Hydes), was also previously present during the day when Plaintiff

attempted to file a complaint against Defendant Skelly when Defendant Skelly thereby retaliated against him by causing Plaintiff to be unlawfully committed to a hospital.

113.  Even after Plaintiff was arrested on charges which Defendant Amanda Curet already knew to be false, still she subsequently contacted Defendant Skelly to inform him about the arrest (based upon information provided to her by Officer Hydes that Plaintiff was in a conflict with Defendant Skelly that he had previously witnessed) and to get some sort of indication from Defendant Skelly as to how they should handle the Plaintiff with regards to this new accusation being leveled against him by Ms. Malone, the person responsible for the previous false terrorism tip submitted against Plaintiff to Agent Skelly.  Upon information and belief, Defendant Skelly informed Defendant Curet to harm the Plaintiff, at which point Plaintiff was then thrown into a solitary cell at some undisclosed location in Broward, Florida, and denied the right to contact his family to inform them of his arrest.

114.  As a result of the extreme aggression by Defendant Curet and the Sunrise PD, Plaintiff suffered a stroke while in their custody and was refused medical attention for the entire duration of his unlawful incarceration.  Plaintiff was subsequently detained incommunicado by Defendant Curet, in complete isolation and under 24-hour lockdown for the next two weeks before Plaintiff's family could finally locate him on their own (after he simply disappeared) and bail him out.

115.  After Plaintiff was finally located by his family and bailed out of prison, Plaintiff discovered for the first time that he was being charged with misdemeanor battery and trespassing for allegedly breaking into Defendant Malone's home and attacking her.

116.  Plaintiff was then incarcerated on misdemeanor charges for which he could have immediately raised bail, which was set by the court through arraignment via video link to the

prison where Plaintiff was being held, at approximately $1,000. Defendant Curet denied Plaintiff the ability to make a phone call in order to notify his family that he was arrested, and then transported him to a prison where Plaintiff was then thrown into a solitary cell for two weeks and denied the ability to contact anyone to even alert them that he had been arrested. Such activity by named Defendants was tantamount to circumventing the bail conditions imposed by the judge, with a no-bail condition of continued indefinite detention due to his inability to alert anyone that he had even been arrested so as to secure the posting of the bail.

117.   While being unlawfully detained in this matter, named Defendants refused to provide Plaintiff with medical attention for physical injuries incurred as a result of the unlawful arrest, resulting in permanent injuries and paralysis being sustained by Plaintiff due to his being denied access to specific treatments for his injuries that would have likely to prevent such injuries from becoming permanent.

118.   After being released from the Prison, Plaintiff finally obtained the police report related to the arrest, and subsequently learned, for the first time, that Ms. Marjorie Malone was allegedly responsible for having provoked it. Plaintiff immediately commenced to contacting Defendant Skelly and another FBI Agent affiliated in South Florida, Defendant Mathew Foster, in an attempt to alert them that the same individual that filed the false terrorism tip against the Plaintiff was now filing false criminal charges against him claiming that Plaintiff had broken into her home to assault her for having made that very tip. According to the police report, Ms. Malone was accusing Plaintiff of breaking into her home and assaulting her, which is offense conduct that could possibly qualify as an additional Federal offense of witness tampering or assault upon a Federal witness, although never charged for obvious reasons.

119. Defendant's Skelly and Foster refused to respond to Plaintiff's numerous calls and messages in 2005 and 2006 that he left them on their voicemails attempting to again inquire as to the investigations from New York, the numerous homicides, the unresolved terrorism investigations and other relevant issues, as well as the additional unlawful prosecution by Defendant Malone whereby Plaintiff obtained clear evidence proving that the allegations were false. They instead held their breath hoping for a conviction in that case for no other reason than to continue to harm Plaintiff and subject him to false convictions as a means by which to continue to cover up their improprieties following Plaintiff's attempts to cooperate in September of 2001.

120. Plaintiff was forced to fight the false criminal allegations filed against him by Ms. Malone from 2005 until 2006 before finally being afforded his right to a trial in October of 2006. On the eve of the trial, Plaintiff discharged his court appointed Attorney after the Attorney deliberately attempted, on numerous occasions, to sabotage Plaintiff's case. Plaintiff then commenced to defending himself through a jury trial on those charges, from jury selection to jury verdict, whereby he achieved an acquittal on all charges. This prosecution was entirely malicious, and as a result of this new level of aggression, Plaintiff decided to leave the United States permanently by purchasing a one way ticket to Morocco. Although Plaintiff was slowly neutralizing the Federal Defendants attempts to portray the Plaintiff as suffering from a mental disorder, thereby reducing their continued ability to cause his incarceration using those means, it was now clear that the Federal Defendants had no problem simply instituting false charges if necessary to engage even more brutal violations of Plaintiff's freedoms, for no other reason other than his continued insistence upon a proper investigation of 911, in light of information that Plaintiff acquired that he knows to be relevant to those events.

42

*Plaintiff flees to Morocco*

121.  Plaintiff purchased a one-way ticket to Morocco in a final attempt to resolve the unlawful activities of the named Defendants through the intervention of a foreign government. Plaintiff also decided he would continue to attempt to investigate and gather evidence regarding the whereabouts of Osama Bin Laden for a second time since Bin Laden was first allowed to escape apprehension in 2001.

122.  Plaintiff, after arriving in Morocco and continuing to research the subject matter of this complaint using the internet and other sources, subsequently discovered several media articles describing the event of the nuclear hoax that Plaintiff inadvertently caused as a result of his dispute with named Defendants at that time.  After discovering these articles, Plaintiff again began to send another flurry of emails to the FBI, DEA and other Federal authorities back in America, whereby he provided his contact information in Morocco, including his cell phone number, and requested that they call him back (which they never did).  Plaintiff then called the FBI directly and spoke to an unidentified Agent who stated he would attempt to locate the emails and respond, and still there was no response.  Plaintiff continued to email detailed information regarding unsolved homicides, including other information he previously never had an opportunity to provide to Federal authorities.  These emails should have immediately provoked an investigation, especially since Plaintiff was no longer dealing directly with specific Federal agents that he already knew to be part of the conspiracy described herein, but was instead submitting his tips directly to various Federal websites and FBI email addresses, thereby broadening the number of random Federal Agents that would be exposed to this investigation.

123.  Plaintiff, after having resided in Morocco for approximately 9 months, was subsequently offered unsolicited employment at an American corporation in August of 2007.

Plaintiff accepted a position as Head of Technology for a network of American Schools located in Tangier and Marrakesh, Morocco.

124.   While employed at this American company, Plaintiff continued to attempt to resolve the numerous crimes witnessed.  Plaintiff obtained the email address of the Federal Prosecutor assigned to prosecute the Chaudhry Conspiracy, AUSA Leslie Brown, and emailed her directly to inquire if an individual named Abid Chaudhry, who is the prime suspect in the 1994 homicide that Plaintiff attempted to provide information about to Defendant Baily in 1996, was already arrested and charged with the crime.  Plaintiff simply assumed that the reason there was never any follow up with Plaintiff on this murder was because it had already been solved, as Plaintiff still could not believe that the Federal Defendants were deliberately obstructing the case despite all the very clear evidence to the contrary.  Plaintiff proceeded to include in that email, numerous confidential details regarding the murder that only the killers could know.

125.   Plaintiff received a response to the email he sent Leslie Brown from an individual named James Motto, who stated he was an Investigator with the Southern District of New York's International Narcotics Trafficking Unit.  Mr. Motto informed Plaintiff that Defendant Ken Bradley of the DEA, who was knowledgeable about the Abid Chaudhry murder investigation, would contact the Plaintiff shortly to follow up on the information he provided.  Defendant Bradley never attempted to contact the Plaintiff and thereby joined the conspiracy to continue to obstruct the 1994 murder investigation of Mohammed Syed, as Plaintiff would soon learn it was still an unsolved murder despite the fact that Plaintiff had already provided them with evidence and information that should have long resulted in the arrest of the prime suspect, Mr. Chaudhry.

126.  By January of 2008, Plaintiff had already infiltrated an alleged cell of militants located in Morocco, Algeria, Spain and elsewhere, and had utilized information acquired from

44

them to penetrate additional cells located in Egypt. Plaintiff was subsequently invited to Egypt to meet with high-ranking members of Sheikh Rahman's organization. Plaintiff began to make preparations for a trip to Egypt starting approximately the end of January in 2009.

127. In early February of 2009, in what appeared to be a manufactured scandal at the job site where Plaintiff was employed, Plaintiff was subsequently subjected to a third unlawful prosecution by several former United States Ambassadors that were members of the Board of Directors for the American corporation that he was employed with at that time. These Ambassadors and other members of the Board of Directors for the school that employed the Plaintiff, subsequently filed criminal allegations against the Plaintiff with a foreign law enforcement entity (the Moroccan government) accusing Plaintiff of various criminal offenses ranging from illegally intercepting United States Embassy communications to plotting a terrorist attack against the schools that employed him. These individuals additionally and directly accused Plaintiff of being a member of Sheikh Rahman's organization, which is designated to be a terrorist organization by the United States government. This is memorialized in legal documents related to that case, and Plaintiff is informed and believes that this scandal was deliberately manufactured against him in retaliation for his continued attempts to obtain a ceasefire from terrorist organizations pending an investigation of these matters.

128. Plaintiff was subsequently charged by law enforcement authorities in Marrakesh with various criminal and terrorism related offenses, although Plaintiff was allowed to remain free pending the investigation. Plaintiff was informed by the police at that time, that they knew Plaintiff had committed no crimes and that they were only reluctantly pursuing the investigation due to the large amount of political pressure applied upon them by named Defendants. While in the midst of fighting the case, and while refusing to be intimidated by the pending terrorism

allegations in Marrakesh, Plaintiff then continued to proceed with his planned trip to Egypt in April of 2009, where he subsequently met with Sheikh Rahman's son, a Mr. Abdullah Omar Rahman, and Sheikh Rahman's Egyptian attorney, a Mr. Montassir El-Zayat.

129.   Shortly after Plaintiff returned to Morocco from his trip to Egypt, he was again subjected to an increased campaign by named Defendants to effectuate his arrest in Morocco, whereby he was again called into questioning by police and informed that he was no longer allowed to leave the country until further notice.  Plaintiff then spent approximately 5 months between April of 2009 and September of 2009 attempting to ascertain the nature of the criminal charges that were filed against the Plaintiff in Marrakesh, as well as attempting to ascertain why Plaintiff was receiving information from Moroccan security services that the United States government, along with Plaintiff's employer (which was an American company doing business in Morocco), was directly involved in attempting to secure the Plaintiff's incarceration in Morocco.  Plaintiff then accelerated his attempts to again try to ascertain why named Defendants were committing all these unlawful actions against him while being held in Morocco against his will.  Plaintiff contacted numerous Defendants during this time, including Defendant Thomas T. Riley, Defendant Robert P. Jackson, and Defendant Donald E. Gonneville, without any response. Defendants Riley, Jackson and Gonneville had the authority and ability to immediately terminate the investigation provoked by other State Department Officials that were members of the Board of Directors for the company that employed Plaintiff, but had refused to intervene.  Upon information and belief, they not only refused to intervene to terminate the false charges, they actually assisted the unlawful conspiracy by disclosing confidential information to members of the Moroccan government in violation of Plaintiff's Privacy Act protections.

130.   At the same time Plaintiff was fighting fabricated criminal allegations in Morocco and subsequently banned from leaving Morocco, Plaintiff additionally decided to dedicate his full resources to discovering the identity of the 1994 murder victim, which was the first homicide victim he divulged knowledge about to Defendant Baily on February 14th, 1996.  Plaintiff still did not know the name of the victim at that time, as all he had were details, times, locations and other information about the crime.  Plaintiff wanted to properly identify this murder victim in any future correspondence dedicated to attempting to resolve the obstruction of his murder investigation, which essentially marked the start of this unlawful conspiracy as it relates to the Plaintiff.

131.   Plaintiff purchased subscriptions to various New York City newspaper archives approximately May of 2009, and then combed through every single article relating to homicides reported by the media during the time period between December of 1993 and approximately March of 1994, as Plaintiff did not know the exact date, but the approximate timeframe based upon the information he was receiving from another person involved in that murder, a Mr. Raoul Campana.

132.   After combing through hundreds of articles from the archives, Plaintiff discovered an article describing a murder that fit the description given to Plaintiff by Mr. Campana.  It was a fit for two reasons: the victim was known to have a Pakistani-sounding name since he was Pakistani, and the victim was known to have been shot to death in a deserted area in the Bronx approximately December of 2003 or January of 1994.  Based on just those two factors, Plaintiff believed that he had finally discovered the identity of a murder victim that he was previously aware had existed for approximately 15 years up until that time.

133.  Plaintiff then sent an 'anonymous' tip to the NYPD's Crimestopper website attempting to ascertain whether the article that described a murder victim named Mohamed Syed was actually the infamous Abid Chaudhry murder that Plaintiff had been attempting to resolve starting approximately 1996.  Plaintiff then received a response from a cold case Detective assigned to the NYPD, Defendant Anthony Scalia.

134.  Over the course of several months in 2009, Plaintiff exchanged numerous emails with Defendant Scalia which clearly indicated that Defendant Scalia, unlike his DEA counterparts that were attempting to obstruct the investigation, was actively attempting to resolve this still unsolved homicide, which the DEA and Federal Defendants had previously investigated without success because they refused to speak to Plaintiff about it.

135.  Plaintiff, after being notified by Defendant Scalia for the first time in 8 years that the DEA was claiming to have never received audio recordings regarding the murder made by Plaintiff that he provided them in 2001 after the 911 attacks, had again emailed portions of those same recordings to Defendant Scalia and snippets of other recordings including video recordings made with other murder suspects, including and individual named Max Alejandro Madrigal-Calvo.  Soon thereafter, Defendant Scalia then disappeared again, although Plaintiff continued to receive emails from the Internal Affairs division of the NYPD that was investigating another acquaintance of the Plaintiff that he alerted Defendant Scalia about.

136.  Approximately September of 2009, at the same time when Defendant Scalia disappeared and refused to respond to Plaintiff's requests for status updates on the information and recordings he had already provided via email, Plaintiff was finally able to obtain a police report memorializing the criminal allegations filed against the Plaintiff in Morocco by the three Ambassadors.  In this complaint, which was sent directly to the King of Morocco through the

48

Moroccan Ambassador to the United States in Washington, D.C., Plaintiff is being accused of serious crimes including illegally intercepting the email communications of the United States Embassy in Rabat, Morocco, a serious Federal offense.

137.   After finally obtaining a copy of the allegations made against Plaintiff by named Defendants, Plaintiff immediately commenced to emailing the United States Embassy in Rabat and various State Department officials in an attempt to ascertain the source of these allegations being made by former US government officials.  Plaintiff made numerous inquiries for clarification and/or consular assistance to attempt to resolve the allegations being made by these former government officials, without any attempt by named Defendants to reverse the damage committed by their associates, including the former head of that very Embassy.

138.   Defendant Riley, Defendant Jackson and Defendant Gonneville thereby refused to repair the damage that they and their co-conspirators intentionally caused to the relationship between Plaintiff and the Royal Family in Morocco.  Named Defendants first caused a confrontation between the two as part of their attempts to force the Plaintiff to be unlawfully incarcerated in Morocco, and after provoking the conflict, they simply walked away and allowed Plaintiff and his family to incur the consequences, which included the illegal incarceration of Plaintiff's cousin without charge.

139.   Despite receiving confirmation that the emails Plaintiff sent to various State Department officials were received and read by the recipients, including Secretary of State Hillary Clinton, Plaintiff still did not receive any response from anyone in the State Department offering assistance or clarification of the matters despite the fact that Plaintiff, a United States citizen, was no longer allowed to leave Morocco due to the named Defendants having engaged an unlawful criminal prosecution against him.  Plaintiff was thereby denied his right to due

process in the form of consular assistance from the United States Embassy, which is the right of all United States citizens that are charged with criminal offenses in a country that has a U.S. diplomatic presence.

140.   The denial of this assistance Plaintiff requested from Defendants Riley, Jackson and Gonneville, coupled with the deliberate sabotage against Plaintiff by other DOS employees who encouraged and provided assistance to the Moroccan government in attempting to force them to pursue the false charges, had the effect of preventing Plaintiff the ability to leave Morocco in order to return to America.  This conduct also further exacerbated the conflict between Plaintiff and the Moroccan government to the point that Plaintiff's family members were being arrested and incarcerated in Morocco without charge, and Plaintiff was forced to threaten the safety and security of the King of Morocco in order to deter him from any further unlawful acts against Plaintiff and/or his family that still resides in Morocco.

141.   This manufactured conflict between Plaintiff and the Moroccan government is still, as of yet, unresolved due to the refusal by the Defendants to admit that they lied to the Moroccan government to provoke a conflict (in much the same way they continuously lied to State law enforcement and hospital officials to illegally provoke them against Plaintiff).  Named Defendants also refused to properly investigate the events that Plaintiff witnessed in Morocco, which he knows to be directly relevant to the Marrakesh Bombing investigation, and this too is a major obstacle to any resolution that will end the conflict between Plaintiff and the Moroccan government.  This subjects the Plaintiff to the threat of assassination at the hands of the Moroccan government while this matter is still pending, and they have committed such political assassinations in the past (as Plaintiff's uncle was involved with at least one such operation).

142.   In December of 2009, after numerous complaints and emails that again went unanswered regarding the allegations made against Plaintiff by former government officials, Plaintiff finally received a response from the State Department after several months claiming that they were renouncing the acts of their former employees.  No explanation was provided by Defendant Gonneville as to the origin of the allegations that Plaintiff had illegally intercepted the electronic communications of the United States Embassy in Rabat, such allegations being made by the former head of that very same Embassy.  Defendant Gonneville additionally refused to provide Plaintiff with a renunciation of the allegations made against him by the Ambassadors. This refusal by Defendant Gonneville had the effect of exacerbating the situation between Plaintiff and the Moroccan government, as the Plaintiff fled Morocco shortly thereafter, and when the Moroccan Government had found out that he had left the country, they immediately retaliated against his cousin by incarcerating him without charge as a form of kidnapping and ransoming of Plaintiff's family in an effort to deter Plaintiff from pursuing legal remedies against them in America.

*Plaintiff flees back to America*

143.   After finally providing Marrakesh law enforcement with a letter written by Donald Gonneville disputing the allegations filed against Plaintiff by other former State department officials, Plaintiff was eventually informed that the charges against him in Marrakesh were dropped and that the Plaintiff was finally allowed to leave the country, although the Marrakesh Police were themselves unaware of the additional conflicts that were occurring between Plaintiff and the Royal Family.  Plaintiff immediately proceeded to make plans to return to the United States starting approximately December of 2009.  By the time Plaintiff was preparing to leave Morocco, he had already penetrated numerous militant cells and had additionally acquired

information from a Pakistani intelligence operative that Osama Bin Laden was being held under 'house arrest' in Abbatobad, Pakistan. Prior to leaving Morocco, Plaintiff obtained the assistance of Mr. Syed Farooq Ahmed and dispatched him to Abbotabad, Pakistan to investigate a lead Plaintiff acquired regarding Bin Laden's whereabouts. Plaintiff informed Mr. Ahmed not to disclose their contacts, but after a recent trip to New York, Plaintiff learned from a close associate of Mr. Ahmed that he had indeed disclosed their contacts (which may have led to his assassination by the Pakistani government).

144. Prior to leaving Morocco, Plaintiff additionally contacted numerous foreign Embassies in Morocco to provide them with various pieces of evidence so as to have multiple witnesses to the information acquired by Plaintiff over the course of nearly two decades while investigating all these matters. Upon information and belief, these different governments then contacted the Federal Defendants to seek their permission to interview Plaintiff, and the Federal Defendants responded by again violating Plaintiff's Privacy Act rights by disclosing information they know is false that is contained in Plaintiff's FBI files, in an effort to deter foreign law enforcement from wanting to question Plaintiff whereby he would then provide them with the information they were attempting to deny. Plaintiff never received any response from any foreign law enforcement, despite the fact that Plaintiff had information that they could have investigated within their own countries, as Plaintiff had contacts within these countries relevant to the 911 investigation.

145. Just about one week before Plaintiff was scheduled to leave Morocco in January of 2010, Plaintiff was contacted by Defendant John Doe 6, who claimed his name was 'David' and that he was a legal attaché at the Embassy that was investigating a confidential email Plaintiff

sent to a Syrian Ambassador located in the United States, which was apparently unlawfully intercepted by named Defendants.

146. Defendant John Doe 6 then asked Plaintiff to travel to the United States Embassy in Rabat to be interviewed. Plaintiff was again concerned that the timing of this request was yet another unlawful attempt by the Federal Defendants to obstruct the 911 investigation, and any investigation for which Plaintiff had acquired privileged information. The concern of Plaintiff is valid considering the timing of this requested interview. Since 2007 and while Plaintiff was in Morocco, he had sent numerous emails to Federal Defendants begging to be interviewed about many serious crimes including murders and the 911 attacks without any response. Then, one week prior to his purchasing a one-way ticket back to America, he is contacted by the Federal Defendants and asked to be interviewed while still a resident in a foreign country. It was clear that if they did not like what Plaintiff told them in the interview, their intention was to cause Plaintiffs arrest/detention/assassination in Morocco before he could return to the cozy comfort of his constitutional protections in America.

147. Due to the obvious attempt by the Federal Defendants to retrieve information from Plaintiff before he left Morocco, as opposed to after he left Morocco and returned to America, Plaintiff refused to meet with Defendant John Doe 6 unless he first provided Plaintiff with his full name and identity so that Plaintiff could confirm that he was authentic and take steps to ensure that the interview is documented. Plaintiff had already confirmed that unidentified Federal Defendants had previously attempted to cause the death of Plaintiff's uncle in Morocco following the 911 attacks, and had additionally caused the death of other individuals that Plaintiff recruited as sources of information within the Pakistani ISI, such individuals risking their lives by betraying the Pakistani government in providing assistance and information to

53

Plaintiff. The unidentified individual refused to provide Plaintiff with his name and Plaintiff decided not to attempt any such interview until he first returned to America.

148. After arriving back in America, Plaintiff again attempted to reach out to the Federal Defendants by emailing the FBI (to which he received no response) and additionally approaching a Senate Subcommittee tasked with investigating "security lapses" that allow terrorism attacks to occur. Plaintiff then took the time to construct a 100+ page report that he then submitted to the FBI and Defendant Lieberman, Chairman of the HSGAC, through a member of his committee at the time, a Defendant Mathew Leatherman. Despite the fact that Defendant John Doe 6 was requesting to interview Plaintiff while he was still located in Morocco, upon Plaintiff's return to America, all of a sudden there was no interest in receiving any information from Plaintiff while he was physically located within the territorial boundaries of the United States.

149. This report submitted by Plaintiff to the HSGAC should have provoked an immediate investigation, especially with the attachment of the email exchanges between Plaintiff and Defendant Scalia which clearly proved that the DEA and others were engaged in a deliberate conspiracy to obstruct numerous investigations ranging from murders to terrorism. Although Plaintiff was able to confirm that Mr. Leatherman received and read the report, which was also forwarded to Defendant Michael Reigle of the FBI at the same time, still Plaintiff received no response from anyone including Senator Leiberman, who was the Chairman of the HSGAC and upon information or belief, had been informed regarding the existence of this report.

150. Between February of 2010 and December of 2010 Plaintiff attempted numerous communications with different entities within the NYPD and Federal government, including approaching the Prosecutors in the Mendez Conspiracy directly (just as he had previously approached Prosecutor and Defendant Leslie Brown directly regarding Abid Chaudhry), with

follow-up information related to events first described in emails to Defendant Scalia in 2009.

Despite numerous attempts to once again penetrate the 'blue wall of obstruction' that had

prevented Plaintiff from bringing closure to the families of numerous homicide victims, Plaintiff

was unable to get a response from anyone.

151.  In 2011, after not receiving any response from named Defendants, Plaintiff

subsequently obtained confirmation that a potential terrorist threat affecting Morocco would

likely surface on Easter Sunday in April of 2011.  Plaintiff then began to file Privacy Act

requests in preparation for yet another attempt to provide information regarding this confirmed

terror plot.  Plaintiff filed these Privacy Act requests in an attempt to pinpoint the source of the

obstruction, so as to better understand exactly how the Federal Defendants are able to exert this

much control over so many different entities.  Despite the fact that Plaintiff already has

confirmation that the FBI is maintaining numerous files on Plaintiff full of false information, the

FBI responds to these requests by stating that no such records exist.  Other agencies, including

the DEA, don't even bother to respond for over a year, and when they do finally respond, all they

provide are hundreds of pages of records that are essentially redacted in their entirety.

152.  Plaintiff is informed and believes that each attempt to contact a new individual to

request assistance regarding these unresolved investigations, is met by a response by Federal

Defendants who falsely state that Plaintiff is hallucinating or that he suffers from some mental

disorder, or that they investigated everything Plaintiff told them and confirmed it be a

hallucination since they could not confirm any of it.  Federal Defendants make these disclosures

of false information in violation of the law, and in violations of Plaintiff's Privacy Act Rights,

and in an effort to prevent Plaintiff the ability to disclose this information to any other law

enforcement outside of the United States.

153. Plaintiff, in anticipation that the Federal Defendants would do everything in their power to obstruct his ability to inform upon the imminent terrorist threat affecting Morocco, had decided to renounce his Moroccan citizenship prior to divulging the information related to the Marrakesh terrorist plot. This was done for several reasons, the least of which was to attempt to neutralize the possibly of being unlawfully subjected to treason-related charges in Morocco if he divulged confidential Moroccan state secrets to the American government, whereby the Moroccan government would thereby assert the right to assassinate Plaintiff anywhere in the world in retaliation for his divulging this information. Based upon these considerations, Plaintiff renounced his Moroccan citizenship in an email to a Moroccan consul and former friend of the Plaintiff's father, a Mr. Mohamed Karmoun of the Moroccan Consulate in New York. That same day, Plaintiff travelled to FBI headquarters in Miami to once again attempt to provide all the information he acquired over the past 15 years.

154. By the time Plaintiff again attempted to provide time-sensitive Moroccan terrorism related information to the FBI, he had already acquired the location of Osama Bin Laden and Ayman Al-Zawahiri, as well as obtaining information that individuals claiming to be in possession of possible nuclear blueprints stolen from A.Q. Khan (a nuclear scientist in Pakistan) were also attempting to sell the blueprints on the black market.

155. Plaintiff then travelled to FBI Headquarters in Miami on March 8th, 2011, and attempted to meet with a random agent at the facility to provide his information. Plaintiff, as a result of previous communications with Defendant Scalia whereby he was informed that DEA Agent John Hannah and Defendant Jimmy Arroyo were denying having received the evidence Plaintiff provided the DEA in 2001, was thereby planning to again document his transfer of information to the FBI by recording the interview (which they were already informed he would

56

attempt to do).  Upon arriving at the FBI headquarters in Miami, Plaintiff was thereby stripped of

his cell phone that he was going to utilize to record the conversation, and thereby told that he

could not bring it inside the facility with him.

156.  After Plaintiff was stripped of his recording device and forced to leave it in his car,

Plaintiff then informed the guard at the FBI Headquarters that he wished for the FBI to record

the information he was attempting to provide so that it be documented, which he said they

would.

157.  Plaintiff subsequently met with two unidentified agents, Defendant John Doe 7 and

Defendant John Doe 8, who refused to identify themselves to Plaintiff upon his requesting to see

their credentials.  These Defendants refused to provide their identities and explained their refusal

to do so as warranted by Plaintiff being a potential Al-Qaeda terrorist.  Plaintiff presented the

two unidentified Defendants with documentation indicating the identities of several people he

wished to inform upon, and these two unidentified Defendants were subsequently alerted to the

terrorist threat affecting Morocco.  The two unidentified Defendants were informed that the

threat was time-sensitive, but since Plaintiff was being refused the ability to know who was

receiving the information, Plaintiff was thereby informed that they intended to deny receiving the

information.  In a situation like that, Plaintiff could not provide specific details since he was

deprived of the ability to document the transfer of the information himself in their refusal to

allow Plaintiff his ability to record the conversation.  Plaintiff still provided enough details that

ensured the agents were completely informed that a terrorist plot was imminent and about to be

brought to completion.

158.  Plaintiff also informed Defendant John Doe 7 and Defendant John Doe 8 that the

information Plaintiff sought to provide was sensitive enough that he was essentially forced to

renounce his Moroccan citizenship and "defect" from the Moroccan government just to provide

it. Plaintiff clearly stated that it was necessary to know the identity of anyone that is receiving

this information in case the FBI fails to act upon it and it turns out to be credible, that way

Plaintiff could then identify who received the information so as to be able to again backtrack and

analyze why the information was not investigated.

159. The two unidentified Defendants still refused to provide their identities or state

which agency they represented, and continued to inform Plaintiff that he was not entitled to

know their identities, and additionally informed the Plaintiff that if this was a problem, that

Plaintiff could leave the headquarters and return with his attorney to have a second witness to the

transfer of whatever information Plaintiff sought to provide.

160. Plaintiff informed them that he would not spend money to hire an attorney just to

provide information to the FBI 'on the record,' especially when he could simply give this

information directly to them on the spot, if only Plaintiff could simply be informed who he was

providing this information to. The two unidentified Defendants again refused to identify

themselves for fear that Plaintiff was an Al-Qaeda terrorist, but they subsequently took Plaintiff's

phone number and told him that they would see if they could find someone else willing to reach

out to Plaintiff in a less than anonymous manner. Plaintiff then left the facility not having

accomplished anything, and again sensing that the Federal Defendants were going to attempt to

obstruct his ability to prevent the imminent Marrakesh bombing.

161. Plaintiff subsequently left FBI headquarters and travelled directly to the Sunrise

Police department, which was the local police department in the city where he resided in Fort

Lauderdale, Florida. Plaintiff then made contact with Officer Jose Martin, a police officer with

the Sunrise PD. Plaintiff then informed Defendant Martin that he had attempted to provide

information to the FBI earlier that day, but they were refusing to receive it because they wanted

the ability to deny receiving it if they failed to act upon it and it later proved relevant, or in the

event that it was too provocative to even acknowledge receiving.  Plaintiff then informed

Defendant Martin that the information was terrorism-related an time sensitive, at which point

Defendant Martin remarked that he hoped Plaintiff didn't attempt to provide him with the

information directly, clearly out of fear that he could also be subjected to some unlawful activity

after being informed that such information was too provocative for even the FBI to receive it on

the record.

     162.  Officer Martin promised to contact another individual in the Sunrise Police

Department that was tasked with investigating terrorism related matters, an individual he

identified as Matthew Kroger, and stated that Mr. Kroger would contact the FBI and find out

why they were refusing to receive time-sensitive terrorism-related information from the Plaintiff.

     163.  Defendant Martin provided Plaintiff with a complaint number for Plaintiff to

retrieve a police report documenting Plaintiff's concerns.  Upon information and belief,

Defendant Martin was subsequently directed by Federal Defendants not to write a police report

documenting Plaintiff's concerns, as the Federal Defendants sought to prevent Plaintiff any

ability to document the imminent threat in the event it turned out to be accurate.  Although

Federal Defendants were informing numerous other state officials, and hospital officials, that

they investigated Plaintiff's information and found it not to be credible, the fact is that they had

actually investigated Plaintiff's information and found the exact opposite in that it was entirely

accurate.  This is the very reason why Federal Defendants generally increase surveillance of

Plaintiff at times when he alerts them to having acquired information suggesting imminent

danger.

59

164. Plaintiff, after never receiving a response from Defendant Martin or the Federal Defendants, then proceeded to make a second trip to the Davie Police department to obtain yet a second police report in the event that Defendant Martin would refuse to provide him with the police report he had promised to write, in violation of his rights to equal protections and due process under the law.

165. Plaintiff also attempted to warn the French and British governments by contacting their Embassies and requesting to be interviewed by them, and upon information and belief, they then contacted the Federal Defendants and were again told that Plaintiff suffered from a mental disorder and that they should not bother talking to him as no information he has ever provided has been verified to be accurate.

166. When Plaintiff contacted the British Government, he also notified them that he had acquired a database of their confidential Consulate communications after having infiltrated the Royal family in Morocco, yet they still refused to follow up on this information despite the fact that Plaintiff still has these files. Plaintiff additionally informed them that he had sensitive information related to imminent terrorism affecting Morocco. The unidentified individual at the British Embassy took Plaintiff's contact information and phone number, and notified him that they would contact Plaintiff shortly but never did.

167. Plaintiff is informed or believes that the Federal Defendants, along with the British and Moroccan governments, thereby attempted to force the British Consul into implicating Plaintiff in wrongdoing in having acquired the database of confidential communications. Plaintiff is informed and believes that the British Consul subsequently refused to falsely implicate the Plaintiff, and was eventually forced to resign his position as the Honorary British

Consul of Marrakesh after almost two decades of service to the Crown as a direct result of his refusal to implicate the Plaintiff in criminal activity.

168. After continued obstruction of the Moroccan terrorism-investigation by Federal Defendants, Plaintiff also sent an email directly to the Royal family declaring that a terrorist cease fire affecting Morocco was going to be abandoned by a terrorist organization named A.Q.I.M. on Easter Sunday in April of 2011. The mere mention of security threats affecting Morocco should have immediately provoked Moroccan authorities to make a request of the United States government in an attempt to question Plaintiff regarding the nature of the threat. Plaintiff is informed and believes that the Royal family deliberately refused to interview Plaintiff regarding this threat, because they may have been implicated or somehow involved in possibly creating it. Immediately after Plaintiff sent that email directly to the Royal Family, the email account that Plaintiff emailed was shut down and subsequent emails by Plaintiff to that account were rejected due to the account having been terminated.

169. On Easter Sunday in April of 2011, A.Q.I.M. released a youtube video threatening to attack Morocco, and three days later a tourist café in Marrakesh was bombed at the very location where Plaintiff was informed that they intended to strike, which was the fulfillment of the exact terrorist plot Plaintiff was attempting to prevent. A.Q.I.M. then retracted their statement by attempting to claim that they didn't commit the bombing after already having announced their intention to do so just three days prior.

170. Immediately after the Marrakesh bombing was simply allowed to proceed, Plaintiff was on notice that the remainder of the information he had also acquired, including the location of Osama Bin Laden in Pakistan, was also in danger of being obstructed. Plaintiff then began to focus upon making sure that Osama Bin Laden was captured alive, so as to ensure that the named

Defendants are not successful in continuing to obstruct the proper investigation of the 911 attacks. Plaintiff then began making plans to drive to Washington, D.C. to make visits to various Embassies, and when named Defendants learned of Plaintiff's plans to start driving to Washington, D.C. on May 11th, 2011, named Defendants then rushed to assassinate Osama Bin Laden in Pakistan in order to prevent Plaintiff the ability to effectuate his capture approximately May 12th, 2011.

171. As the result of all these matters, Plaintiff essentially felt that he had confirmed, without any possible alternative explanation, the direct involvement of United States government officials in severe misconduct that likely contributed to, if not directly caused, the 911 attacks. Over the course of 15 years and hundreds of communications with dozens of law enforcement agencies and operatives, it was no longer a statistical probability that the obstruction and other provocative actions being engaged by named Defendants was an isolated incident limited to just one agency or group of law enforcement officials, but the actual consequence of a system designed to fail. Plaintiff therefore subsequently decided one last attempt to force an abandonment of this clearly unlawful conspiracy using the final remaining legal outlet he could think of at that time.

172. On June 30th, 2011, Plaintiff sent every member of the United States Senate an email, which he started off by declaring that "you may feel free to consider this a direct threat upon President Obama's life, or a threat to commit a terrorist attack." After making that direct threat, Plaintiff then commenced to complaining about the actions of the named Defendants, and disclosing classified information related to the intricacies of the criminal conspiracy Plaintiff infiltrated in Morocco, as well as other relevant information.

173.  At first, there was no immediate response to Plaintiff's email threat to kill Obama and perpetrate a terrorist attack in America.  Plaintiff then began to email media organizations complaining that not even a direct threat on the President's life will be investigated by named Defendants as a result of the scandal, and shortly thereafter a group of Federal and State law enforcement entities descended upon Plaintiff's mother's home in Sunrise, Florida, attempting to ascertain the whereabouts of Plaintiff, despite the fact that Plaintiff had already provided all his accurate contact information in the email threat to kill Obama so that they could contact him directly.

174.  After being contacted by Plaintiff's mother, Plaintiff then spoke with Defendant John Doe 14, who claimed he was a Secret Service Special Agent 'McLellun' that wished to interview the Plaintiff regarding his email threat upon Defendant Obama's life. Plaintiff arranged to meet with Defendant McLellun at the Davie Police Department where Plaintiff had made his second attempt to obtain a police report after becoming aware that the Sunrise PD was going to continue to conspire with the Federal Defendants by denying Plaintiff a police report.

175.  In an interview with Defendant McClellan and another unidentified Secret Service Agent at Davie Police Department, Plaintiff subsequently inquired as to why they had failed to prevent the Marrakesh bombing, upon which time Defendant McClellun informed Plaintiff that he had "fulfilled his civic duty" to provide information about the Marrakesh bombing in March, and that he need not concern himself with anything more than that, without explaining why named Defendants did not fulfill their civic duty to prevent the bombing.  Defendant McClellun also stated that "some people in Washington know your really not trying to threaten the President." Although Plaintiff himself knows that the threat was a desperate attempt to provoke or otherwise enforce a legitimate investigation into all these matters, it is still unknown to

Plaintiff how the Defendant McClellun could ascertain that there was no imminent threat to Defendant Obama's life unless he was himself aware of the scandal that provoked the threat to begin with, especially without his ever once attempting to interview Plaintiff about the people he met in Morocco and the remainder of the information he acquired over the past two decades since starting off on this investigation as an Explorer with the DEA.

176. After a subtle argument with Defendant McLellun at Davie Police Headquarters, whereby Plaintiff essentially remained adamant and refused to acknowledge that there was no threat to Defendant Obama's life based upon the continued threat upon Plaintiff's life by named Defendants. Plaintiff was thereby informed by Defendant McClellan that the Federal government was investigating the terrorism-related information contained in the threat email sent to the Senators, and promised that the issues raised by Plaintiff would be investigated, and that the previous government obstruction would be put to an end.

177. The interview at Davie Police Headquarters was thereby terminated, and Plaintiff left the location only to be contacted later that same day Defendant McLellun and asked to again submit to an additional telephone interview, likely based upon the fact that Plaintiff refused to acknowledge that there was no threat to Defendant Obama's life in the previous interview.

178. In this second telephone interview, Defendant McLellun again asked Plaintiff a variety of questions, but every time Plaintiff attempted to steer the conversation back to the information he sought to provide regarding the Marrakesh bombing, expecting the obvious questions such as "who did you meet in Morocco," "what else do you know about aside from the Morocco plot" and other relevant questions, it became clear that Defendant McLellun was only interested upon investigating the threat upon Defendant Obama's life, while at the same time refusing to investigate the second threat in that same email whereby the Plaintiff was also

64

threatening to commit a terrorist attack if he is not debriefed immediately.  No attempt was made to question Plaintiff about anything related to terrorism, or anything related to all the previous issues, including the numerous unsolved murder investigations to which Plaintiff was a witness.

179.  After encountering the very clear and deliberate obstruction in this second interview with Defendant McLellun, Plaintiff again inquired about how long would it take for the FBI to finally come to the table and start to question Plaintiff in order to investigate all these matters, and Defendant McLellun stated that it will take "a long time," as if to say that Plaintiff could never succeed in forcing named Defendants to properly investigate the matters to which Plaintiff was a witness.

180.  After waiting from approximately June of 2011 until September of 2011 for the FBI or any other Federal Defendants to request an interview of Plaintiff regarding these matters, Plaintiff thereby began to draft this Complaint to begin to seek assistance from the Courts in putting this matter to an end.

181.  After filing the original Complaint on September 26th, 2001, Plaintiff subsequently learned that the individual he had solicited with assistance in confirming the whereabouts of Osama Bin Laden, a Mr. Syed Farooq Ahmed, had been assassinated in Pakistan shortly thereafter in 2010.  Plaintiff was initially concerned regarding the disappearance of this individual following his having agreed to investigate the lead for Plaintiff, but had simply assumed that Mr. Ahmed was unable to confirm the information Plaintiff had acquired.  Plaintiff subsequently discovered that Mr. Syed Farooq Ahmed was assassinated in Lahore, Pakistan after having travelled there from Abbotabad, Pakistan, where Plaintiff had dispatched him to investigate the lead.

182. As a result of Plaintiff having confirmed that Mr. Syed Farooq Ahmed was assassinated in Pakistan after he attempted to confirm that Osama Bin Laden was being held under house arrest in Abbotabad, Plaintiff again sent out a mass email to numerous law enforcement individuals and other affiliated persons attempting to highlight the unlawful conduct of the named Defendants.  In response to this mass email, Defendant McLellan once again contacted Plaintiffs family (while refusing to contact the Plaintiff directly) and thereby asked Plaintiff's brother to ask Plaintiff to cease sending out mass emails regarding the matters raised in this Complaint.  Plaintiff thereby informed his brother to inform Defendant McLellun that he would not cease attempting to resolve these matters on his own absent an interview and debriefing by the FBI, where he could provide them will all the information he acquired, at which point Defendant McClellan informed Plaintiff's brother that the FBI would contact Plaintiff immediately to investigate his claims, which they never did.

183. Although Defendant McClellan informed Plaintiff's brother in October of 2011 that the FBI would contact him immediately, Plaintiff has not yet been contacted by the FBI as of the filing of this Third Amended Complaint on August 20th, 2012.

184. In addition to attempting to make contact with the Federal Defendants, Plaintiff also continued to pursue attempts to resolve State investigations related to unsolved homicides, and had again contacted Cold Case detectives with the NYPD, namely Defendant Jim Bruinsma and James Berger of the NYPD's cold case squad.  Despite once again providing these detectives with access to evidence and information regarding several unsolved homicides, they have still refused to respond and are again attempting to assist federal authorities by obstructing homicide investigations in New York, some of which are completely unrelated to terrorism.

185.  Defendants UNITED STATES OF AMERICA, DEPARTMENT OF JUSTICE, DEPARTMENT OF STATE, FEDERAL BUREAU OF INVESTIGATION, PERRY CUOCCI, MATTHEW FOSTER, THOMAS T. RILEY, ROBERT P. JACKSON, DONALD E. GONNEVILLE, JOSE MARTIN, DAVID FORTEZA, AMANDA CURET, DONALD BAILY, JIMMY ARROYO, KEN BRADLEY, JIM BRUINSMA, ANTHONY SCALIA, STEVEN BERGER, SHAMUS SKELLY, SCOTT MCLELLUN, LANNY A. BREUER, MICHAEL REIGLE, JOHN DOES 1-10, and AN UNKNOWN NUMBER OF UNKNOWN EMPLOYEES OF THE US GOVERNMENT, thereby committed actions and omissions in furtherance of a conspiracy to deny Plaintiff his constitutional rights based upon discriminatory and other unlawful motives.

186.  Plaintiff continues to live in fear that the lives of numerous innocent civilians are being endangered by the named Defendants actions, and he is still being forced to endure the mental and physical scars caused by Defendants and each of them.  Plaintiff seek damages for the violation of their rights and injuries, in excess of $75,000, as well as any other declaratory and/or injunctive relief as the Court deems just and proper, as set forth in the prayer below.

## CAUSES OF ACTION

1) CIVIL RIGHTS - 42 U.S.C. §§1983, 1985, 1986; 28 U.S.C. §§1331-1343; BIVENS CLAIM

2) FIRST, FOURTH, FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS

3) NEGLIGENCE, FALSE IMPRISONMENT, MALICIOUS PROSECUTION and other torts.

4) VIOLATION OF THE FEDERAL TORT CLAIMS ACT, 28 U.S.C. 1346(b), 2671 et seq

5) VIOLATION OF THE PRIVACY ACT

187.  Plaintiff incorporates all the above stated paragraphs, and each of them, as though set forth in their entirety herein.

_Violation of Civil Rights - Equal Protections – Violations of Fifth and Fourteenth Amendment_

188. This is a case in which State and Federal Defendants, individually and together, conspired and acted in concert and did violate the constitutional rights of the Plaintiff under the Fifth and Fourteenth Amendments by conspiring to impede, hinder, obstruct and defeat in any manner, the due course of justice with the intent to deny Plaintiff access to due process and equal protection of the laws.

189. Plaintiff had a right, as does any other US citizen of non-Arab ethnicity, to engage personal investigations into unsolved crimes for purposes of solving them. In the event that Plaintiff was able to discover information that the police were not able to obtain on their own, Plaintiff had a right to have this information evaluated by law enforcement for purposes of determining his eligibility to receive financial compensation, including reward money, for his information. Plaintiff also has a right to request that law enforcement evaluate his information for other tangible benefits, such as recognition for his accomplishments should his information result in the resolution of unsolved crimes.

190. Each Defendant named in this Complaint had either refused to investigate information provided by Plaintiff after being contacted directly, or otherwise obstructed investigations where Plaintiff requested their assistance, in an effort to deny Plaintiff his constitutional right to be recognized for his efforts undertaken to solve crimes that law enforcement was itself unable to solve. Named Defendants sought to discriminate against Plaintiff by denying him the recognition he was to receive for solving crimes that they themselves were not smart enough to solve on their own. Named Defendants did this because they did not want an individual of Arab descent to take credit for solving crimes that they themselves were unable to solve.

191.  Prior to the 911 attacks, this conspiracy to obstruct criminal and terrorism investigations in an effort to deny Plaintiff the recognition he would receive for obtaining leads and evidence that law enforcement was unable to obtain, was engaged by Defendants DOJ, BAILY and unidentified employees of Defendant DOJ regarding their attempts to obstruct Plaintiff's efforts to provide information regarding several unsolved homicides, as well as information regarding the abuse of Sheikh Rahman in prison and other events possibly related to terrorism that were witnessed by the Plaintiff.

192.  Following the 911 attacks and before Plaintiff left to Morocco, this obstruction conspiracy expanded to include (in order of appearance) Defendants ARROYO, FBI, CUOCCI, SKELLY, FOSTER, FORTEZA, CURET and other unknown employees of Defendant DOJ, who thereby impeded all the previous investigations and continued to obstruct additional investigations, including the 911 investigation.

193.  After Plaintiff arrived in Morocco, this obstruction conspiracy expanded to include (in order of appearance) Defendants BRADLEY, DOS, BREUER, SCLALIA, JACKSON, RILEY, GONNEVILLE, REIGLE and unidentified employees of Defendant DOJ and/or DOS, who then continued to obstruct all previous investigations, and continued to obstruct additional investigations related to events taking place in Morocco and relating to the Moroccan governments involvement with terrorism, and other relevant investigations.

194.  After Plaintiff's return from Morocco, this obstruction conspiracy expanded to include Defendants MARTIN, BRUINSMA, BERGER, MCCLELLAN and unidentified employees of Defendant DOJ, who additionally acted to obstruct all previous investigations and any additional investigations that may have come about since Plaintiff had contact with these new conspirators.

195.  All these Defendants thereby conspired and acted in concert to deprive Plaintiff access to financial rewards being offered for information that would prevent a terrorist attack or result in the arrest of terrorist leaders such as Osama Bin Laden, as is his right under the Equal Protection Clauses of the US Constitution.

196.  Federal Defendants also engaged in a scheme to deprive Plaintiff of the ability to properly establish his withdrawal from criminal conspiracies he associated with between 1991 and 1996 as a result of having been introduced to involvement with criminals after joining a DEA explorer program, as is his right under the Equal Protection Clauses of the Constitution. Defendants USA, DOJ, FBI, DOS, CUOCCI, FOSTER, RILEY, JACKSON, GONNEVILLE, BAILY, ARROYO, BRADLEY MCCLENLUN, BREUER, REIGLE and unidentified employees of the USA, DOJ and DOS deliberately sought to prevent Plaintiff the ability to disclose to them information he acquired in his own personal investigations for purposes of securing the arrest of terrorists, and they also refused to allow Plaintiff to engage such debriefings which Plaintiff also sought to utilize for purposes of establishing his non-conformance with, or withdrawal from, the criminal conspiracies he penetrated for purposes of disrupting them.

197.  Defendants also violated Plaintiff's Fifth Amendment rights to liberty and property without due process of law by causing him to be incarcerated in a hospital on several occasions since 911 based on false information that they provided hospital staff, information that they knew to be false by virtue of their refusal to allow Plaintiff an opportunity to be debriefed in order to prove the information false.  By denying Plaintiff an opportunity to dispute false information that somehow found itself to be made part of Plaintiff's FBI record, the Federal

70

Defendants deliberately sought to deprive Plaintiff of equal protections under the law that are available to all other citizens of non-Arab descent.

198.   Defendants also violated Plaintiff's Fifth Amendment rights by causing him to lose his job on two different occasions through their deliberate actions, and for causing Plaintiff to be subjected to a malicious prosecution in both Florida in Morocco based upon their acts and omissions that were taken in furtherance of a conspiracy to deny Plaintiff access to law enforcement resources for purposes of resolving terrorism investigations.

*Violation of Civil Rights - Deprivation of Religious Freedoms –Violation of First Amendment*

199.   Defendants additionally conspired to deny Plaintiff the right to be free from being restricted in his right to freely practice his religions.

200.   Plaintiff was denied his First Amendment right to practice his religion freely by being subjected to unlawful surveillance without probable cause.  Prior to Plaintiff's attempts to provide information relevant to the 911 attacks, Plaintiff attended religious services on a regular basis without fear of causing others to be subjected to unlawful surveillance and other forms of retribution at the hands of the Federal Defendants.  The conduct of the Federal Defendants following Plaintiff's attempts to provide information to them after the 911 attacks was so illegal, provocative and heinous that it immediately restrained Plaintiff's ability to participate in communal religious services, as he was being subjected to suspicion of terrorism and vicious threats and reprisals without ever once being afforded the ability to remove himself as a suspect through a proper debriefing by authorities.

201.   As a continued result of authorities' refusal to debrief Plaintiff, he is thereby indefinitely deprived from being able to participate in religious services while residing in the US from September 2001 until the time when he left the US in December of 2006, and again after

their refusal to prevent the Marrakesh Bombing and their attempts to cover up the fact that they were informed about it prior to its occurrence.  Plaintiff is limited in participation in religious services because he is informed that any such attempt to do so, will result in unlawful surveillance being instituted against any mosque that he should happen to attend.

202. Additionally, the Federal Defendants deliberately caused a conflict between the Plaintiff and at least three different foreign governments as a result of their deliberate obstruction of these various investigations.  Named Defendants caused a direct conflict with the Plaintiff and the Moroccan government, resulting in Plaintiff renouncing his Moroccan citizenship and causing a situation where Plaintiff can no longer travel to the Middle East without being threatened by retaliation from the Moroccan government.  Plaintiff was also forced into a conflict with the Saudi Government almost immediately following the 911 attacks, and then forced to remain in conflict with them for years while the conflict continued to get even more disruptive and dangerous to Plaintiff.

203.  Plaintiff cannot even follow his religious obligation to attend the pilgrimage in Saudi Arabia under fear of assassination for conflicts he now has with other governments that the Defendants themselves deliberately provoked.  Plaintiff had refrained from conducting his pilgrimage for over 10 years as a result, but has decided to take the trip this year since he cannot simply wait another 10 years for this case to be resolved and the conspiracy terminated before finally being allowed to perform his religious obligations without fear of retaliation from foreign governments that are deliberately being provoked against Plaintiff as part of this unlawful conspiracy.  Plaintiff is thereby forced to endure the stress of knowing that he is being subjected to a mortal threat by the defendants for no other reason than his desire to perform the pilgrimage to Saudi Arabia.  This is yet another violation of Plaintiff's religious freedoms that is deliberately

manufactured by the Defendants, as it is their intention to cause Defendant harm through the manipulation of other countries, as is clearly evidenced by their attempt to do the same in Morocco.

*Violation of Civil Rights - Illegal Surveillance – Violation of Fourth Amendment*

204.  Plaintiff was denied his Fourth Amendment right to be secure in his person against unreasonable seizures in the form of illegal surveillance instituted against Plaintiff by the Defendants without any probable cause to suggest a crime was committed, and solely because Plaintiff volunteered to provide information related to terrorism, as set forth above.

205.  From the moment Plaintiff attempted to assist with the capture of Osama Bin Laden following the 911 attacks, the Federal Defendants instituted aggressive surveillance against Plaintiff, not for any valid investigative reason, but solely for purposes of attempting to intimidate Plaintiff into abandoning his efforts.  The Federal Defendants never wanted to capture Osama Bin Laden, and they essentially threatened Plaintiff with death just for suggesting it, and then used continuous threats against Plaintiff for many years to continue to deter him from speaking out regarding the deliberate obstruction of the 911 investigation by the Defendants.

206.  Wiretap, In-Home and In-Car Video and Listening Devices were implemented against Plaintiff almost immediately following his attempt to cooperate after the 911 attacks, and these forms of intrusive surveillance have remained a fixture of his life ever since, and without any probably cause to suggest that Plaintiff had committed any crime.

207.  Defendant FBI approved installation of electronic eavesdropping equipment in Plaintiff's apartment, in his cars and his private residential and cellular telephone lines immediately following his attempts to cooperate in the 911 investigation.  Since that time, special agents of the FBI have listened in on every conversation Plaintiff has had while in his

apartment or while using his cellular phones.  In order to initially obtain a court order to

electronically eavesdrop on Plaintiff, and for each subsequent monthly extension of that Title III

order, an FBI special agent was required to swear under oath to a federal district court judge that

there was probable cause for belief that particular communications relevant to ongoing

investigations will be obtained through such interception, 18 U.S.C. § 2518 (3)(b) & (5).

208.  Government agents have been aware since the moment that Plaintiff attempted to

cooperate following the 911 attacks where they refused to respond to his request to be debriefed,

that Plaintiff was clearly aware that the surveillance was occurring, especially since the

Defendants did not even attempt to hide it but had instead made it a point to be flagrant about it.

Therefore, FBI special agents have known since then that there was no reasonable expectation

that any form of surveillance would yield evidence of past or future crimes.  The continuing

surveillance is thus not designed to uncover any evidence in the government's investigation.

Rather, its sole purpose is to harass Plaintiff by invading the most personal and private sphere of

his life.  He cannot speak to his friends or family, or discuss what the government is doing to him

in this "investigation," or share any intimacy with his girlfriend without the constant presence of

the government.

*Violation of Civil Rights - Unlawful imprisonment and excessive bail – Eight Amendment*

209.  Plaintiff was denied his Eighth Amendment right to be free from excessive bail

after being unlawfully imprisoned or otherwise detained by named Defendants, in psychiatric

hospitals and otherwise in New York and Florida where such commitments circumvented the

application of bail or judicial oversight.  Plaintiff was also detained on criminal charges in

Florida by Defendant Curet, in a situation where even though bail was instituted, Plaintiff was

still deprived of any physical means by which to arrange that it be posted by Defendant Curet.

Plaintiff was additionally detained in Morocco using a mechanism that precluded Plaintiff the ability to post bail, while denying Plaintiff the ability to leave Morocco without any judicial oversight and every effort to deny Plaintiff the ability to gain relief for his condition.

210.   Named Defendants engaged in a conspiracy concerning the above stated acts, and caused to be done acts in furtherance of the object of such conspiracy, whereby Plaintiff was both injured in their person and property, and deprived of having and exercising the rights and privileges afforded all citizens of the United States, as well as the basic inalienable rights of all citizens of planet Earth to be entitled to these same rights.

211.   Named Defendants are liable to Plaintiff for damages for his injuries and the deprivation of his rights as prayed for below.

*Violations of Privacy Act, 5 U.S.C. § 552a(b)*

212.   The Privacy Act states:  "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains ...."  5 U.S.C. §552a(b).  None of the exceptions to the disclosure prohibition applies here.

213.   Plaintiff is informed and believes that Defendants FBI, DOJ, DOS, all maintain a "system of records" as defined by the Privacy Act, 5 U.S.C. § 552a(a)(5). This "system of records" includes "records," as defined by 5 U.S.C. § 552a(a)(4), pertaining to Plaintiff.

214.   Defendant FBI, DOJ and DOS, have intentionally and willfully disclosed "records" pertaining  to Plaintiff  from within the "systems of records" to other individuals and/or agencies without Plaintiff's prior written consent or approval, and for purposes of provoking

hospitals, State Law Enforcement and even foreign Governments into acting against Plaintiff to harm him at their behest.

215.    Defendant FBI, DOJ and DOS's intentional, willful, and unauthorized disclosures of records pertaining to Plaintiff, such disclosures also containing deliberate false information, have had an adverse effect on Plaintiff, including causing him to be unlawfully committed to psychiatric institutions, as well as subjecting Plaintiff to malicious prosecutions on false charges both in the United States and Morocco, with future violations all but a certainty should Plaintiff travel to Saudi Arabia as part of any attempt by him to follow his religious obligation to attend the pilgrimage there.  Among other adverse effects, these false and deliberate unlawful disclosures have caused Plaintiff to be terminated from his employment, and have limited Plaintiff's employment opportunities and ability to earn a living, as well as having irreparably damaged his personal and professional reputation after such disclosures were even mass-mailed to the parents of all the students at the school where Plaintiff was once employed in Morocco. These disclosures have caused Plaintiff extreme mental and emotional distress.

216.    Defendants FBI, DOJ and DOS are sued, in their capacity as agencies, for actual damages sustained by Plaintiff, and costs and reasonable legal fees, as provided for in 5 U.S.C. § 552a(g)(4).

*FEDERAL TORT CLAIMS ACT, 28 U.S.C. 1346(b), 2671 et seq.*

217.  At all times relevant to the complaint, all Federal Defendants were employees of the United States, acting in the scope of their employment through their own actions and their directions to employees and agents, under circumstances that would render the United States, if a private person, liable for damages that their actions caused Plaintiff under all applicable State

laws.  The United States and all Federal Defendants are therefore liable to Plaintiff pursuant to 28 U.S.C 1346(b) and 2674 for the misconduct described in this Complaint.

218.  Plaintiff presented the DOJ and DOS with notification of the above-alleged incidents and claims for monetary damages in claims sent to each of these agencies using Standard Form 95 on or about September 26th, 2011.  These agencies failed to make any meaningful response to Plaintiff's claims within six months after they were filed.  After Defendants apparently rerouted Plaintiff's claims because they did not properly understand them, Plaintiff called them twice to try and clarify his claims, and they never responded except but to state that someone would call the Plaintiff back, and no one ever did.

219.  Defendants, through their actions as described above, are liable to Plaintiff for torts such as negligence, fraud, unlawful imprisonment and malicious prosecution, and other injuries sustained as a result of the unlawful conspiracy described herein, under all applicable tort claims that are relevant to their conduct.

PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

FOR ALL CAUSES OF ACTION NAMED IN THE COMPLAINT:

1.  For general damages in a sum according to proof at trial in excess of $75,000;

2.  For special damages in a sum according to proof at trial in excess of $75,000;

3.  For economic damages in a sum according to proof at trial in excess of $75,000;

4.  For consequential damages in a sum according to proof at trial in excess of $75,000;

5.  For attorneys' fees per statute;

6.  For declaratory and injunctive relief, as follows:

    A.  Plaintiff is asking this court to issue a declaration that his rights were violated.

77

B.  Plaintiff is asking this court to issue a declaration that Plaintiff is not obligated to be debriefed by the Federal defendants in order to establish his withdrawal, or non-conformance with, any criminal conspiracies he penetrated from 1991 until today.

C.  Plaintiff is asking the court to issue an injunction against Federal Defendants ordering them to immediately terminate all surveillance being conducted against Plaintiff.

D.  Plaintiff is asking this court to order the Federal Defendants to destroy all surveillance materials acquired against Plaintiff since September of 2001.

Plaintiff declares, under penalty of perjury, that the foregoing is true and correct.

Executed on: August 20th, 2012.

Younes Kabbaj   PRO SE
1844 N Nob Hill Road #222
Plantation, FL 33322
(561)223-9777
jonahkabbaj@gmail.com

78

## CERTIFICATE OF SERVICE

I, Younes Kabbaj, hereby certify that a copy of the foregoing THIRD AMENDED COMPLAINT was mailed to Counsel for Defendant Sunrise Police Department, Defendant NYPD and Defendant USA.


Executed August 20th, 2012


Younes Kabbaj
1844 N Nob Hill Rd #222
Plantation, FL 33322